## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRIENDS OF THE CAPITAL CRESCENT TRAIL:
  c/o Ajay Bhatt, President
  P.O. Box 5803
  Bethesda, MD 20824,             :

JOHN MACKNIGHT FITZGERALD,  :
  4502 Elm Street
  Chevy Chase, MD 20815,       :

CHRISTINE REAL de AZUA,      :
  4502 Elm Street
  Chevy Chase, MD 20815,       :

        Plaintiffs,         :

     v.                  :

FEDERAL TRANSIT ADMINISTRATION  :
  c/o K. Jane Williams, Acting Administrator
  Office of the Administrator
  1200 New Jersey Ave., S.E.
  Washington, D.C.  20590,      :

DEPARTMENT OF TRANSPORTATION  :
  Elaine L. Chao, U.S. Secretary
  1200 New Jersey Ave., S.E.
  Washington, D.C.  20590,      :

MARYLAND DEPARTMENT OF
TRANSPORTATION
  Pete K. Rahn, Secretary of Transportation
  7201 Corporate Center Drive
  Hanover, MD 21076,         :

        Defendants.       :

Case: 1:17–cv–01811
Assigned To : Leon, Richard J.
Assign. Date : 9/5/2017
Description: TRO/Preliminary Injunction

**: COMPLAINT FOR INJUNCTIVE**
**: AND DECLARATORY RELIEF**

RECEIVED

SEP - 5 2017

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Plaintiffs, Friends of the Capital Crescent Trail, John MacKnight Fitzgerald, and Christine Real de Azua, by and through undersigned counsel, sue defendants and state as follows:

## NATURE OF THE ACTION

1.     Plaintiffs seek relief from violations of federal law by Defendants in connection with the decision to approve federal assistance for construction of a light rail transit system in Montgomery and Prince George's Counties, Maryland, known as "the Purple Line Project" or "Project". A Full Funding Grant Agreement (FFGA) for the Project has been agreed to by the Secretary of Transportation (Secretary), the Federal Transit Administration (FTA) and Maryland State Department of Transportation and its Transit Administration (MTA), but without completing the required National Environmental Policy Act (NEPA) assessment process and without having met the additional criteria specified in the Federal-Aid Highway Act (FHA). The Secretary has not taken a hard look at adverse environmental impacts of the Project that have been brought to her attention by Plaintiffs via petition and otherwise, in violation of NEPA. She has proceeded in violation of the FHA, which requires a completed NEPA process as a prerequisite for an FFGA. And apart from the matters addressed by this Court in prior litigation between the same parties, Plaintiffs presented the federal Defendants additional new information sufficient to trigger an Supplemental Environmental Impact Statement (SEIS) in its own right. Most recently, since the closure of the prior case, the FFGA approved and agreed to by Defendants is in violation of the substantive criteria of FHA and in violation of the Administrative Procedure Act (APA), in that (a) the criteria for an FFGA have not been met and indeed are unattainable at present, and (b) the affirmative protections in the FHA for specified resources such as parks have been breached. For all of these reasons, Defendants' actions are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, within the meaning of §706(2) of the APA. Defendants also

unlawfully withheld and delayed actions required by law within the meaning of §706(1) of the APA. Accordingly, Plaintiffs seek to have the Purple Line Federal Record of Decision (ROD) and FFGA set aside.

## JURISDICTION

**2.**     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## PARTIES AND STANDING

**3.**     Plaintiff, Friends of the Capital Crescent Trail is a 501(c)(3) non-profit organization dedicated to preserving parkland, open space, and quality of life in Montgomery County, Maryland. Friends of the Capital Crescent Trail is an environmentally conscious group that advocates for transportation solutions that do not sacrifice invaluable regional resources such as the Capital Crescent Trail (CCT). This case is brought on behalf of Friends of the Capital Crescent Trail and its Board members and supporters (hereinafter collectively "FCCT"). FCCT uses the CCT on a regular basis. They enjoy walking, running, biking, and observing wildlife in this unique setting – a serene, natural refuge just twenty minutes outside Washington, D.C. For example, Ajay Bhatt, FCCT's president, as do some other members of the FCCT, lives directly adjacent to the section of the CCT (known as the "Georgetown Branch Trail") that will be most affected by the Project and uses that Trail daily, taking walks with his dog and young son, and observing wildlife. FCCT has participated extensively in the public process of federal agency decisions concerning the Project, submitting comments on the Draft EIS (under the organization's former names the "Greater Bethesda-Chevy Chase Coalition" and "Save the Trail") and Final EIS, along with a petition with over 5,000 signatures of the organization's supporters who oppose the current configuration of the Project.

4.     As proposed, the Project will harm the interests of FCCT in preserving the ecological integrity and tranquil, natural character of the CCT.  As proposed, the Purple Line will entirely change the nature of the CCT, adversely impacting the FCCT's experience on it and causing it and its members aesthetic injury.  The Purple Line would close the Georgetown Branch of the CCT or large parts of it for as many as four to five years and eventually displace the current CCT's Georgetown Branch and replace it with an impervious concrete surface walled in and inaccessible except at very distant intervals, leaving riders trapped against high volume noise every few minutes.  In conjunction with the commercial development projected to occur as a result of the Purple Line's construction, this will strip the scenery surrounding the Georgetown Branch of its current natural beauty. The clamor of the Project's construction and the resulting frequently running trains will shatter the tranquility the FCCT and its members enjoy in this natural haven and will deprive students in adjacent communities of safe and timely access to their schools and of the necessary quiet in the classrooms. In addition, the destruction of the tree canopy along the CCT will harm FCCT's interest in observing its diverse wildlife.  Furthermore, Defendants' acts and omissions harm FCCT by depriving it of an evaluation of these concerns, as well as the opportunity to submit comments that could influence federal agency decisions about the Project.

5.     A court order vacating the Record of Decision (ROD) underlying Defendants' approval of the Purple Line and the Full Funding Grant Agreement supporting it, and/or enjoining irreparable harm that would otherwise occur will protect FCCT's interests in the conservation and continued use and enjoyment of the CCT in its current state.  Requiring Defendants to prepare and make public an SEIS would also provide FCCT with crucial information concerning the potential environmental ramifications of the Project as currently planned and would afford FCCT the

opportunity to participate in Defendants' decision-making process by submitting comments on important environmental and other issues that have been ignored or inadequately addressed to date.

6.     Plaintiff Christine Real de Azua is a self-employed energy and environment consultant.  She has a B.A. from Swarthmore College and an interdisciplinary degree in Political Science, Economics, and Communications from the Institut d'Etudes Politiques in Paris, France. Previously she directed the Accounting for the Environment Project and worked for over ten years at the American Wind Energy Association.  Her work focuses on sustainability, biodiversity, and the accurate valuation of the natural environment and its ecosystem services.  Ms. Real de Azua has also directed the Urban Forest Project, a project of the Society for Conservation Biology.  The Urban Forest Project aimed to find better ways to value and protect urban and suburban forests – like those surrounding the Capital Crescent and Georgetown Branch Trails – with an emphasis on how the loss of mature tree canopy and other productive natural green space in urban areas undermines the sustainability of the environment.

