# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

FRIENDS OF THE CAPITAL CRESCENT TRAIL:
  c/o Ajay Bhatt, President
  P.O. Box 5803
  Bethesda, MD 20824,

JOHN MACKNIGHT FITZGERALD,
  4502 Elm Street
  Chevy Chase, MD 20815,

CHRISTINE REAL de AZUA,
  4502 Elm Street
  Chevy Chase, MD 20815,

               Plaintiffs,

      v.

FEDERAL TRANSIT ADMINISTRATION
  c/o K. Jane Williams, Acting Administrator
  Office of the Administrator
  1200 New Jersey Ave., S.E.
  Washington, D.C.  20590,

DEPARTMENT OF TRANSPORTATION
  Elaine L. Chao, U.S. Secretary
  1200 New Jersey Ave., S.E.
  Washington, D.C.  20590,

MARYLAND DEPARTMENT OF
TRANSPORTATION
  Pete K. Rahn, Secretary of Transportation
  7201 Corporate Center Drive
  Hanover, MD 21076,

              Defendants.

Case: 1:17–cv–01811
Assigned To : Leon, Richard J.
Assign. Date : 9/5/2017
Description: TRO/Preliminary Injunction

**MOTION FOR TEMPORARY
RESTRAINING ORDER**

## MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiffs, Friends of the Capital Crescent Trail, John MacKnight Fitzgerald, and Christine Real de Azua, by and through undersigned counsel, move the Court (pursuant to Fed.R.Civ.P. 65(b) and LCvR 65.1, for a temporary restraining order ("TRO") to prevent imminent irreparable harm until plaintiffs' forthcoming motion for a preliminary injunction can be heard. The motion is supported by plaintiffs' verified complaint and the attached memorandum of points and authorities. A proposed order granting the TRO is also enclosed. Upon grant of the motion, plaintiffs will file a motion for preliminary injunction and supporting papers at the direction of the Court.

As explained more fully in Plaintiffs' accompanying memorandum, this motion for a TRO is necessary because it is Plaintiffs' understanding that Defendants and those acting in coordination with them, intend to begin cutting down trees and otherwise irreparably destroying a portion of the Capital Crescent Trail in order to construct the Purple Line light rail project. In this motion, Plaintiffs simply seek to maintain the status quo until the Court has an opportunity to consider Plaintiffs' motion for a preliminary injunction, which Plaintiffs will brief on whatever schedule the Court deems appropriate. As set forth in the accompanying memorandum, the circumstances here clearly warrant issuance of a TRO.

## LCvR65.1 Certification

Pursuant to LCvR 65.1, undersigned counsel certifies that he served a copy of all the pleadings and papers filed in the action to date or to be presented to the Court on the TRO application, on counsel for defendants electronically on September 5, 2017. Such service included notice that undersigned counsel would apply for the TRO at 9:00 a.m. September 5, 2017 unless Defendants were willing to defer work on the Trail to accommodate the Court's consideration of

this matter. Defendants' counsel are known to the undersigned by virtue of prior litigation in this

Court between the parties.

Respectfully submitted,

**KNOPF & BROWN**

September 5, 2017

_David W. Brown_

David W. Brown, D.C. Bar No. 415429
401 E. Jefferson Street, Ste. 206
Rockville, MD  20850
brown@knopf-brown.com
(301) 545-6100

_John M. Fitzgerald_

John M. Fitzgerald, D.C. Bar No. 32209
Attorney and Advocate
4502 Elm Street
Chevy Chase, MD 20815
greenknights.law@gmail.com
(301) 913-5409

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that this 5th day of September 2017, a Motion for Temporary Restraining Order, Memorandum of Points and Authorities in Support of Motion for a Temporary Restraining Order, and Proposed Order, on the Defendants, FEDERAL TRANSIT ADMINISTRATION, c/o K. Jane Williams, Acting Administrator, Office of the Administrator, 1200 New Jersey Ave., S.E., Washington, D.C.20590, DEPARTMENT OF TRANSPORTATION, Elaine L. Chao, U.S. Secretary, 1200 New Jersey Ave., S.E., Washington, D.C.  20590, and MARYLAND DEPARTMENT OF TRANSPORTATION, Pete K. Rahn, Secretary of Transportation, 7201 Corporate Center Drive, Hanover, MD 21076 to their attorneys of record

Counsel for Department of Justice ("DOJ") and Federal Transit Authority ("FTA"):

Kevin W McArdle, Esq.
U.S. Department of Justice
Kevin.mcardle@usdoj.gov

Jeremy Hessler, Esq.
U.S. Department of Justice
Jeremy.hessler@usdoj.gov

Tyler Burgess, Esq.
U.S. Department of Justice
Tyler.burgess@usdoj.gov

Counsel for Maryland Transit Administration (MTA):

Linda E. Strozyk (DeVuono), Esq.
Assistant Attorney General
ldevuono@sha.state.md.us

Albert M. Ferlo, Esq.
Perkins Coie LLP
aferlo@perkinscoie.com

David W. Brown

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRIENDS OF THE CAPITAL CRESCENT TRAIL:
  c/o Ajay Bhatt, President              :
  P.O. Box 5803
  Bethesda, MD 20824,               :

 

JOHN MACKNIGHT FITZGERALD,
  4502 Elm Street
  Chevy Chase, MD 20815,

CHRISTINE REAL de AZUA,        :
  4502 Elm Street                 :
  Chevy Chase, MD 20815,       :

            Plaintiffs,      :

       v.                 :

