# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

FRIENDS OF THE CAPITAL CRESCENT          *
TRAIL, et al.,
                                          *

            Plaintiffs,                   *

      v.                                  *

FEDERAL TRANSIT ADMINISTRATION,          *      Civil Case No. 17-CV-1811 (RJL)
et al.,
                                          *      Hon. Richard J. Leon

            and                           *

MARYLAND DEPARTMENT OF
TRANSPORTATION,                           *

            Defendants.                   *

      *     *     *     *     *     *     *     *     *

## THE STATE OF MARYLAND'S OPPOSITION TO PLAINTIFFS' MOTION
## FOR A TEMPORARY RESTRAINING ORDER

On July 19, 2017, the D. C. Circuit entered an order finding that the State of Maryland

had "satisfied the stringent requirements for a stay pending appeal" of this Court's order vacating

the Record of Decision ("ROD") issued by the Federal Transit Administration ("FTA") for the

Purple Line ("Project" or "Purple Line").[1]  In that same order, the Circuit Court recognized that

this Court's order vacating the ROD was the equivalent of an injunction with "the direct and

---

[1] The D.C. Circuit's Order was issued in an appeal of this Court's decision in *Friends of the Capital Crescent Trail, et al. v. Federal Transit Administration, et al.*, Civ. No. 14-1471 (RJL).  A copy of the D.C. Circuit's Order is attached as Exhibit 1.

1

intended effect of preventing the use of federal funds and halting the project." Order at 2. The Circuit Court clearly understood that, by issuing the stay, it effectively lifted an injunction entered by this Court and thereby made it possible for the State to obtain federal funds and begin construction of the Purple Line. The State now has the needed funding and has commenced construction activities on the Project.

Plaintiffs are now back before this Court with a new lawsuit seeking to enjoin the very activities that the D.C. Circuit has allowed to proceed. Although plaintiffs purportedly "filed" this lawsuit and a motion for a temporary restraining order ("TRO") on Saturday, September 2, 2017, they did not advise defendants of their request for a TRO until the evening of Monday, September 4, 2017 (Labor Day), by email. Moreover, plaintiffs never contacted the State prior to filing their motion for a TRO and never asked the State for information regarding the schedule for removing the large trees found along the Georgetown Branch right-of-way that is the primary focus of their motion.

Had the inquiry been made, the State could have informed the plaintiffs that tree-clearing would not begin until the week of September 18, 2017, thus effectively rendering moot the purported urgency of plaintiffs' request. The only work planned in the Georgetown Branch right-of-way prior to the week of September 18 is preparatory work needed before full-scale tree-clearing can begin. This work will involve installing fences to close the trail, mobilization of equipment, brush removal, and installation of erosion and sedimentation control measures (e.g., silt fences). Some individual trees will be removed as needed to install the silt fences, but no large-scale clearing of trees will occur as part of this preparatory work. Further, as explained below, the contractor will not remove any 'specimen' tree (over 9.5 inches in diameter) during this preparatory work. There are thus no imminent construction activities that even remotely

2

reach the stringent standard for "irreparable harm" *See Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("the injury must be certain and great; it must be actual—not theoretical")

Thus, rather than wasting the Court's and defendants' time in responding to a request for a TRO, plaintiffs could have filed the motion for preliminary injunction they now promise to bring some time in the future.  In fact, the two weeks between the filing of plaintiffs' complaint and motion for TRO and the scheduled initiation of tree-clearing along the trail allows more than enough time for this Court to consider a fully briefed motion for preliminary injunction.

Moreover, as explained below, plaintiffs have not come close to demonstrating any likelihood of success on the merits of their claims, or that the balance of equities or public interest favor granting a TRO.  The Court should deny plaintiffs' request for a TRO because the plaintiffs cannot satisfy their burden of showing that the facts and applicable law support each of the four prerequisites necessary for such extraordinary relief under Supreme Court and D. C. Circuit precedent.

## FACTS

On July 19, 2017, the D.C. Circuit issued a stay pending appeal of this Court's previous orders vacating the ROD for the Purple Line.  The effect of that stay was to reinstate the ROD.