7.     Ms. Real de Azua has lived in Chevy Chase, Maryland since 1991, during which time she has been a regular user of the Capital Crescent and Georgetown Branch Trails and enjoys biking and walking in the Rock Creek Parks.  She is now Treasurer of FCCT.  She uses the Trails several times a week, and has a recreational, aesthetic, and professional interest in the Trails as a whole.  In tandem with her professional focus, Ms. Real de Azua enjoys knowing that this trail supports public health, bird and other wildlife habitat, and pedestrian and cyclist community connectivity.  Ms. Real de Azua is also a public transit user, using the Metro system for trips in the area and downtown but having experienced some of Metro's electrical fires and other failures hampering timely and safe access to downtown DC and the Washington Metropolitan Area Transit Authority (WMATA) service area for work meetings, airport access, and other purposes.

**8.**     As proposed, the Project will seriously impair Ms. Real de Azua's aesthetic, recreational, and occupational interests in the urban and suburban forests along the CCT, including her interest in various species that inhabit the Trails, in biodiversity, in maintaining a healthy mature tree canopy, and in a healthy Caquelon Run watershed.  As proposed, the Project would also impair her ability to use a properly capitalized, maintained, and safely operating WMATA and regional transportation system.

**9.**     A court order vacating the ROD underlying Defendants' approval of the Purple Line and/or enjoining irreparable harm to the environment, including harm to the CCT, will protect Ms. Real de Azua's environmental, aesthetic, recreational, and professional interests in the CCT and the surrounding area and watersheds likely to be adversely impacted by the Project.

**10.**    Plaintiff John Fitzgerald is a semi-retired public interest attorney and consultant. He is has served as Vice President of the Board of Directors of Green America and is a member of the Board of the Environmental Investigation Agency, a not-for-profit organization based in Washington, D.C. and the United Kingdom. Mr. Fitzgerald's clients have included the Endangered Species Coalition and the Society for Conservation Biology.  His current work focuses on environmental conservation.  Mr. Fitzgerald worked for Defenders of Wildlife for ten years in various positions, including Director of Wildlife Law and General Counsel, where his work focused on biodiversity, endangered species, and wildlife in general.

**11.**    From early in the year 2000 to September 2002 at the US Agency for International Development ("USAID"), Mr. Fitzgerald was the primary author of reviews by USAID of Environmental Impact Assessments of projects proposed by the World Bank and other multilateral development banks.  He represented USAID in the interagency review process that helped to

6

determine whether the U.S. could vote for such projects, and which projects would be included in reports to Congress and to the public concerning proposals likely to have significant effects upon the environment and indigenous peoples.  From early 2007 to mid-2013, Mr. Fitzgerald was the Policy Director of the Society for Conservation Biology.

12.    Mr. Fitzgerald has lived in Chevy Chase, Maryland since 1999, during which time he has been a frequent user of the Capital Crescent Trail and its Georgetown Branch and enjoys biking and walking in the Rock Creek National and Regional Parks.  When working in downtown Washington D.C., Mr. Fitzgerald used the CCT from time to time for commuting.  He currently uses the CCT once or twice a week and has a practical transportation and recreational and aesthetic interest in both parts of the CCT.  Mr. Fitzgerald enjoys biking and strolling on these Trails while looking for and viewing bird and other wildlife species in the mature tree canopy.

13.    Mr. Fitzgerald also uses the WMATA Metrorail frequently and occasionally its buses as well as other elements of the region's public transit network. He has been subjected to smoke from the trains within the stations and delays caused by malfunctions.  The project will impair Mr. Fitzgerald's ability to use and rely on the WMATA system by competing for and by definition reducing funds and/or raising the price and scarcity of the personnel, management, and material needed to repair. operate and maintain that system and the region's transportation network as a whole.

14.    The Project will permanently impair Mr. Fitzgerald's practical, professional, aesthetic and recreational link to the forests along the Capital Crescent and Georgetown Branch Trails.  Mr. Fitzgerald's use of the Trails will be adversely impacted by degradation of the environment associated with the Trails and their surrounding area and watersheds.

15.     Mr. Fitzgerald and Ms. Real de Azua are also residents of the Town of Chevy Chase ("Town"), which filed extensive comments on the Project's Draft and Final EIS's for the benefit of all residents of the Town, comments, which complemented those filed by the FCCT.

16.     A court order vacating the Project's ROD and/or enjoining irreparable harm to the area and persons affected will protect Mr. Fitzgerald's environmental, aesthetic, and recreational interests in the Capital Crescent and Georgetown Branch Trails.

17.     Defendant K. Jane Williams, Acting Administrator of the Federal Transit Administration ("FTA"), is an agency within the Department of Transportation ("DOT"), and as such is responsible for issuing the federal approvals at issue here.

18.     Defendant Chao is the U.S. Secretary of DOT and therefore ultimately responsible for the FFGA decision at issue here.

19.     Defendant Rahn is the Secretary of Transportation for the Maryland Department of Transportation, and as such is responsible for the State of Maryland's role in seeking the federal approvals at issue here.

## STATUTORY AND REGULATORY FRAMEWORK

### A. Federal-Aid Highway Act (FHA)

20.     The FHA, 23 U.S.C. §§ 101 *et seq.*, and 49 U.S.C. §5309, was enacted to fulfill the national interest in the construction of federal-aid highway and transit systems. Under the statute, "the National Highway System" consists of the highway routes and connections to transportation facilities that "serve national population centers...public transportation facilities and other intermodal transportation facilities . . ." 23 U.S.C. §103(b). It provides for federal assistance to states in constructing components of the national system. *Id.* §104 and §106(b). The statute is administered with respect to transit programs by the Administrator of the FTA. Under the FHA,

"each State transportation department shall submit to the Secretary for approval such plans, specifications, and estimates for each proposed project as the Secretary may require." *Id.* §106(a)(1).

21.    The statute further provides that it is declared national policy "that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites." *Id.*   §138(a).   This Section, in subparagraphs 138(b) and 138(c), further directs the Secretary to take strong measures to avoid harming parks or areas that function like parks, such as refuges.  23 U.S.C. §138 is more commonly known as Section 4(f) of the FHA.

22.    The FHA, in 49 U.S.C. § 5309, establishes the criteria for applications for New Start Fixed Guideway Capital Investment Grants, i.e., the kind of FFGA approved for the Project. This statute provides that concurrent with the required NEPA analysis, each applicant shall develop sufficient information to enable the Secretary to make findings of project justification and local financial commitment.  *Id.* § 5309 (d)(1)(B) & (2)(A).

23.    Section 5309 also sets out individually rated criteria including environmental benefits, congestion relief, cost per rider, economic development effects associated with the project, policies and land use patterns of the project that support public transportation, and the project's cost-effectiveness as measured by cost per rider. §§5309(k)(2)(B) and (d)(2)(A)(iii).

24.    In making the determination that the Project is justified based on the criteria of subparagraph (d)(2)(A)(iii), the Secretary must "evaluate, analyze and consider the reliability of the forecasting methods used to estimate costs and utilization made by the recipient and the contractors." §5309(g)(2)(B)(i).