FEDERAL TRANSIT ADMINISTRATION  :
  c/o K. Jane Williams, Acting Administrator :
  Office of the Administrator
  1200 New Jersey Ave., S.E.       :
  Washington, D.C.  20590,      :

DEPARTMENT OF TRANSPORTATION   :
  Elaine L. Chao, U.S. Secretary     :
  1200 New Jersey Ave., S.E.       :
  Washington, D.C.  20590,      :

MARYLAND DEPARTMENT OF     :
TRANSPORTATION             :
  Pete K. Rahn, Secretary of Transportation :
  7201 Corporate Center Drive     :
  Hanover, MD 21076,         :
                       :

          Defendants.     :

Case: 1:17−cv−01811
Assigned To : Leon, Richard J.
Assign. Date : 9/5/2017
Description: TRO/Preliminary Injunction

: **MEMORANDUM OF POINTS**
: **AND AUTHORITIES IN**
: **SUPPORT OF MOTION FOR**
: **A TEMPORARY**
: **RESTRAINING ORDER**

1

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF
## MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiffs, Friends of the Capital Crescent Trail, John MacKnight Fitzgerald, and Christine Real de Azua, by and through undersigned counsel, submit this Memorandum to demonstrate their entitlement, factually and legally, to a temporary restraining order ("TRO") to prevent actual, certain and imminent irreparable harm until such time as a motion for a preliminary injunction can be adjudicated.

## FACTS

By this action, plaintiffs seek injunctive and declaratory relief from violations of federal law that have now led to a $900 million grant for construction of a light-rail project in Maryland known as the Purple Line ("the Project"). Plaintiffs include two residents of Chevy Chase, Maryland who live close to and are frequent users of the Capital Crescent Trail (CCT"), over which much of the Project is to be routed. The third plaintiff is Friends of the Capital Crescent Trail, a 501(c)(3) non-profit organization devoted to preserving parkland and open space in Montgomery County and especially the CCT. Complaint ¶¶13-16. Defendants include the federal and state agencies most directly involved in the funding and construction of the Project: the Federal Transit Administration ("FTA"), the U.S. Department of Transportation ("DOT"), and the Maryland Department of Transportation.

Prior Project-related litigation between the parties in this Court has been completed at the District Court level, with an appeal and cross-appeal pending in the Court of Appeals for the District of Columbia Circuit.[1] That case dealt with a number of issues concerning

---

[1] *Friends of the Capital Crescent Trail, et al. v. FTA, et al.*, Civil No. 14-01471-RJL (D.D.C.), *appeal pending*, No. 17-5132, Sept. Term 2016 (D.C. Cir.).

the lawfulness of the Project under various federal environmental laws, including the National Environmental Policy Act ("NEPA"), based on a factual record current through early 2016. This case raises new issues under federal law not adjudicated in the prior case, issues based upon facts that post-date those involved in the prior case.

More specifically, the new Complaint, verified by Plaintiff John Fitzgerald, alleges multiple violations of (a) the Administrative Procedure Act, 5 U.S.C. §§706(1), (2) (the "APA") in conjunction with violations of the Federal-Aid Highway Act, 49 U.S.C. §5309 and 23 U.S.C. §138 (the "FHA"), Complaint ¶¶82-91; and (b) the APA in conjunction with violations of NEPA Section 102. Complaint ¶¶82, 92-98.  The Complaint further alleges (a) with respect to the FHA claims, that FHA violations were deemed unripe in the prior litigation between the parties and thus not addressed on the merits; Complaint ¶83; and (b) with respect to the NEPA claims, that the Complaint "presents significant new information about changes in the Project or its circumstances that was not before this Court and could not reasonably be before this Court, in its previous consideration of the Project's compliance with NEPA." *Id.* ¶84.

In seeking a preliminary injunction, plaintiffs intend to discuss the "likelihood of success" requirement with a comprehensive assessment of all the alleged FHA and NEPA claims. For TRO purposes, however, plaintiffs limit the factual and legal discussions to two FHA claims – violations of 49 U.S.C. §5309f)(1)(C) and 49 U.S.C. §5309(k)(2)(B), and one NEPA claim -- violation of 40 C.F.R. §1505.2, the duty to develop and enforce a monitoring and mitigation plan for any mitigation commitments made in the ROD, including here, the commitment to work with the County to minimize any closures of the Trail.

**Violation of 49 U.S.C. §5309(f)(1)(C)**

The FHA is clear in requiring the Secretary of Transportation, as a condition precedent to awarding a Full Funding Grant Agreement ("FFGA") for a new light-rail transit project for any metropolitan area, to make certain findings regarding the **existing** public transportation system. Specifically, 49 U.S.C. §5309(f)(1)(C) requires her to find that "local resources are available to recapitalize, maintain and operate the overall **existing** and proposed public transportation system," and she is to include in her findings that "essential feeder bus and other services necessary to achieve the projected ridership levels" will be available "without requiring a reduction in existing public transportation services or level of service to operate the project." Such a finding has presumably been made in this case. Secretary Chao announced on August 28, 2017 the signing of the FFGA for the Project. Complaint ¶47.

Applying this requirement to the Purple Line, the Secretary must find that local resources are currently available to maintain and operate WMATA busses and Metrorail and to recapitalize them before she can agree to fund a new light-rail project in this metropolitan area. This finding requirement reflects a federal policy that federal funds should not be awarded to jurisdictions that cannot demonstrate an existing "track record" of financial stability of the public transportation system they currently have in place.