On August 28, 2017, the U.S. Secretary of Transportation announced that she had authorized FTA to sign the full funding grant agreement ("FFGA") for the Purple Line.  The grant provides Maryland access to $900 million in federal funds toward the construction of the Purple Line.

Purple Line Transit Partners ("PLTP") issued a "Trail Closure Notice" announcing that

3

the Georgetown Branch trail would be closed for Purple Line construction.[2]   This notice identified an alternative route for the trail, which was developed by Montgomery County in cooperation with the State.  On August 31, PLTP also issued a general Construction Notice for the Project.[3]

On September 2, 2017, plaintiffs filed a complaint challenging FTA's decision to provide federal funds and FTA's compliance with the National Environmental Policy Act ("NEPA"). Plaintiffs also filed a motion for a TRO seeking to prevent Maryland from engaging in construction activities on that part of the Purple Line that utilizes the Georgetown Branch right-of-way owned by Montgomery County, Maryland.[4]

On the evening of September 4, 2017, plaintiffs' legal assistant forwarded, via email, a copy of the complaint and motion to counsel for the State and counsel for FTA.  That email informed counsel for the defendants of plaintiffs' intent to seek a hearing on the motion for TRO at 9:00 a.m. on September 5, 2017.  On September 5, 2017, the Court informed counsel that a hearing would be held on plaintiffs' motion on September 6, 2017, and that defendants had permission to file an opposition to the motion by noon, on September 6.  Construction activities have been underway on the Purple Line since the morning of August 28, 2017.

## ARGUMENT

### PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS FOR PRELIMINARY INJUNCTIVE RELIEF.

---

[2] http://www.purplelinemd.com/en/construction-menu/updates-and-notices.
[3] http://www.purplelinemd.com/images/construction/notices/2017-08-31%20Commencement%20of%20Construction%20Notice.pdf
[4] In a telephone conversation on September 5, 2017, plaintiffs' counsel informed counsel for Maryland that the complaint and motion were filed with the Court by placing them in the "overnight" box at the federal courthouse on Saturday, September 2, 2017.  The complaint was not assigned a docket number until the court reopened after the Labor Day holiday, on September 5, 2017.

A.    **Plaintiffs Bear the Burden of Satisfying Each of Four Requirements for a Temporary Restraining Order or Preliminary Injunction.**

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008).  A party seeking a preliminary injunction must demonstrate that it satisfies the following four requirements: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter*, 555 U.S. at 20 (2008)).  The same four requirements must be met by a party seeking a temporary restraining order.  *See, e.g., Baker DC v. National Labor Relations Board,* 102 F.Supp.3d 194, 198 (D.D.C. 2015).

Before *Winter*, this Circuit and others applied a "sliding scale" test under which a strong showing on one factor could make up for a weaker showing on others. *See, e.g., Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360–61 (D.C. Cir. 1999).  Following *Winter*, the status of the sliding-scale test has been cast into doubt.  While not expressly abandoning that test, this Circuit has noted that *Winter* "could be read to create a more demanding burden" on plaintiffs to demonstrate likelihood of success on the merits.  *Davis v. Pension Benefit Guaranty Corp.,* 571 F.3d 1288, 1292 (D.C. Cir. 2009).  In addition, this Circuit has construed *Winter* to "suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction."  *Sherley*, 644 F.3d at 393 (internal quotations omitted).

Based on *Winter*, courts in this Circuit have recognized that "it is especially important for the movant to demonstrate a likelihood of success on the merits."  *Friends of Animals v. United*

*States Bureau of Land Management*, 232 F.Supp.3d 53, 60 (D.D.C. 2017); *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 205 F.Supp.3d 4, 26 (D.D.C. 2016).   In any case, it is clear that the movant must *always* show irreparable harm: if the requisite showing of irreparable harm is not made, the court may deny the motion for injunctive relief without considering the other factors. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.").