25.     The statute requires that in rating a project under this paragraph, the Secretary shall provide individual ratings for each of the criteria established under subsection (d)(2)(A)(iii) and give comparable, but not necessarily equal, numerical weight to each of the criteria ... in calculating the overall project rating. §5309(g)(2)(B)(ii).

26.     Section 5309 (d)(2)(A) also sets out mandatory threshold findings, including a demonstration of stable and dependable local financial sources. *Id.*  § 5309 (d)(2)(A)(iv). This subsection incorporates the resource requirements of §5309(f)(1), which requires the Secretary to make certain findings about the regional transportation network before the Secretary can consider signing an FFGA. These include subparagraph (f)(1)(C) which provides that the Secretary shall require that "local resources are available to recapitalize, maintain, and operate the overall existing and proposed public transportation system, including essential feeder bus and other services necessary to achieve the projected ridership levels *without requiring a reduction in existing public transportation services or level of service to operate the project*."   49 U.S.C. § 5309(f)(1)(C) (emphasis added).

27.     Under §5903(d)(2)(A), in conjunction with §5903(k)(2)(B), the Secretary must complete the NEPA process in order to inform her decisions on compliance with the criteria for an FFGA. FTA feeds the results of its NEPA analysis into the cost/benefit decision it makes under Section 5309(k), as prescribed in 49 C.F.R. §611.203(a).

28.     The duty of FTA to complete an EIS, to review and respond to comments on it and supplement that EIS as necessary, arises under NEPA §102 and also under FHA's §5309 and §4(f), as set forth above, and must be completed before the FTA decides to offer matching funds for any transit project.

29.     The FHA further provides that "[t]he Secretary shall consider new information received after the close of a comment period if the information satisfies the requirements for a supplemental environmental impact statement" pursuant to FTA regulations.   23 U.S.C. §139(l)(2).   Those regulations provide that "[a]n EIS shall be supplemented whenever the Administration determines that...new information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS." 23 C.F.R. §770.130.

**B.  The National Environmental Policy Act**

30.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. §1500.1. Section 101 (42 U.S.C. §4331) states that "it is the continuing responsibility of the Federal Government to use all practicable means...to the end that the Nation may...(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings...." It was enacted to "help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment," and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* §§1500.1(b) & (c).

31.     To accomplish these objectives, NEPA requires all agencies of the federal government to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This statement, known as an Environmental Impact Statement ("EIS"), must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) "alternatives to the proposed action," and (4) "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it

be implemented." 42 U.S.C. §4332.  NEPA's implementing regulations define "environmental effects" to include the "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" aspects of a decision, "whether direct, indirect or cumulative."  40 C.F.R. §1508.8. "Direct effects" are those "caused by the action and occur at the same time and place." "Indirect effects" may include "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." *Id.* "'Cumulative impact' is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts can, result from individually minor but collectively significant actions taking place over a period of time." (40 C.F.R. §1508.7).  Further CEQ guidance is published on their website in the Document "Considering Cumulative Effects: Under the National Policy Act", dated January 1997.

**32.**    In the EIS, the agency taking the proposed action must "rigorously explore and objectively evaluate" the effect of each alternative on the "human environment," which is defined as "the natural and physical environment and the relationship of people with that environment." *Id.* §1508.14.  Federal agencies applying NEPA now have reliable and accepted processes for evaluating and assessing ecosystem services, such as the stormwater retention, carbon sequestration and cooling effects of trees.  In the case of the Purple Line, economic valuation of environmental impacts of the proposed action and alternatives can be identified and credibly assessed. Hence, an ecosystem services valuation analysis is required for compliance with NEPA.

*Id.* §1502.6 (Interdisciplinary preparation), §1502.23 (Cost-benefit analysis), §1508.8 (Effects to include "the functioning of affected ecosystems").

33.     CEQ regulations require that "if a cost benefit analysis relevant to the choice of environmentally different alternatives is being considered for the proposed action it shall be incorporated by reference or appended to the statement as an aid in evaluating the environmental consequences. To assess the adequacy of compliance with §102(2)(B) of the Act the statement shall, when a cost benefit analysis is prepared, discuss the relationship between the analysis and any analyses of unquantified environmental impacts, values and amenities." *Id.* §1502.23. The entire process of applying for FTA subsidies is anchored in the applicant agency's presentation of transit cost and benefits of transit options.

34.     Agencies must also make "diligent efforts to involve the public in preparing and implementing their NEPA procedures," including providing public notice and soliciting public comment. *Id.* §1506.6. Further, agencies "must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken," because "[a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. §1500.1(b).

35.     At the time of its decision to take a proposed action, the agency must prepare a concise public record of decision ("ROD") that identifies all reasonable alternatives and states "whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." *Id.* §1505.2. The alternative selected is known as the "Preferred Alternative."

**36.**    Commitments by the agency or its partners made in the ROD to mitigate harms are binding.  40 C.F.R. §1505.2 provides that "A monitoring and enforcement program shall be adopted and summarized where applicable for any mitigation. Id., §1505.2(c).

**37.**    NEPA's implementing regulations provide that if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts," the agency "[s]hall prepare" a supplement to its draft or final EIS.  40 C.F.R. § 1502.9(c)(1)(ii).

**38.**    Although a project generally can proceed after a ROD is in place, once a project is changed or deviates from its description in the FEIS and the ROD so as to have a significant impact on the human environment that differs from that which was described in the FEIS or ROD, or significant changes in the project's circumstances require a Supplemental EIS, the NEPA process is no longer complete until such an SEIS assessing the changes is completed. NEPA's implementing regulations provide that the lead federal agency in such cases shall inform any non-federal entity participating in the project that they may not take any action that would have an adverse environmental impact or limit the choice of reasonable alternatives until the NEPA process is completed.  40 C.F.R. §1506.1.

**39.**    The Department of Transportation and its agencies have additional specific duties under NEPA and in particular as it is used to inform decisions under the Federal-Aid Highway Act, by virtue of DOT's Order 5610.1C and Attachments 1 and 2 thereto.

**FACTS GIVING RISE TO PLAINTIFFS' CLAIMS FOR RELIEF**

<u>Overview</u>

**40.**    The Project is a major transportation infrastructure project that is not a part of, nor administered by, the Washington Metropolitan Transit Authority (WMTA).  It is a project of the

14

MTA, Montgomery County, Prince George's County and as proposed after the FEIS was published, a private consortium that was to be selected to design, build, and operate the Project. The Project is to consist of a 16.2-mile east-west, above-ground double track rail system traversing parks, streams, forested areas and other open spaces between the Bethesda Metrorail station in Montgomery County and the New Carrollton Metrorail/MARC/Amtrak station in Prince George's County.   It is to include a concrete, walled replacement bicycle and hiking trail with a limited number of entrances and no canopy or shade trees overhead to replace the current shaded cinder-covered path between Bethesda and Silver Spring.   The Purple Line "Preferred Alternative," as adopted in the ROD for the Project, includes two sets of train tracks, their overhead power lines and adjacent power stations and almost a mile of new culverts, as well as the replacement trail, for a combined width, varying from 66 to 100 feet covering and extending many yards beyond what is now an average of 12 to 16 feet.   The Project would divert water from the area, and traverse parks, streams, forested areas and other open spaces, and in particular, would impact Rock Creek National and regional Parks where it would cross Rock Creek in Montgomery County. The waterways it would cross also include Sligo Creek Parkway, Long Branch Creek, Northwest Branch Creek and Northeast Branch Creek, which are all tributaries of the Anacostia River. Along the CCT, which it would replace, the Project includes a new, moved, deforested and paved and walled trail.