Plaintiffs have as of today not seen the exact findings the Secretary made on this in conjunction with the FFGA just recently agreed to, because Defendants have refused to provide them in response to Plaintiffs' request, but they are the subject of a pending

Freedom of Information Act request.[2] But however they may be worded, the notion that "local resources" are in place to "recapitalize, maintain and operate" the existing WMATA system is not only arbitrary and capricious, but almost farcical. As stated in the verified Complaint, WMATA has recently reduced existing bus and rail services and asked for billions of dollars of additional funding over the next ten years to restore safe, reliable service to Metrorail. Complaint ¶86. The Secretary's FFGA finding is also inconsistent with her own actions in suspending a percentage of existing federal funding to WMATA for local governments' failure to provide those resources. Complaint ¶87. Nor is this dated information. **Exhibit 1** is an article from the first page of the *Washington Post* Metro Section of September 3, 2017, detailing the current lack of agreement among Maryland, Virginia and the District of Columbia elected officials regarding Metro funding. The *Post's* Senior Regional Correspondent Robert McCartney summed up the situation thusly:

> Contrary to the public display of goodwill for the media after a closed-door meeting last week, the region's top three elected officials clashed sharply over Metro funding, with Maryland Gov. Larry Hogan (R) saying the transit agency would get no additional money from his state.
>
> The lack of agreement among the leaders over how to meet Metro's financial needs makes it increasingly unlikely the region will come up with the additional money that General Manager Paul J. Wiedefeld says is necessary by next July to keep the system safe and reliable. The only other options, Wiedefeld told the meeting, are significant fare increases and service cuts beyond those customers have already experienced.

---

[2] Plaintiffs' efforts to obtain the Secretary's findings, which to their knowledge have not been made public, have been delayed by the insistence on the filing of an FOIA request, which to date, has not been granted. This response reinforces the propriety of a restraining order until the important issues raised by this case can be litigated by a more complete record.

Exhibit 3 at 1. Mr. McCartney went on to detail the contentious nature of the meeting, including WMATA General Manager Paul J. Wiedefeld's being "visibly disturbed' at Governor Hogan's claim that Maryland, the beneficiary of the $900 million Purple Line FFGA, "could not afford to give Metro more money and flatly ruled out asking the legislature or counties to raise taxes to do so." *Id.* at 1-2.

### Violation of §5309(k)(2)(B)

As has been widely reported, the FFGA signing and its accompanying ceremony had been delayed for over a year on account of orders issued by this Court in the prior litigation.

On May 30, 2017, this Court entered Final Judgment on all claims in the prior litigation. ECF NO. 142 in Civ. No. 14-171. In a subsequent Memorandum Opinion explaining the rulings embraced in the Final Judgment, ECF No. 149, this Court explained why Plaintiffs' FHA claims under 49 U.S.C. §5309 were being dismissed as "not ripe for adjudication." *Id.* at 13. Both Federal Defendants and Maryland argued that the Section 5309 findings had not previously been made and could only be made *after* all required NEPA analysis was completed. The Court accepted that construction of FTA's statutory responsibilities. The Court's complete explanation for this result was as follows:

> ### II. Federal Transit Act, 49 U.S.C. §5309
>
> Maryland is seeking a significant amount of federal funding for the Purple Line through the "New Starts" component of the FTA's Capital Investment Grant program. AR1_012149-51. Under 42 U.S.C. §5309, the FTA is statutorily required to rate a proposed project and determine that it meets specific criteria before it can issue any "New Start" funding. Plaintiffs allege that defendants failed to make those required findings in the Purple Line's March 2014 ROD and have therefore violated §5309.

> However, plaintiffs conflate the overlapping but distinct requirements of NEPA and §5309. Plaintiffs argue that the FTA must make its §5309 findings "concurrently" with the NEPA analysis and include the §5309 findings in the Project's ROD, which they characterize as the formal decision as to "whether or not to approve federal grant money before the project." Pls.' Reply in Supp. Of Mot. For Summ. J at 17-18. I disagree. ***Section 5309 and its implementing regulations both clearly presume that the FTA will have the benefit of all NEPA analysis before making §5309 findings, which indicates that all NEPA analysis must be completed before, not concurrently with, §5309 findings.*** *See* 49 U.S.C. §5309(d)(2)(A) (stating that a FTA can issue findings allowing a project to advance to engineering phases "at the completion of the process required under the National Environmental Policy Act"); 49 C.F.R. §611.203(a) ("To perform the statutorily required evaluations and assign ratings for project justification, FTA will evaluate information developed locally through the planning and NEPA processes."). The ROD represents the conclusion of the NEPA analysis process. It is separate from the FTA's decision to grant funds under §5309, which occurs in a separate full-funding grant agreement ("FFGA") that follows. 49 U.S.C. §5309(k)(2). Defendants have not executed a Full Funding Grant Agreement for the Purple Line Project.
>
> In sum, plaintiffs allege that the defendants have not made the necessary §5309 findings, but defendants have not yet executed the FFGA that obligates them to make those findings. Therefore, plaintiffs' claim "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all," and is therefore not ripe for judicial decision. *In re Aiken Cty.*, 645 F.3d 428, 435 (D.C. Cir. 2011).

*Id.* at 12-13 (emphasis added).

This ruling adopted the position espoused by all Defendants in that motion. Specifically, the federal Defendants had claimed that section 5309 "specifically requires those [section 5309] findings to be made *after* the NEPA process is complete." ECF No.

61 at 13 (emphasis in original). Maryland made the identical claim. ECF No. 62 at 13. *See* Complaint ¶85.