Furthermore, "the standard for irreparable harm is particularly high in the D.C. Circuit." *Fisheries Survival Fund v. Jewell*, 236 F.Supp.3d 332, 336 (D.D.C. 2017).  Plaintiffs have the "considerable burden" of proving that their purported injuries are "*certain, great and actual— not theoretical—and imminent*, creating a clear and present need for extraordinary equitable relief to prevent harm." *Id.* (citing *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)) (emphasis added). As the Supreme Court has held, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

As to the final two factors, the balance of harms and public interest factors "merge when the Government is the opposing party."  See *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Courts may consider the public interest in providing the benefits of an infrastructure project and avoiding unnecessary additional cost and delay in completing the project.  *See, e.g., Sierra Club v. Army Corps of Engineers,* 990 F.Supp.2d 9, 42 (D.D.C. 2013). ("Although allowing challenged conduct to persist certainly may be harmful to a plaintiff and the public, harm can

also flow from enjoining an activity, and the public may benefit most from permitting it to continue."); *Winter*, 555 U.S. at 24, ("courts of equity should [have] particular regard for the public consequences in employing the extraordinary remedy of injunction") (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

### B.   Plaintiffs Have Not Made a Clear Showing That They Are Likely to Succeed on the Merits.

Plaintiffs' limit their merits arguments in support of their request for a TRO to three of their claims raised in the complaint.  They have not demonstrated a likelihood of success on any of them.[5]

Plaintiffs first argue that FTA's decision to enter into an FFGA with the Maryland Transit Administration ("MTA") was arbitrary and capricious in light of the alleged financial problems of the Washington Metropolitan Area Transit Authority ("WMATA") and the State of Maryland's alleged reticence to provide additional funding to WMATA.  Plaintiffs assert that these "facts" make it impossible for FTA to have found that local resources are available to recapitalize, maintain and operate the overall existing and proposed public transportation system, as required under 49 U.S.C. § 5309(f)(1)(c).  Memorandum at 4-5.

Plaintiffs have misconstrued the statutory requirement.  FTA had no duty to consider WMATA's financial or operating status when deciding whether to execute an FFGA with MTA. WMATA is a wholly separate entity and has an entirely different source of funding from MTA. Thus, neither WMATA's financial status, nor the State of Maryland's financial contribution to

---

[5] Given the limited time to prepare this response, the State focuses this discussion on certain aspects of themerits of plaintiffs' three arguments.  The State notes, however, that there are serious questions whether plaintiffs possess standing to bring this action and whether plaintiffs' claims are actionable under the Administrative Procedure Act.  The State preserves

WMATA, are relevant to FTA's statutory analysis.  The purpose of § 5309(f)(1)(c) is to evaluate the "degree of local financial commitment" and "evidence of stable and dependable financing sources" of the grant applicant.  49 U.S.C. § 5309(f)(1).  *See also*, 49 U.S.C. § 5309(f)(2) (directing FTA to consider the grant recipient's financial condition).  As explained in FTA's June 2016 "Final Interim Policy Guidance for the Capital Grant Program" ("FTA Guidance"),[6] FTA's analysis of the local financial commitment is appropriately focused only on the project sponsor's financial condition and the system operated by that sponsor.  *Id.* at Chap. I, p. 32 (FTA's evaluation is limited to the "current financial condition, both capital and operating, of the project sponsor and/or relevant project partners").  MTA is the project sponsor for the Purple Line, not WMATA.  The financial and other condition of WMATA, a wholly separate system operated by an entirely different entity which is not a project partner to MTA for the Purple Line, is irrelevant to FTA's analysis under the statute.

Plaintiffs' second argument fares no better.  Plaintiffs allege that FTA violated 49 U.S.C. § 5309(k)(2)(B) by executing the FFGA before completion of the Supplemental Environmental Impact Statement ("SEIS") ordered by this Court.  Memorandum at 6-9.  Plaintiffs again misconstrue the statute.  Both the statute and FTA's guidance make it clear that the NEPA process is complete upon issuance of a ROD. Specifically, the statute states that FTA may enter into an FFGA upon completion of NEPA activities, as "demonstrated by a record of decision with respect to the project."  49 U.S.C. §§ 5309(d)(2)(A), 5309(g), 5309(k)(2)(B).  FTA's

---

these and any other arguments or defenses to plaintiffs' claims.