**41.**   According to the FTA, the purpose of the Project is to "[p]rovide faster, more direct and more reliable east-west transit service connecting the major activities in the Purple Line corridor at Bethesda, Silver Spring, Takoma/Langley Park, College Park, and New Carrollton; [p]rovide better connections to Metrorail services located in the corridor; and "[i]mprove

connectivity to the communities in the corridor located between the Metrorail lines." ROD (March 2014) at 3.

42.    On October 17, 2008, the FTA and the MTA made available for public comment the Project's Draft EIS.  Four years later, the FTA had not issued a final EIS.  In August 2012, MTA prepared a purported reevaluation of the Project, but both the MTA and FTA determined at that time, based largely on the assumption that neither the Project nor available alternatives had changed, that neither a supplemental Draft EIS nor a continuing comparison of reasonable and prudent alternatives was required.

43.    On August 28, 2013, FTA and MTA made available to the public a Final EIS (FEIS) and provided the public with a sixty-day comment period.  In March 2014 the FTA adopted a Record of Decision adopting the FEIS and preparing the way for the Secretary to consider an FFGA.

44.    Based on a record last supplemented with a supplemental complaint in early 2016, this Court ordered that FTA and MTA must undertake an SEIS.  Defendants' appeal of the order for preparation of an SEIS is pending, but it has not been stayed, remanded or altered by any court.  That same pending appeal also includes cross-appeal claims by Plaintiffs of this Court's dismissal of certain NEPA-based claims.  This complaint does not repeat or rely upon evidence supporting any of Plaintiffs' claims dismissed by this Court in the previous litigation between the parties. The NEPA claims made herein arise from new information and changes in the project and its circumstances whereas the FHA claims, which were previously deemed unripe for review until an FFGA was signed, are based on the entire record supporting determinations under the FHA.

45.    In early February 2017, Secretary Chao ordered the suspension of certain funds to WMATA in response to the failure of Maryland, Virginia and the District of Columbia to provide

WMATA the resources – both financial, governance, management and actual material in place - that the FTA and former Secretary Foxx had demanded to ensure a safe and reliable system. That suspension remains in effect.

46.     On March 2, 2017, Plaintiffs sent to Secretary Chao an APA petition that presented recent evidence that the Project fails to meet the requirements of §5309(f)(1)(C) and that a new and broader SEIS to assess changes in the Project and circumstances is required by law. (March Petition). Plaintiffs requested that the Secretary determine that the Project does not qualify for an FFGA or that she initiate a new EIS or an SEIS, to consider, *inter alia*, detailed new information (attached to the March Petition) about the project and about changed circumstances seriously affecting both the economic and environmental impacts of the Project and the alternatives analysis required by the combination of NEPA and the FHA. Plaintiffs stated that a failure to do so within 15 working days would be deemed a denial. They received no substantive response to their letter before the Project's FFGA was agreed to.

47.     On Monday, August 28, 2017, Secretary Chao announced the signing of the FFGA for the Project and the "groundbreaking" for the Purple Line.

48.     On August 29, 2017 residents of the affected areas received a notice from the FTA/MTA's Private Partner in the Project that the entire Georgetown Branch of the Capital Crescent Trail would be closed for "four to five years" starting on September 5, 2017. The notice also said that tree clearing and construction seven days a week could occur as soon as all permits were obtained.

49.     The ROD lists mitigation commitments from the MTA that include: "MTA will work with Montgomery County to designate, communicate, and sign detour routes for the Interim Capital Crescent Trail throughout project construction. MTA will also minimize the time of the

trail closure." ROD, page 2 of "Attachment A Commitments and Mitigation Measures", Mitigation ID & Reference: TR02 FEIS Ch. 3.4 Construction or Long- term Issue: Construction—Detours.

50.     The abrupt and complete closure announcement prompted immediate letters from officials, including Roger Berliner, the President of the Montgomery County Council, to Defendant Rahn quoting the promise in the ROD to work with the County to minimize closures of the Trail.

**The Regional Transportation Network's Resource Deficiency**

51.     The March Petition presented new evidence that those in charge of the existing regional transportation network have acknowledged in budget reports, confirmed by the Metropolitan Council of Governments, that they lack now, and will lack for the next ten years, the financial (a $15.3 to 25 billion short fall), technical, material, management and governance resources to repair, recapitalize and maintain its former and planned levels of safe, reliable Metrorail service.

52.     The March Petition included, *inter alia*, the following evidence:

**a.**     Permanent or long-term reductions in service that have taken place over the past year and one half in bus and Metrorail service and the additional reduction and/or elimination of three dozen bus routes by WMATA. These reductions include the very route that the Purple Line is supposed to serve (the J4 east-west route).  They are taking place to set and maintain a reduced schedule of Metrorail service.

**b.**     The Maryland Office of Legislative Services has determined that Maryland's DOT failed to comply with the directions of the Joint Chairs of its Committees of Jurisdiction in calculating the assets of the State's Transportation Trust Fund and thus is expected to have $1.7 billion less than previously projected.

c.      WMATA has requested an additional $50 Million per County (Montgomery and Prince George's) on top of the increases already agreed to in WMATA's budget for the coming year, neither of which was in place when the Project FEIS and ROD were completed.

d.      WMATA is continuing its practice of diverting tens of millions of dollars of its federally provided capital funds intended for repairs and long-term maintenance to be used instead for daily operations to help make up for a $125 million revenue shortfall for the current fiscal year and anticipated $290 million shortfall for the next fiscal year -- a practice the FTA has repeatedly warned WMATA not to do.  According to a December 2016 FTA report, current repairs and upgrades that are not being diverted are placing additional stress on the aging system and the demands on it.  For example, introducing eight-car trains to serve more passengers taxes the current electrical wiring beyond its capacity and triggers more problems such as power shutdowns and the need for another iteration of repairs and investment.

e.      In further confirmation of the long-term, seemingly intractable problems with Metrorail, a Washington Post article of August 30, 2017, entitled "Internal reviews of Metro turn up modified reports, inadequate staffing," reported that "an internal review of every aspect of Metro operations...conducted in June and July" documented "the ill-effects of structural problems within the agency" such as the Railroad Operations Control Center being chronically understaffed, and that the FTA said full staffing of the ROCC "remains one of FTA's top concerns." The reports revealed that this problem often causes technicians to be "concerned for their own safety" as the "ROCC cannot be trusted" in the words of one supervisor, to reliably slow down the trains "in the presence of track workers or inspectors ..."to prevent a tragedy." The reports also show that inspectors and mechanics aren't necessarily qualified for the positions they hold and that trainees aren't being given the

expertise they need.  The reports also found that "in an effort to save money and increase the number of parts available for train repairs on short notice, Metro workers have been salvaging parts from now-retired 1000- and 4000-series rail cars without ensuring they are cleaned and inspected and properly labeled "to ensure that their remaining useful life" is known.