Under section 5309, the findings Plaintiffs attempted to challenge in the prior case are a condition precedent to the execution by the Secretary of an FFGA. 49 U.S.C. §5309(k)(2)(B) ("the Secretary shall enter into a full funding grant agreement, based on the evaluations and ratings required under subsection (d)....)" Since an FFGA has now been executed by the Secretary, Plaintiffs presume the necessary predicate findings have been made, although, again, to date Defendants have refused even to provide those findings to Plaintiffs. Whatever their substantive content, however, they are necessarily predicated on the belief that, as their counsel stated to this Court, they were "made after the NEPA process is completed." ECF No. 61 at 13; ECF No. 62 at 13. In short, the Secretary's recent signing of an FFGA for the Project unmistakably conveys Defendant's assessment that "the NEPA process is completed." *Id.*

However, on May 22, 2017, the Court in the prior litigation between the parties entered partial summary judgment for Plaintiffs and thereby precluded any finding that the NEPA process can at present be deemed "complete." The Court ruled that Defendants' refusal to prepare a Supplemental Environmental Impact Statement ("SEIS") under NEPA, as Plaintiffs had claimed was necessary, was

> ...arbitrary and capricious. Accordingly, it is hereby ordered that, consistent with NEPA's procedural requirements, the defendants shall prepare an SEIS...as expeditiously as possible."

ECF No. 138 at 11. The SEIS is to address serious questions about the defendants' Metrorail ridership assumptions and Metrorail's future impact on the Purple Line. *Id.*

In the Court of Appeals, on July 19, 2017, Maryland obtained a stay of this Court's order vacating the Record of Decision ("ROD") underlying the Project's Final Environmental Impact Statement. **Exhibit 2.** Crucially, however, neither Maryland nor the federal Defendants sought or obtained, from either this Court or the Court of Appeals, a stay of this Court's order to "prepare on SEIS...as expeditiously as possible." To Plaintiffs' knowledge, however, there have been no noticeable steps taken by Defendants to initiate, let alone complete, the SEIS process ordered by this Court on May 22, 2017.

Under these circumstances, Plaintiffs have a high likelihood of prevailing on their argument that, in view of Defendants' own prior position and this Court's acceptance of it, an FFGA could not be lawfully signed until and unless all required NEPA analysis was "complete"—which is not the case because the Court's extant order for expeditious completion of an SEIS has not been complied with. At the very least, that Defendants appear to be acting in a manner completely at odds with the representations they made to the Court supports temporary maintenance of the *status quo* so that this issue can be addressed before irreparable environmental damage is done.

### Violation of NEPA and CEQ Regulation 40 C.F.R. 1505.2

At the time of its decision to take a proposed action, an agency must prepare a concise public record of decision ("ROD") that identifies all reasonable alternatives and states "whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." 40 C.F.R. §1505.2. The alternative selected is known as the "Preferred Alternative." Commitments by the agency or its partners made in the ROD to mitigate harms are binding. *Id.* This section provides that "A monitoring and enforcement program shall be adopted and summarized

9

where applicable for any mitigation. *Id.*, §1505.2(c) and 1505.3. Here, the ROD committed to minimizing closure of the Trail but that commitment has been violated by MTA's recent announcement that it intends to close the CCT -- for four to five years – a departure from the ROD that has serious repercussions for Trail users, including school children who will be forced to use a dangerous travel route instead.

**Irreparable Harm**

With respect to imminent harm attributable to Defendants in the wake of the execution of the FFGA for the Project on August 28, 2017 and their ensuing decision to immediately close the Trail for many years while they begin tree destruction and other irreversible activities, the Complaint includes the following verified allegations of fact:

**48.**   On August 29, 2017 residents of the affected areas received a notice from the FTA/MTA's Private Partner in the Project that the entire Georgetown Branch of the Capital Crescent Trail would be closed for "four to five years" starting on September 5, 2017. The notice also said that tree clearing and construction seven days a week could occur as soon as all permits were obtained.

**49.**   The ROD lists mitigation commitments from the MTA that include: "MTA will work with Montgomery County to designate, communicate, and sign detour routes for the Interim Capital Crescent Trail throughout project construction. MTA will also minimize the time of the trail closure." ROD, page 2 of "Attachment A Commitments and Mitigation Measures", Mitigation ID & Reference: TR02 FEIS Ch. 3.4 Construction or Long- term Issue: Construction—Detours.

**50.**   The abrupt and complete closure announcement prompted immediate letters from officials, including Roger Berliner, the President of the Montgomery County Council, to Defendant Rahn quoting the promise in the ROD to work with the County to minimize closures of the Trail.

**78.**   On August 29, 2017, the public was notified that the CCT would close on September 5, 2017, for 4-5 years for

tree cutting and Project construction. The FEIS did not assess the impact of the CCT closure and rerouting, even though the ROD committed the MTA to work with the County to minimize the closures of the CCT.   The CCT is to be re-routed out of the safe tunnel under Wisconsin Avenue to a ramp down into the area of Elm Street Park now used daily by toddlers from day care centers. This will significantly change park usage and pose risks of collision at high speeds with bicycles. This change alters the plan set forth in the FEIS to maintain and provide a safe tunnel passage for cyclists and pedestrians. From Elm Street Park, the commuter bike traffic would be further diverted across Wisconsin Avenue, one of the busiest commuter routes in the County, and then down narrow streets in downtown Bethesda, posing further risks of collision with trucks, bicycles and pedestrians.

Complaint ¶¶48-50, 78. A copy of the Berliner letter is attached as **Exhibit 3**.