      [6] FTA is required by statute to issue this guidance to implement its capital grant program, and it thus carries substantial weight in evaluating the meaning of the statute.  49 U.S.C. § 5309(g)(5).  That guidance is found at https://www.transit.dot.gov/sites/fta.dot.gov/files/docs/FAST_Updated_Interim_Policy_Guidance_June%20_2016.pdf.

definitive guidance is identical, stating that an FFGA cannot be executed until the NEPA process is "completed as signified by a final FTA environmental decision (e.g., . . . record of decision)." FTA Guidance at Chap. I, p. 5.   This reading comports with common sense and the statutory purpose, because FTA could forever be prevented from executing an FFGA if it had to wait to complete any post-ROD supplemental analyses (such as an SEIS).   Indeed, the Court of Appeals decision to stay this Court's vacatur was clearly premised its understanding - as fully briefed by the parties - that an FFGA and construction would follow upon entry of its order.

Plaintiffs' third argument is similarly unlikely to succeed.   Plaintiffs argue that the closure of the Georgetown Branch of the Capital Crescent Trail violates the ROD's mitigation requirement to "minimize" the time of trail closure.   Memorandum at 9-10.   Plaintiffs fail to explain, however, how this mitigation requirement has been violated, other than expressing their general sense that the closure is not as brief as they would like.   The mitigation requirement does not establish an absolute length of time that the trail may remain closed, but simply provides that MTA should strive to minimize the length of that closure.   In fact, the trail closure is minimized to the extent possible in a major construction project, consistent with the need to ensure public safety.   Allowing access by children or others during a construction project would be foolish and unsafe.   As required by the ROD, MTA has worked with Montgomery County to identify an alternative route to accommodate bicycle and pedestrian travel during construction.[7]   Plaintiffs

---

[7] Plaintiffs' falsely assertion that the trail was "unilaterally configured by Defendants without consultation (as promised) with Montgomery County officials." Memorandum at 13.   On the contrary, MTA has been coordinating with the County for more than a year regarding the location for an alternative route for the Georgetown Branch trail during construction of the Purple Line.   In March 2017, the County held a public open house seeking input on an 'interim route' for the Georgetown Branch trail during construction.   *See* http://www2.montgomerycountymd.gov/mcgportalapps/Press_Detail.aspx?Item_ID=19829.   The

have not demonstrated any likelihood of success in demonstrating that MTA has not met its mitigation commitments.

### C. Plaintiffs Have Not Made a Clear Showing That They Are Likely to Be Irreparably Harmed Absent an Injunction.

Plaintiffs' claim of irreparable harm continues to be centered on the planned removal of trees along the length of the Purple Line.  For the purposes of their request for a TRO, the removal of the trees is not imminent.  The "private" partner with the State in this public-private partnership for the Project, PLTP, is not prepared to begin removing the large "specimen" trees that are within the right-of-way along the Georgetown Branch interim trail until September 18, 2017.  The non-imminent removal of these trees is the only action that even comes close to being the type of irreparable harm needed to support a request for a TRO, and there is adequate time for the Court to consider a preliminary injunction in the interim.  No "irreparable harm" as defined by Circuit precedent, could conceivably result from the other activities that have taken place, such as closure of the trail, construction of silt fences to prevent sediment from reaching waterbodies, construction of three entry ways to allow construction equipment to safely reach the construction site, pruning tree roots that have run into the trail, and installation of a pipe drain at Sleafer Road, constitute irreparable injury.  All these activities, except the root pruning, are reversible.  None of these activities constitute the type of "great" irreparable harm demanded by the D.C. Circuit and that the extraordinary relief of a TRO is designed to prevent.  In fact, even the tree removal does not constitute irreparable harm per se.  *Sierra Club v. United States Army Corps of Engineers*, 990 F.Supp.2d 9, 39-40 (D.D.C. 2013) (concluding that imminent

---

open house was held on March 15, 2017, and was attended by approximately two dozen residents.  *See* http://www.bethesdamagazine.com/Bethesda-Beat/2017/Countys-Proposed-Interim-Georgetown-Branch-Trail-Would-Route-Cyclists-Onto-Jones-Bridge-Road/.

construction activities that included "grading, excavation, clearing trees, vegetation and ground cover, dragging, chipping, burning, topsoil stripping, digging, blasting, dewatering, water withdrawal and discharge, permanent road building, and stream crossings" do not constitute irreparable harm).