        **f.**      Maryland has made clear it would use the regional commuter "MARC" train's  fare revenue to pay Purple Line debt, thus depleting a key component of the regional transit system, one that reaches West Virginia as well as Baltimore, key corridors in Maryland and Washington, DC.  In Montgomery County, MDOT has diverted federal TIGER funds that had been obtained to install signaling and other improvements to reduce bus travel times on University Blvd, and Viers Mill Rd., and instead used those funds to plug cost overruns for the Langley Transit Center, a transit center that would be one of the Purple Line stops - thus depriving transit users along the same route of some of the mobility improvements they would have had today.

**New Analysis Revealing Inflated Ridership Projections**

       **53.**     New information about and analyses of direct costs and exaggerated ridership has been produced in declarations and published by several experts in transportation and economics, who question the Metropolitan Region's ability to absorb those costs and repair and maintain the existing transportation network. This analysis expands dramatically, in its findings and examples cited, upon previous experts' statements to the effect that the results of the ridership projections far exceed any reasonable expectations and the known ridership of similar systems in the United States.  Included among these recent reports are those by Dr. Frank Lysy, former senior economist at the World Bank Group, who has detailed the basis for his conclusion that the ridership and thus

revenue and cost-benefit projections for the Purple Line are too high and the cost projections too low.

54.     In a January 2017 declaration, Dr. Lysy pointed out, among other things, that "[t]he forecast ridership figures have varied widely. The average daily boardings for the year 2030 forecast by MTA have ranged from 47,000 in 2007 to 62,600 in the AA/DEIS (October 2008) to 64,538 in the FEIS (August 2013) to 69,000 now. They have also increased over time even though operating hours were cut significantly from what was initially planned, and train frequency during peak hours was cut by 25%. Such reductions in operating service, Dr. Lysy inferred, would be expected to reduce, not increase, ridership. Yet the MTA ridership forecasts rose steadily over time, with no explanation and no public assessment as part of the EIS process.

55.     In a July 2017 analysis comparing tables published in the Technical Appendix to the FEIS with the publicly posted Project ratings, Dr. Lysy revealed a number of remarkable, impossible conclusions reached by the Defendants in their earlier assessment of these data.  He concluded that the ridership on the Purple Line alone between many of the geographic zones analyzed was reported in the FEIS to be higher than the ridership between those same pairs of zones on all forms of public transit - which includes ridership by bus, by Metrorail, plus by the Purple Line itself, i.e., a mathematical impossibility.

56.     Included in Dr. Lysy's revelations are the FTA/MTA estimate that about 19,000 riders would arrive in Bethesda on the Purple Line each day but only roughly 10,000 would leave Bethesda on it each day.  He showed that "the calculated minutes of "user benefits" (primarily time savings) for travelers resulting from the Purple Line being built were in some cases impossibly high, and on average also high. In one case, the level of user benefits per trip was forecast to be 691 minutes (11.5 hours) and in another case 582 minutes (9.7 hours). Dr. Lysy explained that this

extreme figure cannot be - as one could walk faster -- and that these were not just typos in the tables, but rather errors that passed through in the calculated value of the overall user benefits, and made a significant difference in the ratings and findings.

57.     Dr. Lysy noted that the data indicated that 19,800 Purple Line riders would travel to Bethesda each day, while only 10,210 would leave, implying that the population of Bethesda would be growing by roughly 9,600 people per day.  He explained that the mistake made here was a confusion between ridership presented in a production/attraction format with ridership in an origin/destination format. He concluded that due to this mistake, the report stated that ridership on the peak segment of the line would be up to 21,400 riders per day, and that correcting this would lead to a far lower peak ridership load. He further explained the materiality of these errors in the selection of public transit alternatives:  the light rail line was justified by the argument that only a rail line would be able to carry the high number of riders forecast on the peak segments. But with the true peak segment load far less, the case for building an expensive rail line is significantly reduced in comparison to available alternatives.

58.     Dr. Lysy further showed that the exaggerated ridership estimates drive most of the rating categories and that the financial commitment component of the ratings fails entirely to take into account the newly recognized need for massive increases in funding for WMATA from Maryland and/or its two Counties, which in either case cuts funding available for the region's transportation network, including bridges and roads rated very low in safety by professional engineering associations, compared to those of other states and regions.

59.     The Purple Line light rail option would be more costly than similar extent rail systems in the U.S. At $2.4 billion in capital costs alone for a 16-mile route, the cost per mile is $150 million.  This is far higher than the costs per mile seen for four systems that MTA itself

identified as comparable in the EIS process ($45 million per mile for a line in Denver, $54 million in Phoenix, $87 million in Minneapolis-St. Paul, and $128 million in Seattle where a 1.3 mile tunnel is required under downtown). The cost estimates have continued to increase every year and have doubled since the last assessment of alternatives.

**The Project Offers No Net Congestion Relief**

60.     Defendants have projected in the FEIS that more than two out of every three Purple Line riders would already be a transit user. The Project, even by its own official projections, would therefore not create or serve many new transit riders. The Project would not take many cars off the road, and the MTA in response to comments included in the FEIS stated that the Project is not designed to address congestion.

61.     The February 2017 Montgomery County Mobility Assessment Report confirms that the existing highway network has in effect declined in the service that it provides due to increased congestion and slower traffic since the 2014 assessment (and the previous one), primarily on north-south commuter routes which account for all of the top ten most congested roadways in the County. That amounts to a decrease in transportation service provided by the roadway portion of the region's transportation network just as much as a reduction in bus or train schedules or transit speeds. This decline is further compounded by Metrorail's own declining service, which causes more people to drive.

**The Project Would Cause Disproportionate Economic
Harm to Environmental Justice Communities**

62.     The Final EIS reported that 69 percent of the Purple Line corridor is located within Environmental Justice areas. Prince George's County, and the Purpose Line route there in particular, is the home of many "Environmental Justice Communities." New information and analysis presented initially in an APA petition by civil rights attorney and development and

transportation blogger, Bradley Heard, and incorporated by Plaintiffs in their March Petition, demonstrates that according to official reports of WMATA and Prince George's County, the Project will disperse and dilute much needed economic development from the areas near existing Metrorail stations in such a way as to deny to those areas the critical mass required to create the levels of sustainable employment and investment planned. These impacts would also be felt largely by the many Environmental Justice Communities in that County. The Heard Petition explains that the Purple Line will create too many transit centers, depleting many existing stations of the economic growth planned for them.  This in turn would also deplete the existing transit lines and systems of the funds, population density and ridership needed to sustain them in Prince George's County.

63.    Plaintiffs also advised in their March Petition that the Secretary's own Office of Civil Rights had in January 2017 begun an investigation of the possible systematic violation of the Civil Rights Act by the Maryland Transportation Department and that that investigation should be allowed to consider the Bradley Heard petition, and in turn be allowed to inform the Secretary's decision as to whether to conduct a broader SEIS or to complete an FFGA.