## ARGUMENT

### I.     TRO STANDARDS

In ruling on a TRO application,

> the district court "must consider whether (1) the party seeking the injunction has a substantial likelihood of success on the merits; (2) the party seeking the injunction will be irreparably injured if relief is withheld; (3) an injunction will not substantially harm other parties; and (4) an injunction would further the public interest." *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005). "The test is a flexible one. 'If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.'" *Id.* (quoting *City Fed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995)).*

*Estate of Coll-Monge v. Inner Peace Movement*, 524 F.3d 1341, 1349 (D.C. Cir. 2008). On the issue of irreparable harm, two showings must be made:

> First the harm must be "certain and great," "actual and not theoretical," and so "imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297

(internal quotation marks omitted). Second, the harm "must be beyond remediation." *Id.*

*League of Women Voters of the United States v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016).

## II.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Among the claims made by Plaintiffs is the allegation that Defendants have violated the FHA, 49 U.S.C. §5309 in two ways.  First, the Secretary has approved an FFGA despite her obligation to make predicate findings on the viability of the existing public transportation system by making findings that simply cannot withstand judicial scrutiny, as detailed above. Indeed, her own earlier actions regarding WMATA convey exactly the opposite finding, one which current circumstances strongly reinforce is still correct. Complaint ¶¶86, 87, **Exhibit 1**.  Her findings, therefore, is remediable under APA § 706(2)(A), as "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law."

Second, the Secretary has violated 49 U.S.C. §5309(k)(2)(B) by signing an FFGA and going forward with the Project before the NEPA process is completed, contrary to Defendants' own prior representations to this Court. Complaint §85. The factual predicate for this claim is unequivocally clear and not subject to dispute: the NEPA process, as ordered by this Court to be completed "as expeditiously as possible" has not been completed, yet the Project's FFGA was executed anyway. The legal basis for this claim is equally clear. In the prior litigation, Defendants expressly claimed that the FFGA could be signed only after completion of the NEPA process, and this Court, having assessed that claim, expressly agreed with it.  Her execution of an FFGA for the Purple Line, therefore, is remediable under APA § 706(2)(A), (C), or (D).

Third, the ROD and the letter from the President of the Council to which the FTA and MTA made the commitment to minimize the closures of the Trail in cooperation with that County speak for themselves in proving the absence of the enforcement plan required by 40 C.F.R. §§1505.2 and 1505.3, and in particular of the enforcement of the promised process for minimizing closures. Defendants' violation of this commitment is a NEPA violation that is remediable under APA § 706(2)(A), (C), or (D).

It is therefore clear that, the FFGA cannot be sustained at present, that Defendants NEPA duties have been breached, and Plaintiffs are likely to prevail on the claims set forth in ¶¶85-87 and 98 of the Complaint.

### III.   PLAINTIFFS HAVE DEMONSTRATED IRREPARABLE HARM IF A TRO IS NOT ENTERED

Plaintiffs have described in detail how their standings to sue in this case, as in the prior case, is significantly tied to their use and enjoyment of the CCT, which is, in turn, significantly enhanced by the presence of an abundance of trees in this nature refuge, located in an otherwise fully developed area of homes and businesses. Complaint ¶¶3-16. But as of September 5, 2017, MDOT intends to fully and completely close the CCT for 4-5 years for Project construction, which will include the imminent cutting down of acres of forest along the CCT to make way for train tracks on the Trail. In addition, as of September 5, 2017, not just Plaintiffs, but all Montgomery County residents who have made the protected CCT a heavily used and very popular trail, will be relegated to city streets and, at least initially, a purported trail rerouting unilaterally configured by Defendants without consultation (as promised) with Montgomery County officials.

The obvious safety risks in switching from a trail to city streets will not be a permanent loss, but it will be irremediable while it lasts for several years and particularly

13

if any children or others suffer serious injury or worse because of it. On the other hand, the restoration of felled trees is a far longer proposition. It will plainly be many decades, if ever, before the nature refuge Plaintiffs and others have long enjoyed will become a semblance of its former self. Indeed, the individual Plaintiffs, as well as most FCCT members, reasonably anticipate that in the rest of their lifetimes, they will never see the imminent harm about to commence remediated in any significant way.

In short, especially because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable," *Amoco Prod. Co. v. Village. of Gambell, Alaska*, 480 U.S. 531, 544 (1987), Plaintiffs have demonstrated actual, not theoretical, irreparable harm that is "certain and great", as well as a "clear and present need for equitable relief." *League of Women Voters, supra.* Plaintiffs have also demonstrated that this harm is "beyond remediation." *Id.*

## IV.     A TRO WILL NOT SUBSTANTIALLY HARM DEFENDANTS

The narrow scope of the equitable relief being sought by TRO will halt the cutting or harming of trees along the route of the Project and the moving of earth on it and will leave the CCT open for the duration of the TRO, which is just until the Court can rule on the preliminary injunction motion to follow. Moreover, this targeted relief will not substantially harm Defendants. It will not harm the federal Defendants at all, because it does not constrain them in any way. It will briefly impact Maryland's current planned schedule of Project activities, but it does not preclude Maryland from pursuing other activities contemporaneously planned outside the environs of the CCT. Especially given the short time frame for the TRO, such relief will not substantially harm Maryland.

## V.    A TRO WOULD FURTHER THE PUBLIC INTEREST

A TRO would preserve the *status quo* with respect to the CCT until such time as the Court can consider and rule on Plaintiffs' motion for a preliminary injunction. Defendants' evident plan is to begin work on the Project by first destroying what is most valued and cherished by Plaintiffs and other members of the Plaintiff Friends of the Capital Crescent Trail, along with the thousands of additional citizens who use and benefit from the Trail. Plaintiffs are admittedly vulnerable to this detestable tactic, and need the protection of equitable relief to preserve the *status quo* while their entitlement to preliminary injunctive relief is resolved by this Court on the merits, not on the basis of buzzing chain saws.