### D.     Plaintiffs Have Not Made a Clear Showing That the Equities or the Public Interest Tips in Their Favor.

In granting the stay which reinstated the ROD, the D.C. Circuit weighed the equities and found that they favored the State.  The balance of equities has not changed since the D.C. Circuit acted.  However construction is now underway as contemplated by the Circuit Court's stay order. Plaintiffs' harms are the same as the harms considered and rejected by the Circuit Court in granting the stay, i.e., construction of the Purple Line and the necessary removal of trees along the Georgetown Branch right of way.   Construction along the Georgetown Branch is now a "critical path" item for the construction that impacts the completion of the entire Project.  Any new delays will cause irreparable harm.  The State told the D. C. Circuit, delay costs amount to $13 million per month - or approximately $433,000 for every day of delay.  Given that the costs of delay from a TRO are certain, and that tree removal is not scheduled until September 20, the balance of equities in determining whether a TRO is warranted tips strongly in favor of the State as found by the D.C. Circuit in granting the State's previous request for relief from such delays.

Similarly, plaintiffs have failed to demonstrate that a TRO here is in the public interest. And, as already recognized by the D.C. Circuit, the public interest strongly favors allowing the Purple Line to proceed.  The need for additional transit opportunities in the corridor to be served is firmly established.  The numerous studies that the State has conducted to assess the need for a transit line have all concluded that the need for additional transit is overwhelming.  The amicus

briefs recently filed by Prince George's and Montgomery Counties, in the current pending appeal of plaintiffs' first challenge to the Purple Line, outline the depth of the two Counties' support and need for this Project, including their substantial financial contributions.   Exhibit 2 (Montgomery County brief); Exhibit 3 (Prince George's County brief).   Indeed, both Counties have committed substantial financial support to the Project, and both are relying on the economic development that will result.   Finally, Congress has reviewed the Project and has appropriated $325 million to implement the Project, in three separate appropriations in consecutive years.[8] The commitment of resources at all levels of government demonstrates the strong public interest in construction and operation of the Purple Line.

**E.     If the Court Grants a TRO, the Court Should Require Plaintiffs to File a Security.**

Should the Court decide to grant plaintiffs' request for a TRO, it should require plaintiffs to file a security "in an amount that the court considers proper to pay the costs and damages" that will be sustained by the State.  Fed. R. Civ. P. 65(c).  A security is clearly appropriate in light of the D.C. Circuit's order, the fact that plaintiffs' claims are focused almost entirely on financial, rather than environmental, concerns and that a TRO would place $900 million in federal funding in jeopardy.

**CONCLUSION**

For the foregoing reasons, plaintiffs' motion for a TRO should be denied.

---

[8]  Congress appropriated $100 million for the Purple Line in fiscal year 2015; an additional $100 million in fiscal year 2016; and an additional $125 million in fiscal year 2017.

12

Dated: September 6, 2017

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

JULIE SWEENEY
Assistant Attorney General
Maryland Transit Administration
6 St. Paul Street, Suite 1200
Baltimore, MD  21202-1614
Telephone:  410.767.3844
Email: JSweeney@mta.maryland.gov

*/s/ Albert M. Ferlo*
ALBERT M. FERLO  (Bar No. 290395)
Perkins Coie LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C.  20005-3960
Telephone:  202.654.6200
Facsimile:  202.654.6211
Email: aferlo@perkinscoie.com

Attorneys for the State of Maryland

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2017, a copy of the foregoing document was served

via the CM/ECF system on the following counsel of record.

David Brown
Knopf & Brown
brown@knopf-brown.com

Kevin W. McArdle
U.S. Department of Justice
Keven.mcardle@usdoj.gov

Jeremy Hessler
U.S. Department of Justice
Jeremy.hessler@usdoj.gov

Tyler L. Burgess
U.S. Department of Justice
Tyler.burgess@usdoj.gov

John M. Fitzgerald
4502 Elm Street
Chevy Chase, MD  20815
johnmfitzgerald@earthlink.net


Date:  September 6, 2017                          */s/ Albert M. Ferlo*_____
                                                  Albert M. Ferlo

14