64.    The EIS process failed to consider the possibility there was an excessive number of transit centers or hubs in Prince George's County and that the addition of the Purple Line was likely to undercut the planned growth at the previously existing Metrorail stops in particular and undercut the combination of existing Metro-bus and Metrorail transit.

65.    Reallocating or reprogramming the Project's FFGA Funding and other funds and loans devoted to it to the more pressing regional transportation network needs could more effectively address the real transportation and development needs of minority and middle and low

income communities in Maryland, and do so with far less harm of the type caused when environmental justice concerns are not properly taken into account.

**Newly Disclosed Environmental Harms and Risks**

66.     On June 8, 2017, Plaintiffs filed and provided to Defendants a series of new declarations which together demonstrated newly disclosed harms and risks that would cause irreparable harm to Plaintiffs if the Project were allowed to proceed without addressing these concerns (the June Submission).

**New Evidence of Improper Handling of Unassessed Hazardous Materials**

67.     The June Submission included a June 8, 2017 declaration of John Bickerman, a former Member of the Town of Chevy Chase Town Council and an experienced environmental lawyer. He detailed the Project's adverse impacts, and hazardous substance and safety risks on users of the CCT, students attending Bethesda-Chevy Chase High School, and other residents of Montgomery County. On hazardous substances, Mr. Bickerman noted that DOT and MTA, as documented in the EIS, did an extremely poor job of characterizing the hazardous substances that may be present on the CCT, which is an abandoned railroad line, the bed of which is invariably a source of hazardous substances.

68.     Heavy metals, petroleum products, coal ash, creosote from railroad ties and polynuclear aromatic hydrocarbons ("PAH's") have long been associated with railroad beds. Indeed, federal law requires railroads to submit an environmental report to the federal Surface Transportation Board prior to abandonment. Railroads are required to address and resolve environmental issues prior to abandonment. Remarkably, the EIS makes little mention of any of the hazardous substances that are commonly found in abandoned rail beds. No mention of environmental reports filed with the Surface Transportation Board was included in the EIS.

69.     More recently, during the planning and pre-construction stage of the Purple Line, the MTA's contractor took numerous soil borings along the CCT. The results of these soil borings have never been made public. However, soil from these borings were indiscriminately shoveled onto or near the property of Town residents. MTA informed the Town Manager that MTA's crews would continue to spread such material on the CCT's.

**New Analysis Shows Harm to Students and Teachers**
**Subjected to Repeated Peak Levels of Intermittent Noise**

70.     The June Submission includes a study conducted in February 2017 demonstrating that Project construction and operation may have significant adverse noise impacts on schools that are in close proximity to the Project route, including an elementary school that is only 65 feet away, as set forth in the expert Declaration of Donald W. MacGlashan of June 7, 2017.

**New, Unassessed Harm to Historic Sites**

71.     Among the multiple permits, exemptions and variances the Project is now seeking from County and State regulations that were not described in the EIS process, is the moving of the historic original post office and general store of Bethesda, along with a waiver of noise regulations for round-the-clock destruction of the Apex Building where the store was located until recently. The general store was cut in half and moved in late August in order to expedite the building of the Purple Line Station in Bethesda.

72.     This Project-necessitated action adversely affects the historic context and integrity of the general store.  That building, now cut in half, has been moved several blocks from its historic site.

**New Unassessed Changes in the Project Harm Parks, Watersheds and Wildlife**

73.     Maryland Secretary of Transportation Rahn has asserted in a recent letter to the Town that the MTA and private contractors have made progress improving formerly deficient on-

site stormwater controls, but the MTA and contractors have not released their current or latest complete Stormwater Management Report to show how and why this is so. Thus, the comments filed by Plaintiffs and the Town on behalf of all Town citizens have not yet been assessed or answered and the issue remains as the Project has changed since the FEIS.

74.    In another recent development, the Project now requires a new, previously unassessed, permit application for a massive "appropriation" and redirection of waters of the United States that was never assessed or disclosed in the EIS process. It has only recently become known to local residents and office holders that the "Purple Line Transit Constructors" applied on August 3, 2016 for a permit from the Maryland Department of the Environment to appropriate and redirect as many as 30-40,000 gallons of underground spring water per day for a lengthy period in order to make possible the construction of the Bethesda Purple Line Station. Neither the diversion nor the permit for it, were listed in the FEIS nor was the impact of such a major withdrawal and diversion assessed. The only anticipated permit of a similar withdrawal of water mentioned in the FEIS was for a diversion to build the only tunnel discussed in the FEIS, which was for Silver Spring.

75.    It is as yet unknown which of the Bethesda area watersheds will be most affected by this withdrawal and diversion, and to what extent it may affect Elm Street Park, one block away, and amphipod species downstream that are protected by State and Federal law. Furthermore, since the permit was applied for, it has become evident that more water -- 50,000 gallons a day on average, and up to 100,000 gallons a day in peak months – than originally estimated would be redirected for a period of four years. This is all in order to lower the water table to what appears to be the depth of nearly two stories underground for elevator construction to serve what would be the deeply buried Bethesda Metro Station's South Entrance and Purple Line Station passageways.

If successful, the lowered water table would be almost certain to starve Elm Street Park of the ground water needed to keep its many trees alive.

76.     The spring that is the source of the water appears to be the headwaters of a stream, Caquelon Run, whose valley hosts a species listed as endangered by Maryland, proposed for listing this year as endangered by the US Fish and Wildlife Service, (the Kenk's amphipod), just hundreds of yards above the habitat of another state endangered amphipod (Sextarius) and also not far upstream of the District of Columbia's official amphipod, the federally endangered Hay's amphipod.

77.     The June Submission also included the June 6, 2017 declaration of Dr. Albert Manville, the former lead migratory bird biologist with the U.S. Fish and Wildlife Service. He discussed new evidence and declarations confirming protected barred owl use of forest areas, that Project has slated for destruction.

78.     On August 29, 2017, the public was notified that the CCT would close on September 5, 2017, for 4-5 years for tree cutting and Project construction. The FEIS did not assess the impact of the CCT closure and rerouting,  even though the ROD committed the MTA to work with the County to minimize the closures of the CCT.   The CCT is to be re-routed out of the safe tunnel under Wisconsin Avenue to a ramp down into the area of Elm Street Park now used daily by toddlers from day care centers. This will significantly change park usage and pose risks of collision at high speeds with bicycles. This change alters the plan set forth in the FEIS to maintain and provide a safe tunnel passage for cyclists and pedestrians. From Elm Street Park, the commuter bike traffic would be further diverted across Wisconsin Avenue, one of the busiest commuter routes in the County, and then down narrow streets in downtown Bethesda, posing further risks of collision with trucks, bicycles and pedestrians.

**79.** The March Petition explained that revolutionary changes in transportation technology over the past decade outdate the 2008 Alternatives Analysis and Draft EIS. As Plaintiffs explained, the recession of late 2008 ushered in a new mind-set and an array of technologies, led by the private sector, for sharing cars. This in turn has caused the automobile, hi-tech, and transportation industries generally to develop entirely new offerings. These include shared transport in single cars and small buses along with the communication technologies to maximize the efficiency with which they are dispatched and allocated. Since the March Petition, innovations have continued unabated.