The public interest will very clearly be served by the entry of a TRO. Either plaintiffs will convince the Court, across all the claims raised in the Complaint, that they have a likelihood of success on the merits, or they will fail to do so. Plainly, if the plaintiffs prevail on that motion, its adjudication is in the public interest. But even if plaintiffs do not prevail, the public will be well served by a full and fair adjudication of the preliminary injunction issues. Such an outcome will surely serve to enhance public acceptance of Defendants' claimed necessity to place a cherished place of peace, tranquility and highly valued non-motorized passage, into limbo for multiple years, only to then emerge as a shadow of its former self to be shared with Purple Line trains.

**CONCLUSION**

For the foregoing reasons, Plaintiffs motion for a TRO should be granted. A proposed Order granting the TRO is attached.

Respectfully submitted,

**KNOPF & BROWN**

September 5, 2017

David W. Brown, D.C. Bar No. 415429
401 E. Jefferson Street, Ste. 206
Rockville, MD  20850
brown@knopf-brown.com
(301) 545-6100

John M. Fitzgerald, D.C. Bar No. 32209
Attorney and Advocate
4502 Elm Street
Chevy Chase, MD 20815
greenknights.law@gmail.com
(301) 913-5409

**Attorneys for Plaintiffs**

16

# The Washington Post

Transportation

# Behind closed doors, region's leaders clashed sharply over Metro funding

**By Robert McCartney**   September 2 at 5:27 PM

Contrary to the public display of goodwill for the media after a closed-door meeting last week, the region's top three elected officials clashed sharply over Metro funding, with Maryland Gov. Larry Hogan (R) saying the transit agency would get no additional money from his state.

The lack of agreement among the leaders over how to meet Metro's financial needs makes it increasingly unlikely the region will come up with the additional money that General Manager Paul J. Wiedefeld says is necessary by next July to keep the system safe and reliable. The only other options, Wiedefeld told the meeting, are significant fare increases and service cuts beyond those customers have already experienced.

The summit discussion, according to people who attended or were briefed on it, was contentious and alarming to Metro's supporters. Virginia Gov. Terry McAuliffe (D) was sufficiently concerned that he instructed the several dozen officials and staff attending that no one leak what was said to the media. If Hogan's comments and other disagreements became public, McAuliffe warned, there would be no hope Virginia's Republican-controlled legislature would support Metro with additional money as he desires.

At one point, D.C. Mayor Muriel E. Bowser (D) warned Hogan that without additional money, Metro would have to reduce spending by an amount equal to the cost of running an entire Metro line. Hogan suggested a line might be privatized, officials said.

Hogan said Maryland could not afford to give Metro more money and flatly ruled out asking the legislature or counties

EXHIBIT 1

to raise taxes to do so.

Wiedefeld was described as visibly disturbed by Hogan's overall comments and the ensuing debate.

Hogan spokesman Doug Mayer declined to comment on what was said at the meeting, held Monday, and warned that such leaks hurt chances of having future regional summits.

"It was a private meeting. It was a real discussion. It wasn't a made-for-TV news conference moment, which is the kind of conversations elected officials need to be having," Mayer said. "The fact that the details have been leaked publicly make it very clear that the chances of a productive meeting ever happening again are about zero."

Spokesmen for McAuliffe and Bowser also expressed regret and surprise that details had become public.

"It was a private meeting, and it would be unfortunate if others who were party to it are discussing its details," McAuliffe spokesman Brian Coy said.

Given the leaders' differences, it's difficult to see how the region can meet its deadline to agree on a long-term funding plan for Metro to present to the Maryland and Virginia general assemblies when they meet in January. That means Metro probably will have to wait until the 2019 legislative sessions or later for such a plan.

After the meeting, Wiedefeld asked Metro Chief Financial Officer Dennis Anosike to study the possible effect on service if no additional funding is received. He has said Metro needs an additional $500 million a year in dedicated funding for new equipment and maintenance.

The funding dispute overshadowed the recommendation by former U.S. transportation secretary Ray LaHood to the summit to temporarily shrink the Metro board from 16 members to five to implement an emergency reform plan.

McAuliffe, Hogan and Bowser said they liked the idea in principle, but it faces legal obstacles and resistance from some current board members.

LaHood was recruited by McAuliffe to lead a panel drafting a plan for restructuring and funding Metro.

Before the summit, Bowser and McAuliffe had hoped the meeting would narrow differences over funding at a critical time. Bowser favors quick adoption of a regionwide dedicated sales tax to fund Metro, while McAuliffe supports a new tax or other dedicated funding once Metro has shown improvement in governance, safety and reliability.

But Hogan spoiled his counterparts' expectations. He has previously opposed giving more money to Metro but spoke so forcefully on Monday that an official who received briefings about the session likened the effect to "throwing a bomb into the room."

Another official, who was present, said Hogan "was very adamant that he was not going to use his political capital for Metro."

Like others interviewed for this story, the officials spoke on the condition of anonymity because the summit discussions were private.

Hogan told the group only 2 percent of Maryland residents ride Metro, but the agency eats up 11 percent of the state's capital budget for transportation.

Hogan also cast doubt on the idea that Montgomery and Prince George's counties — the Maryland suburbs served by Metro — would raise taxes on their own to support the transit system. If referendums were held in the two counties, Hogan told the summit, residents would vote 70 percent to 30 percent against a new levy.