**80.** There are also many new transportation innovations and technologies likely to greatly reduce the cost and increase the efficiency of bus service, even before the Purple Line would begin its 30+ years of operation.

**81.** In comments submitted to the Army Corps of Engineers on the Section 404 Clean Water Permit being sought by MTA, Plaintiffs pointed out that Parsons Brinkerhoff, the same firm the designed the Project and managed the EIS process, has decided not to apprise the Secretary or the other Defendants of new technology that could save much of the forest cover now about to be destroyed. This technology is currently being offered to Aspen Colorado, for a light rail system powered by batteries recharged at each station rather than by catenary wires overhead. This obviates the clearing of trees the limbs and leaves of which would interfere with the wires.

## VIOLATIONS OF LAW

### I. VIOLATIONS OF THE APA AND THE FHA

**82.** Plaintiffs incorporate in this Count, as if stated herein in full, the allegations set forth in paragraphs 1 – 82 of this complaint.

83.    In the prior litigation between the parties over the Project, this Court did not address violations of the FHA that were deemed to be not ripe for adjudication until the signing of the FFGA. That signing occurred after the prior litigation in this Court was completed, making FHA-based claims ripe for adjudication.

84.    This complaint presents significant new information about changes in the Project or its circumstances that was not before this Court and could not reasonably be before this Court, in its previous consideration of the Project's compliance with NEPA.

85.    On August 28, 2017, the Secretary acted in violation of 49 U.S.C. §5309 and has acted beyond her statutory authority, by signing an FFGA before completing the NEPA process.The NEPA process is not complete by virtue, at the very least, of the outstanding, unstayed order of this Court, to conduct an SEIS as expeditiously as possible.  Moreover, in the prior litigation, both Defendants and the State of Maryland unequivocally represented to this Court that no FFGA could be signed until *after* the NEPA is "complete." *See* ECF No. 61 in Civ. No. 14-1471, at 13 (argument by Defendants in support of their summary judgment motion that section 5309 "specifically requires those findings to be made *after* the NEPA process is complete") (emphasis in original); ECF No. 62 in Civ. No. 14-1471, at 13 (argument by Maryland in support its motion for summary judgment that "In fact, the statute requires those [section 5309] findings to be made *after* the NEPA process is completed.") (emphasis in original). This Court adopted that position in holding that Plaintiffs' section 5309 challenges were, at that juncture, "not ripe for adjudication." ECF No. 149 in Civ. No. 14-1471, at 13, holding that "[s]ection 5309 and its implementing regulations both clearly presume that the FTA will have the benefit of *all* NEPA analyses before making [section 5309] findings, which indicates that *all NEPA analysis must be completely before, not concurrently with, [section] 5309 findings.*" *Id.* (*emphasis added*).

Therefore, given Defendants' past representations to the Court, on which the Court expressly relied in holding that section 5309 findings (and hence the signing of a FFGA based on such findings) could not be made until after all NEPA analysis is complete, and given the fact that by virtue of this Court's extant order for preparation of an SEIS NEPA analysis cannot be deemed complete, the FFGA must be vacated as unlawful and remanded to prevent any harmful actions consistent with Defendants and Maryland's own interpretation of section 5309 and this Court adoption of that interpretation, pending final adjudication of the additional claims . **This alone is a sufficient basis on which to grant Plaintiffs' request for relief.**

86.     The FFGA approved by the Secretary violates 49 USC §5309(f)(1)(C) and the APA in that it is arbitrary, capricious or contrary to law in finding that "(C) local resources are available to recapitalize, maintain, and operate the overall existing and proposed public transportation system, including essential feeder bus and other services necessary to achieve the projected ridership levels without requiring a reduction in existing public transportation services or level of service to operate the project." The finding is inconsistent with actions of officials, including the Executive Director and Chairman of WMATA, in cutting bus and rail services and asking for between .5 and 1.5 to 2.5 Billion dollars a year more, (depending on which statement is correct ), in funding than is currently available for the next ten years in order to restore safe, reliable services to Metrorail, especially since there is no   reasonable expectation -- let alone present availability - - of the other kinds of necessary resources – i.e., technical, governance, skilled labor, management and fully functioning cars and other material equipment at an affordable price.

87.     The Secretary's continuing in place the suspension of a percentage of funds to the region's transit agencies in response to their governments' failure to provide the resources -- both financial, governance, management and actual material in place -- to ensure a safe and reliable

system is further proof of this lack of resources in and for the region's public transportation network. Such suspension eviscerates the legitimacy of any finding by the Secretary under 49 U.S.C. §5309 (f)(1)(C).

88.    Defendants also acted in an arbitrary, capricious manner not in compliance or accordance with the law in the application of their own regulations to the Project under the criteria in 49 U.S.C. §5309(d)(2)(A)(iii), and in applying the requirement that these criteria be rated and ranked with comparable weight in making the §5309 findings supporting the FFGA.

89.    The harm to the historic building described above and to Elm Street Park and potentially other parks likely to result from the withdrawal and diversion of vast amounts of water from their normal groundwater and spring-fed sources are both direct violations of Section 4(f) of the Highway Act 23 U.S.C. § 138), which requires at the very least a careful consultative process to avoid harming such places if there is any practicable alternative.

90.    FHA require that the Secretary carefully evaluate the methods used for projecting use, or ridership, of the proposed system, before agreeing to an FFGA. In this instance, that effort has been exposed by a series of expert sworn statements and analyses to reveal layer after layer of arbitrary numbers from the outset and the adoption of ridership projections without any subsequent reasoned explanation addressing those expert critiques. Such willful disregard of competent, material evidence is an arbitrary and capricious action in violation of the FHA and the APA.

91.    The Secretary's additional findings that the Project is justified based on the specific costs and benefits required by the FHA to be ranked and rated are not based on an objective and rational "comprehensive review" of any reasonable evidence of record. As noted above, these factors are: the Project's mobility improvements, the Project's environmental benefits, congestion relief associated with the Project, economic development effects associated with the Project,

policies and land use patterns of the Project that support public transportation, and the Project's cost-effectiveness as measured by cost per rider.  As described above, these standards have not been met, and certainly not with a comparable weight assigned to each when compared with any of the alternatives assessed in the AA/DEIS, all of which were far more cost-effective and far less environmentally destructive, as compared to the Project.

## II.   VIOLATIONS OF THE APA AND NEPA

92.   In addition to the previously Court-ordered SEIS, the new information and fundamentally changed circumstances that Plaintiffs have detailed above compel Defendants to conduct a new EIS or additional Supplemental EIS, and to direct their private and state partners not to alter the environment or limit their choice of alternatives until that process is complete.