It's unclear where Hogan got the figures he cited. His forecast is at odds with a Washington Post poll in March. The Post poll found 55 percent of Montgomery residents and 44 percent in Prince George's support a regional sales tax for Metro, although differences were within the survey's margin of sampling error.

However, both counties' top elected officials — who were not at the summit but were questioned about the issue — discouraged expectations their jurisdictions would agree to provide more money for Metro.

Prince George's County Executive Rushern L. Baker III (D) said he opposes raising taxes just in his county and Montgomery for Metro. He said it's the governor's job to find state revenue for the agency.

"The leadership has to come from the governor's office," Baker said. "The Metro system is not about just those two jurisdictions. It's about creating job opportunities for the entire state."

Baker, who is seeking the Democratic nomination to run against Hogan next year, said as governor, he would support increasing state funding for Metro.

Montgomery County Executive Isiah Leggett (D), a longtime supporter of higher taxes for Metro, predicted no agreement would be reached in Maryland until after the 2018 election. The entire state legislature, as well as the governorship, will be on the ballot.

"People do not want to take on this issue of [Metro] funding head-on at least until after the election in 2018," Leggett said.

Maryland's lack of support for increased Metro funding is an ominous sign for the transit agency's supporters. They have generally assumed their biggest hurdle would be Virginia, where the GOP-dominated legislature is averse to raising taxes and critical of Metro's governance, labor costs and efficiency.

"Everybody thinks Virginia is the hardest nut to crack, but Maryland has its obstacles as well," said an official who was at the summit.

Hogan's position springs from long-standing convictions and political considerations. A fiscal conservative, he campaigned in 2014 against higher taxes and in favor of shifting resources from transit to roads. His political base is in rural and outer suburban counties that are not directly served by rail transit.

In a major reversal, Hogan agreed in 2015 to support building the light-rail Purple Line linking Montgomery and Prince George's counties. Now, he points to that project as evidence he is not anti-transit. He says he opposes more money for Metro because the transit system already gets more than its fair share from the state.

Hogan told the summit the federal government should contribute more for Metro. McAuliffe and Bowser readily endorsed that idea but warned they could not depend on it.

The Trump administration has proposed reducing federal spending on transit. It isn't clear the White House or Congress will support extending the $150 million federal subsidy Metro receives each year for capital expenses as part of a program set to expire in 2018.

LaHood told the group its only hope for increasing federal support for the transit agency is to get the region's congressional delegation to push it through Congress.

Hogan tried to lighten the mood by joking that McAuliffe — who is widely thought to have presidential ambitions — would increase Metro funding when he wins another office.

At the end of the summit, before stepping out to address the media, the three leaders agreed to avoid talking publicly about their disagreements. Instead, they focused on their common view that the Metro board needs restructuring, and they praised the importance of regional cooperation.

"We had a great discussion," McAuliffe told the media. "What all three of us have always agreed on, when we all work together, there's not a region in the globe that can compete with the national capital region."

Robert McCartney is The Post's senior regional correspondent, covering politics and policy in the greater Washington, D.C area. 🐦 Follow @McCartneyWP

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 17-5132**

**September Term, 2016**

**1:14-cv-01471-RJL**

**Filed On:** July 19, 2017

John M. Fitzgerald, et al.,

        Appellees

   v.

Federal Transit Administration, et al.,

        Appellees

State of Maryland,

        Appellant

------------------------------

Consolidated with 17-5161

**BEFORE:**    Millett, Pillard, and Wilkins, Circuit Judges

## O R D E R

Upon consideration of the emergency motion for stay pending appeal, the opposition thereto, and the reply; the motion to dismiss, the opposition thereto, and the reply; and the motion to expedite, the opposition thereto, and the reply, it is

**ORDERED** that the motion to dismiss be denied.  Although the appellees' timely Rule 59(e) motion "deprive[d] the judgment of finality," see Derrington-Bey v. Dist. of Columbia Dep't of Corrections, 39 F.3d 1224, 1225 (D.C. Cir. 1994), the notice of appeal will "become[] effective to appeal [the] judgment . . . when the order disposing of the [pending Rule 59] motion is entered," Federal Rule of Appellate Procedure 4(a)(4)(B)(i).  Under 28 U.S.C. § 1292(a), this court may grant the State of Maryland's motion for stay pending appeal of the district court's grant of injunctive relief.  See United States v. Philip Morris USA Inc., 840 F.3d 844, 849 (D.C. Cir. 2016); Comm. on the Judiciary of U.S. House of Representatives v. Miers, 542 F.3d 909, 910-11 (D.C. Cir. 2008).  The district court granted appellees' request for injunctive relief by vacating the Record of

EXHIBIT 2

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

<table>
<tr><td><strong>No. 17-5132</strong></td><td><strong>September Term, 2016</strong></td></tr>
</table>

Decision, which, as the district court noted in this case, had the direct and intended effect of preventing the use of federal funds and halting the project.  See Friends of the Capital Crescent Trail v. Fed'l Transit Admin., 200 F. Supp. 3d 248, 254 (D.D.C. 2016), and Amended Complaint at 59-60 (seeking to set aside the Record of Decision and enjoin defendants "from spending any federal funding on . . . or otherwise proceeding with" the challenged project).  The May 22, 2017, order that denied reinstating the Record of Decision effectively "continu[ed]" or "refus[ed] to dissolve" the injunction, 28 U.S.C. § 1292(a)(1).  See HonoluluTraffic.com v. Fed'l Transit Admin., 742 F.3d 1222, 1229 (9th Cir. 2014); Sierra Club v. Van Antwerp, 526 F.3d 1353, 1358 (11th Cir. 2008); Sierra Club v. Glickman, 67 F.3d 90, 94 (5th Cir. 1995).  Moreover, the pending Rule 59(e) motion in this case does not pertain to the district court's grant of injunctive relief that is the subject of the State of Maryland's motion for stay pending appeal.  The Rule 59(e) motion is, atypically, a motion by the parties who prevailed on their request for injunctive relief.  They do not question vacatur of the Record of Decision; their motion is "limited to seeking clarification or confirmation" of the breadth of the further environmental review the district court separately required.  It is