93.   Defendants have failed to supplement their NEPA assessments for the Project to properly and accurately evaluate the Project and complete their NEPA duties in light of new information and developments never previously addressed by Defendants or considered by this Court, as set forth above.   Given the continuing and substantial changes in circumstances alleged that fundamentally alter the relative benefits and costs and environmental impacts of the Project and reasonable alternatives to it, and given the Defendants' failure to complete a new or Supplemental EIS, the defendants have violated NEPA, Section 102 and the regulations implementing it, 40 C.F.R. §1502.9(c)(1)(i), and abused their discretion, and acted arbitrarily, capriciously, and not in accordance with law within the meaning of the APA, 5 U.S.C. § 706(2). They have also withheld agency action required by law and unreasonably delayed such action, within the meaning of the APA, 5 U.S.C. § 706(1).

94.   Given the significant new circumstances of available transportation options and economics and the very significant new information concerning the likely actual ridership and

costs of the project and alternatives to it that are relevant to a broad range of environmental concerns and have a bearing upon the Project and alternatives to it, due to the fact that the information was either unknown or improperly assessed to a grave degree as described above, Defendants' refusal to undertake a new or supplemental EIS violates NEPA, Section 102 and the regulations implementing it, 40 C.F.R. §1502.9(c)(1)(ii). Defendants have abused their discretion, and acted arbitrarily, capriciously, and not in accordance with law within the meaning of the APA, 5 U.S.C. § 706(2). They have also withheld agency action required by law and unreasonably delayed such action, within the meaning of the APA, 5 U.S.C. § 706(1).

95.     The declarations of Dr. Lysy, Donald MacGlashan and others in the June Submission that were not considered by the Court in disposing of the prior litigation between the parties, as well as the information provided in the March Petition, constitute "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" within the meaning of the relevant NEPA regulations, 40 C.F.R. § 1502.9(c)(1)(ii). By failing to prepare a Supplemental EIS after receiving Plaintiffs' March Petition and failing to make that information available for public scrutiny in a Supplemental EIS, Defendants have violated NEPA and its implementing regulations to the extent that Project-caused impacts upon, or "uses" of, parks or park-like areas, and historic buildings and sites. Defendants have acted arbitrarily, capriciously, and not in accordance with law, and have also abused their discretion within the meaning of the APA, 5 U.S.C. § 706(2). They have also withheld agency action required by law and unreasonably delayed such action, within the meaning of the APA, 5 U.S.C. § 706(1).

96.     Even if the FEIS were deemed adequate at the time it was promulgated and even if Defendants' prior rationales for not supplementing the FEIS were deemed valid, given the

fundamental changes in the Project identified above since that time, and other inadequacies raised by the Plaintiffs, the FTA has improperly refused to meet its obligation to conduct and complete a supplemental EIS at the least, to correct these deficiencies and as noted above, to take the requisite "hard look" at the potential impacts of the Project in its changed form and changed context.

97.   Defendants have failed to explain accurately in the FEIS how the now changed circumstances and nature of the Project will comply with the Clean Water Act, the Migratory Bird Treaty Act and other laws, in part because of the entirely avoidable impacts on streams and wetlands.   Additional information and changed circumstances have arisen that require Defendants to revisit compliance with bedrock environmental laws. A new NEPA analysis must examine not only the previously unconsidered significant impact on local water resources outlined above, but, also how the Purple Line will comply with Section 404 of the Clean Water Act and the laws pertaining to the handling and disposal of hazardous materials. Explaining how Defendants intend to comply with the substantive standards of other laws helps other agency staff, the public and the ultimate decisionmakers to understand the impact of the Project as a whole.   Instead, MTA and FTA for the most part has continued to merely assert that it will comply with a list of laws without any serious explanation as to how. More recently, the MTA has told the Town, its Mayor, and others that the MTA is unable to control the actions of its contractors such as closing the entire trail for 4-5 years instead of minimizing its closure, as promised in the ROD.

98.   The planned extended closure of the CCT violates the mitigation commitments Defendants made in the ROD and therefore violates the regulations implementing NEPA, which provide that "[m]itigation [] and other conditions established in the environmental impact statement or during its review and committed to as part of the decision shall be implemented by the lead agency or other appropriate agencies." 40 C.F.R. § 1505.3.  Defendants have failed to

abide by their duty under the regulations to "[i]nclude appropriate conditions in grants, permits or other approvals," and to "[c]ondition funding on mitigation" required by the ROD, *id.*, and have therefore acted in a manner that is arbitrary, capricious, and not in accordance with law in violation of APA § 706(2), and that entails unlawfully withheld agency action in violation of APA. § 706(1).

99.    Defendants' violations of NEPA and the FHA injure Plaintiffs in the manner described in Paragraphs 3-16 above.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Declare that Defendants have violated Sections 101 and 102 of NEPA, 49 U.S.C. § 5309, 23 U.S.C. §138, and Sections 706(1) and (2) of the APA, 5 U.S.C. §§ 706(1), 706(2);

2.    Declare that the Purple Line Project may not go forward unless and until Defendants comply with all of the relevant provisions of NEPA, the FHA, and the APA as cited in paragraph (1);

3.    Set aside the Full Funding Grant Agreement and § 5309 findings underlying it, as well as the ROD, as invalid and contrary to law, as required by the judicial review provisions of the APA;

4.    Enjoin or restrain Defendants from proceeding with irreversible aspects or actions posing irreparable harm in furtherance of the Project, including the cutting of trees, the moving of potentially contaminated sites or soils, including soils under the Georgetown Branch of the CCT, or emitting noises greater than 85 decibels, and the closing of the CCT or parts of it, or depriving pedestrians and cyclists safe and reasonable access to points north and south of the CCT, unless and until they have fully complied with all of the requirements of NEPA and the FHA;

5.    Award Plaintiffs their reasonable attorneys' and other litigation costs in this action

pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412(d), with regard to the APA, NEPA

and FHA claims; and

6.    Grant Plaintiffs such other and further relief that the Court may deem is just and

proper.

Pursuant to 28 U.S.C. § 1746, I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____

John M. Fitzgerald
Date: _____

Respectfully submitted,

**KNOPF & BROWN**

September 1, 2017

_____
David W. Brown, D.C. Bar No. 415429
401 E. Jefferson Street, Ste. 206
Rockville, MD  20850
brown@knopf-brown.com
(301) 545-6100

_____
John M. Fitzgerald, D.C. Bar No. 32209
Attorney and Advocate
4502 Elm Street
Chevy Chase, MD 20815
greenknights.law@gmail.com
(301) 913-5409

**Attorneys for Plaintiffs**

5.      Award Plaintiffs their reasonable attorneys' and other litigation costs in this action pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412(d), with regard to the APA, NEPA and FHA claims; and

6.      Grant Plaintiffs such other and further relief that the Court may deem is just and proper.

Pursuant to 28 U.S.C. § 1746, I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

John M. Fitzgerald
Date: _____ 9/11/17

Respectfully submitted,

**KNOPF & BROWN**

September 1, 2017

David W. Brown, D.C. Bar No. 415429
401 E. Jefferson Street, Ste. 206
Rockville, MD  20850
brown@knopf-brown.com
(301) 545-6100

John M. Fitzgerald, D.C. Bar No. 32209
Attorney and Advocate
4502 Elm Street
Chevy Chase, MD 20815
greenknights.law@gmail.com
(301) 913-5409

**Attorneys for Plaintiffs**

37