**FURTHER ORDERED** that the emergency motion to stay the portion of the August 3, 2016, order that vacated the Record of Decision and the portion of the May 22, 2017, order that denied reinstating the Record of Decision be granted and the Record of Decision be reinstated pending appeal.  The State of Maryland has satisfied the stringent requirements for a stay pending appeal.  See Nken v. Holder, 556 U.S. 418, 434 (2009); D.C. Circuit Handbook of Practice and Internal Procedures 33 (2017).  It is

**FURTHER ORDERED** that consideration of the motion to expedite be deferred pending further order of this court, while the district court acts on the pending Rule 59 motion.  We are confident the district court will act promptly in this matter.

The Clerk is directed to transmit a copy of this order to the district court.

### Per Curiam

FOR THE COURT:
Mark J. Langer, Clerk

BY:    /s/
       Robert J. Cavello
       Deputy Clerk



**MONTGOMERY COUNTY COUNCIL**
ROCKVILLE, MARYLAND

ROGER BERLINER                                                                                    CHAIRMAN
COUNCIL PRESIDENT                                                    TRANSPORTATION, INFRASTRUCTURE
DISTRICT 1                                                              ENERGY & ENVIRONMENT COMMITTEE

August 31, 2017

Pete K. Rahn, Secretary
Maryland Department of Transportation
P.O. Box 548
7201 Corporate Center Drive
Hanover, MD 21076

Dear Secretary Rahn,

Thank you for your leadership in getting the Purple Line project to this point. We believe the Purple Line will vastly improve our county's transportation system, create jobs, and lead to inclusive smart growth to better our communities. The project has certainly been a long time coming and we appreciate your and Governor Hogan's efforts in making it a reality.

However, as construction begins, it is important to recognize that the hardest work is now before us. That is the work of protecting neighborhoods that will be impacted by construction activities. The state must honor its pledges to the community and ensure an open and responsive public outreach process for whenever questions and concerns arise. We would like to learn more about how the Maryland Department of Transportation (MDOT) and the Purple Line Transit Constructors (PLTC) plan to relay updates and notices to communities that will be impacted by the work.

We know there will be unavoidable impacts. While we believe the Purple Line is clearly in the public interest, as the district councilmembers representing the areas most affected, we are going to fight for our communities every day to minimize the impact of the project's construction. It is critical that the state and the PLTC keep residents informed of potential impacts as far ahead of construction activities as possible and in as much detail as possible.

That is why the announcement of the immediate closure of the Georgetown Branch Trail caught many of us by surprise. *Is it absolutely essential to close all parts of the trail immediately, particularly on the day kids are returning to school?* We have heard many concerns from parents whose children have routinely used parts of the trail to get to school and believe both the state and county must do more to ensure alternative routes are safe.

We have a number of other questions about impacts the community is facing and how the outreach process will work going forward:

1) The March 2014 Purple Line Record of Decision (ROD) lists mitigation commitments from the Maryland Transit Administration (MTA) that include: "MTA will work with Montgomery County

EXHIBIT 3

to designate, communicate, and sign detour routes for the Interim Capital Crescent Trail throughout project construction.  MTA will also minimize the time of the trail closure."

Does closing the Georgetown Branch Trail for four to five years, roughly the duration of the entire project, constitute minimizing the time of the trail closure?  Are there changed circumstances MDOT feels requires the closure of the trail for this duration, despite previous assurances to the community?  What authority does MDOT retain to assure that PLTC honors the terms of the ROD?

2) Can MDOT and the PLTC provide general tree removal plans along the Georgetown Branch Trail, construction access routes, daily construction start and end times, and what measures will be taken to protect pedestrians and bicyclists crossing Wayne Avenue and approaching the Silver Spring Library and downtown Silver Spring?

3) Do MDOT and the PLTC intend to activate the Community Advisory Teams (CATs) that were envisioned to provide a platform for dialogue between neighborhoods and project officials?  When do MDOT and the PLTC plan to activate the CATs and how often will they meet?

4) Who can residents contact with questions about specific details of construction activities in their neighborhoods?  This more granular level of outreach will be especially important for those who have follow-up questions or seek more information than what is covered in regular construction updates and notices.

5) If a resident needs to report a violation of any of the terms of the P3 contract, whom do they contact, and will those complaints be reviewable by state and county officials to assure equitable incentive payments?

We know the construction period will be challenging.  But we must work together, with a laser-like focus every day to minimize construction impacts.  Having an open and responsive public outreach process is fundamental to that task.

We look forward to your response.

Sincerely,

Roger Berliner
Council President, District 1

Tom Hucker
Councilmember, District 5

CC:    Isiah Leggett, Montgomery County Executive
       Al Roshdieh, Director, Montgomery County Department of Transportation
       Robert Chappell, CEO/Project Manager, Purple Line Transit Partners
       Mitch Lester, President/Project Manager, Purple Line Transit Constructors
       Senator Nancy King, Chair, Montgomery County Senate Delegation
       Delegate Shane Robinson, Chair, Montgomery County House Delegation