**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DISTRICT OF COLUMBIA**

| | |
|---|---|
| | ) No. 1:17-cv-01811-RJL |
| FRIENDS OF THE CAPITAL CRESCENT TRAIL, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Hon. Richard J. Leon |
| | ) |
| FEDERAL TRANSIT ADMINISTRATION, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER [ECF NO. 2]**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................... 1

STATUTORY BACKGROUND ........................................................................... 2

I.     National Environmental Policy Act ............................................................. 2

II.    The Federal Transit Act .............................................................................. 3

FACTUAL AND PROCEDURAL BACKGROUND ................................................. 6

STANDARD OF REVIEW ................................................................................. 8

III.   Standard for Extraordinary Injunctive Relief. .................................................. 8

IV.   Review of decisions under the APA. .......................................................... 9

ARGUMENT ...................................................................................................... 10

I.     Plaintiffs' NEPA Challenge to the ROD is Barred by the Statute of
Limitations and the Doctrines of Claim and Issue Preclusion. ........................................ 10

II.    This Court Lacks Jurisdiction Over Plaintiffs' Section 5309 Claims. ........................... 14

        A.    Plaintiffs' Section 5309 Claims Lie Outside the Federal Transit
Act's Zone of Interests, and Therefore Must be Dismissed. ................................. 14

        B.    Plaintiffs' Status as Taxpayers Does not Confer Article III
Standing to Challenge the FFGA Under Section 5309. ....................................... 17

III.   Even if the Court Reaches the Merits of Plaintiffs Section 5309 Claims,
Plaintiffs are Not Likely to Succeed. ........................................................... 19

        A.    FTA was Permitted to Execute the FFGA Before Completing the
Remand SEIS Process. ........................................................................ 19

               1.    Neither Section 5309 nor NEPA Barred FTA from Executing
an FFGA Before Completing an SEIS. ................................................ 20

               2.    To the extent the District Court's Order Prohibited FTA from
executing an FFGA Even with a Valid ROD, the D.C. Circuit
Stayed that Prohibition. .................................................................. 21

        B.    FTA's Determination that MTA's Finances are Adequate is Sound. .................... 22

IV.   The Equities Counsel Against the Injunctive Relief Plaintiffs Seek. ............................. 24

CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

CASES

*Allen v. McCurry*,
    449 U.S. 90 (1980) ........................................................................................................ 11

*Allied Local & Reg'l Mfrs. Caucus v. EPA*,
    215 F.3d 61 (D.C. Cir. 2000) ....................................................................................... 10

*Amarin Pharmaceuticals Ireland Limited v. Food and Drug Administration*,
    139 F.Supp.3d 437 (D.D.C. 2015) .............................................................................. 24

*Apotex v. FDA*,
    449 F.3d 1249 (D.C. Cir. 2006) ............................................................................. 9, 23

*Arizona Christian School Tuition Org. v. Winn*,
    563 U.S. 125 (2011) ...................................................................................................... 17

*AT&T Corp. v. FCC*,
    349 F.3d 692 (D.C. Cir. 2003) ..................................................................................... 10

*Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir.2009) ...................................................................................... 9

*BNSF Ry. Co.*,
    No. CIV 06-866-HA, 2006 WL 3408035 (D. Or. Nov. 27, 2006) ............................... 5

*Citizens to Preserve Overton Park v. Volpe*,
    401 U.S. 402 (1971) ........................................................................................................ 9

*City Fed Fin. Corp. v. Office of Thrift Supervision*,
    58 F.3d 738 (D.C. Cir. 1995) .......................................................................................... 9

*Clarke v. Secs. Industry Ass'n*,
    479 U.S. 388 (1987) ...................................................................................................... 15

*Ctr. for Food Safety v. Vilsack*,
    636 F.3d 1166 (9th Cir. 2011) ..................................................................................... 24

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2005) ...................................................................................................... 18

*Drake v. FAA*,
    291 F.3d 59 (D.C. Cir. 2002) ....................................................................................... 11

*Eason Land Co., LLC v. U.S. Dep't of the Interior*,
  2017 WL 2889177 (9th Cir. July 7, 2017)............................................................. 12

*Elk Grove Unified Sch. Dist. v. Newdow*,
  542 U.S. 1 (2004)................................................................................................... 17

*Friends of the Capital Crescent Trail v. FTA*,
  200 F. Supp. 3d 248 (D.D.C. 2016)........................................................................ 7

*Flast v. Cohen*,
  392 U.S. 83 (1968)................................................................................................. 18

*Granny Goose Foods v. Bhd. of Teamsters*,
  415 U.S. 423 (1974)................................................................................................ 8

*Griggs v. Provident Consumer Discount Co.*,
  459 U.S. 56 (1982)................................................................................................. 24

*Guttenberg v. Emery*,
  26 F. Supp. 3d 88 (D.D.C. 2014)............................................................................ 9

*Hazardous Waste Treatment Council v. EPA*,
  861 F.2d 277 (D.C. Cir. 1988)........................................................................ 14, 16

*Hein v. Freedom From Religion Found., Inc.*,
  551 U.S. 587 (2007)............................................................................................... 17

*In re Jones*,
  768 F.2d 923 (7th Cir.1985) ................................................................................. 24

*Indian River County v. Rogoff*,
  201 F. Supp. 3d 1 (D.D.C. 2016)........................................................................... 15

*Lakes & Parks All. of Minneapolis v. Metro. Council*,
  120 F. Supp. 3d 959 (D. Minn. 2015)..................................................................... 5

*Lexmark Int'l., Inc. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014).......................................................................................... 14

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990)............................................................................................... 14

*Martin v. Dep't of Justice*,
  488 F. 3d 446 (D.C. Cir. 2007).............................................................................. 13

*Match-E-Nash-She-Wish Band v. Patchak*,
  132 S. Ct. 2199 (2012).......................................................................................... 14

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997)...................................................................................................... 8

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010)...................................................................................................... 9

*Morgan Stanley DW, Inc. v. Rothe*,
   150 F. Supp. 2d 67 (D.D.C. 2001)............................................................................... 8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)........................................................................................................ 9

*Munaf v. Geren*,
   553 U.S. 674 (2008)...................................................................................................... 19

*Nat'l Ass'n of Clean Air Agencies v. EPA*,
   489 F.3d 1221 (D.C. Cir. 2007)............................................................................... 9, 10

*Nixon v. Richey*,
   513 F.2d 430 (D.C.Cir.1975)...................................................................................... 11

*Nken v. Holder*,
   556 U.S. 418 (2009)................................................................................................. 8, 24

*Parkridge 6, LLC v. U.S. Dep't of Transp.*,
   420 F. App'x 265 (4th Cir. 2011) .............................................................................. 17

*Philadelphia Council of Neighborhood Organizations v. Coleman*,
   437 F. Supp. 1341 (E.D. Pa. 1977) .............................................................................. 4

*Pullman Inc. v. Volpe*,
   337 F.Supp. 432, (E.D. Pa. 1971) .............................................................................. 16

*Rapid Transit Advocates, Inc. v. S. California Rapid Transit Dist.*,
   752 F.2d 373 (9th Cir. 1985) .......................................................................... 3, 16, 18

*Razorback Cab of Ft. Smith v. Flowers.*,
   122 F.3d 657 (8th Cir. 1997) ...................................................................................... 16

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989)................................................................................................... 2, 3

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011) ..................................................................................... 9

*Sierra Club v. EPA*,
   755 F.3d 968 (D.C. Cir. 2014)................................................................................... 14

*Smalls v. United States*,
   471 F.3d 186 (D.C. Cir. 2006) ........................................................................... 11

*Smith v. District of Columbia*,
   629 F. Supp. 2d 53 (D.D.C. 2009) ..................................................................... 13

*States Power Co. v. Fed. Transit Admin.*,
   No. 01-295 JRT/FLN, 2001 WL 1618532 (D. Minn. May 24, 2001) ..................... 5

*Theodore Roosevelt Conservation P'ship v. Salazar*,
   605 F. Supp. 2d 263 (D.D.C. 2009) ..................................................................... 3

*Theodore Roosevelt Conservation P'ship v. Salazar*,
   616 F.3d 497 (D.C. Cir. 2010) ......................................................................... 2, 3

*Town of Secaucus v. U.S. Dep't of Transp.*,
   889 F. Supp. 779 (D.N.J. 1995) ......................................................................... 16

*Transmission Access Policy Study Grp. v. FERC*,
   225 F.3d 667 (D.C. Cir. 2000) ........................................................................... 10

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982) ........................................................................................... 18

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
   714 F.3d 186 (4th Cir. 2013) ............................................................................. 12

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
   435 U.S. 519 (1978) ............................................................................................. 2

*Warth v. Seldin*,
   422 U.S. 490 (1975) ........................................................................................... 17

*Wild Fish Conservancy v. Jewell*,
   730 F.3d 791 (9th Cir. 2013) ............................................................................. 13

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008) ........................................................................................... 8, 12

*Wis. Valley Improvement v. FERC*,
   236 F.3d 738 (D.C. Cir. 2001) ........................................................................... 10

STATUTES

16 U.S.C. § 703 .................................................................................................... 7

16 U.S.C. §§ 1531 ................................................................................................ 7

23 U.S.C. § 138 .................................................................................................... 7

23 U.S.C. § 139(*l*) .................................................................................................... 20, 25

23 U.S.C. § 139(*l*)(1) ................................................................................................ 10

23 U.S.C. §139 ............................................................................................................ 20

26 U.S.C. § 142 .......................................................................................................... 15

26 U.S.C. § 142(m) ..................................................................................................... 15

42 U.S.C. § 4332(2)(C) ............................................................................................... 2, 3

49 U.S.C. 5301 ........................................................................................................... 16

49 U.S.C. 5301(a) ....................................................................................................... 25

49 U.S.C. § 5309 ........................................................................................................ 2, 6

49 U.S.C. § 5309(b)(1) ............................................................................................... 5

49 U.S.C. § 5309(c)-(d) .............................................................................................. 5

49 U.S.C. § 5309(d)(2)(A) .......................................................................................... 20

49 U.S.C. § 5309(f)(1)(C) ........................................................................................... 22

49 U.S.C. § 5309(k)(2)(A) .......................................................................................... 5

49 U.S.C. § 5309(k)(2)(B) .......................................................................................... 19

49 U.S.C. § 5309(k)(2)(i) ........................................................................................... 6

49 U.S.C. § 5309(k)(5) ............................................................................................... 8

49 U.S.C. §§ 107 ......................................................................................................... 4

5 U.S.C. § 701 ............................................................................................................ 9

5 U.S.C. § 702 ............................................................................................................ 14, 16

5 U.S.C. § 706(2)(A) ................................................................................................... 9

Pub. L. No. 103-272 .................................................................................................... 4

Pub. L. No. 109-59 ...................................................................................................... 4

Pub. L. No. 112-141 .................................................................................................... 4, 5

Pub. L. No. 114-94 ...................................................................................................... 4

U.S.C. § 142(m) ........................................................................................................... 15

REGULATIONS

23 C.F.R. § 771.130(f)(1) .............................................................................................. 20

40 C.F.R. § 1501.3 ........................................................................................................... 2

40 C.F.R. § 1505.2 ................................................................................................... 10, 12

49 C.F.R. § 611.101(a) ..................................................................................................... 5

49 C.F.R. §§ 611.203-611.205 ......................................................................................... 5

# INTRODUCTION

In their second challenge to the Federal Transit Administration's ("FTA") authorization of the Maryland Transit Administration's ("MTA") Purple Line project, Plaintiffs seek the extraordinary relief of a temporary restraining order to prevent tree felling and closure of the Capital Crescent Trail.  Mot. for TRO, ECF No. 2 ("TRO").  Plaintiffs in this case previously brought a challenge in 2014 arguing that FTA's decision to fund the Purple Line violated statutes requiring the disclosure of environmental effects in federal agency decision-making.  After the parties vigorously litigated the case, this Court entered judgment in Plaintiffs' favor on a single claim and rejected all of Plaintiffs' other claims; ordered FTA to perform supplemental analysis of the project's environmental impacts on a single issue; and vacated FTA's earlier Record of Decision ("ROD").  On July 19, 2017, the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") reversed the district court's order vacating the ROD, expressly noting (and therefore, implicitly disapproving) the vacatur's intended effect of "preventing the use of federal funds and halting the project" while the agency moved forward with supplemental analysis.  Meanwhile, FTA and MTA timely appealed the district court's decision order requiring an SEIS and holding that the ROD was defective in the first instance.

Plaintiffs have now filed a new lawsuit, which they concede in their notice of related cases, "grows out of the same event or transaction" as their previous lawsuit.  ECF No. 3. Although the new action also relies on FTA's recent action executing a Full Funding Grant Agreement ("FFGA") for the project—whose environmental impacts were evaluated in connection with the same ROD reinstated by the Court of Appeals—Plaintiffs now assert the exact same environmental, safety, and aesthetic harms; seek the same relief; and cite the same information as the purported basis for their claims of procedural deficiency (albeit updating their allegations with more recent documents that discuss the same information on which they relied

in the earlier litigation).  To the extent there is anything new in Plaintiffs' latest installment, it is

their claim under 49 U.S.C. § 5309 ("Section 5309")—a transportation statute whose aims are

unrelated to Plaintiffs' environmental objectives and which they lack standing to bring.

Inasmuch as Plaintiffs' new complaint offends the spirit, if not the letter, of the D.C.

Circuit Order; runs afoul of the statute of limitations; violates the doctrines of *res judicata* and

collateral estoppel that preclude vexatious, duplicative, and piecemeal litigation; and thwarts

Congress's direction requiring the prompt resolution of challenges to FTA approvals for

transportation projects of this kind, Plaintiffs' new complaint is improper and should be

dismissed.  For the same reasons, Plaintiffs' motion for a temporary restraining order should be

summarily denied.

## STATUTORY BACKGROUND

### I.  National Environmental Policy Act

The National Environmental Policy Act ("NEPA") serves the dual purpose of informing

agency decision-makers of the significant environmental effects of proposed major federal

actions and ensuring that relevant information is made available to the public so that they "may

also play a role in both the decisionmaking process and the implementation of that decision."

*See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *see also Theodore

Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010) ("It is an

'essentially procedural' statute, meant to ensure 'a fully informed and well-considered decision,

not necessarily' the best decision") (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def.

Council, Inc.*, 435 U.S. 519, 558 (1978)).  To meet these purposes, NEPA requires that an agency

prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly

affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3.

The EIS should take a "hard look" at the impacts of the proposed action and compare the

proposal to other reasonable alternatives. *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 503; 42 U.S.C. § 4332(2)(C)).

A court's review of an agency's NEPA compliance is limited. *Theodore Roosevelt Conservation P'ship v. Salazar*, 605 F. Supp. 2d 263, 271 (D.D.C. 2009), *aff'd*, 616 F.3d 497 (D.C. Cir. 2010). "The Court must not substitute its judgment for that of the agency, as 'NEPA merely prohibits uninformed—rather than unwise—agency action.'" *Id.* at 271-72 (quoting *Robertson,* 490 U.S. at 351).

## II. The Federal Transit Act

In contrast to NEPA's focus on environmental disclosure, the "Federal Transit Act" is concerned largely with addressing objectives relating to funding mass transportation. Congress passed the Urban Mass Transportation Act of 1964 ("Federal Transit Act") Pub. L. No. 88-365, 78 Stat. 302 (codified as amended at 49 U.S.C. §§ 5301-5330, 5332-38, 10531), creating the Urban Mass Transportation Administration, which became FTA in 1991. The Federal Transit Act "authorizes the Secretary of Transportation to make grants or loans to assist *states and local agencies* in financing the planning, development, construction and improvement of mass transportation facilities."[1] *Rapid Transit Advocates, Inc. v. S. Cal. Rapid Transit Dist*., 752 F.2d

---

[1] The purposes of this Act are-

(1) to assist in the development of improved mass transportation facilities, equipment, techniques, and methods, with the cooperation of mass transportation companies both public and private;

(2) to encourage the planning and establishment of areawide urban mass transportation systems needed for economical and desirable urban development, with the cooperation of mass transportation companies both public and private; and

(3) to provide assistance to State and local governments and their instrumentalities in financing such systems, to be operated by public or private mass transportation companies as determined by local needs.

373, 375 (9th Cir. 1985) (citing 49 U.S.C. § 1602(a)(1)) (emphasis added); *see also Phila.*

*Council of Neighborhood Orgs. v. Coleman*, 437 F. Supp. 1341, 1353 (E.D. Pa. 1977), aff'd, 578

F.2d 1375 (3d Cir. 1978) (The Act "provides for a program of Federal loans and partial grants to

assist States and Municipalities in financing the extension and improvement of public urban

mass transportation systems." (citing H.R. Rep. No. 88-204 (1964), *reprinted in* 1964

U.S.C.C.A.N. 2569, 2570-80))); 49 U.S.C. §§ 107, 5303(a), 5304, 5314(a).  "The [Federal

Transit] Act is a broad congressional delegation to the Secretary of Transportation to make

grants or loans to States and local public bodies 'on such terms and conditions as he may

prescribe' in order to finance the acquisition, construction, or improvement of facilities and

equipment for use in mass transportation in urban areas."  *Phila. Council of Neighborhood Orgs.*,

437 F. Supp. at 1353-54 (quoting 49 U.S.C. § 1602(a)(1)).

The Federal Transit Act has been amended dozens of times since its enactment.  In 1994,

the Federal Transit Act was codified at Title 49, Chapter 53 (Subtitle III-General and Intermodal

Programs, Chapter 53-Public Transportation) to the United States Code.  Pub. L. No. 103-272, §

1(d), 108 Stat 745 (1994).  Chapter 53 establishes FTA's funding authority and since 1994,

Congress has amended Chapter 53 through both long- and short-term transportation legislation

that guides the funding programs FTA is responsible for administering. Section 5309 sets forth

the Secretary of Transportation's authority and procedures for administering "discretionary

grants,"[2] for fixed guideway capital investments.  Section 5309 was amended most recently in

---

Federal Transit Act, § 2(b).

[2] Section 5309, now titled "Fixed guideway capital investment grants," has been amended numerous times since its addition to the United States Code in 1994.  *See, e.g.*, Pub. L. No. 109-59 (SAFETEA-LU), Title III, § 3011(a), Aug. 10, 2005, 119 Stat. 1573; Pub. L. No. 112-141 (MAP-21), Div. B, § 20008(a), Div. G, Title III, § 113003, July 6, 2012, 126 Stat. 656, 984; Pub. L. No. 114-94 (FAST Act), Div. A, Title III, § 3005(a), Dec. 4, 2015, 129 Stat. 1450.).

2012, when it was revised to its current form by the Moving Ahead For Progress in the 21st

Century Act ("MAP-21"), Pub. L. No. 112-141, Div. B, § 20003, July 6, 2012, 126 Stat 405, 622

(2013).  At that time, Congress declared what is now the policy of the United States:

> It is in the interest of the United States, including the economic interest of the United States, to foster the development and revitalization of public transportation systems with the cooperation of both public transportation companies and private companies engaged in public transportation.

*Id.*[3]

FTA administers the Capital Investment Grant program in Chapter 53 to support locally

planned and operated transit projects.  *See* 49 U.S.C. § 5309(b)(1), (d); 49 C.F.R. § 611.101(a).

Under Section 5309, FTA evaluates and rates proposed major transit capital investments against

specific statutory criteria to ensure that prospective grant recipients are both technically and

financially able to implement the project.  49 U.S.C. § 5309(c)-(d); 49 C.F.R. §§ 611.203-

611.205.  FTA provides federal funding for new fixed guideway projects by executing an FFGA

with the project proponent.  49 U.S.C. § 5309(k)(2)(A) ("[A] new fixed guideway capital project

or core capacity improvement project shall be carried out through a full funding grant

agreement."); *see also AT & T Commc'ns-E., Inc. v. BNSF Ry. Co.*, No. CIV 06-866-HA, 2006

WL 3408035, at *2 (D. Or. Nov. 27, 2006), *aff'd*, 323 F. App'x 487 (9th Cir. 2009); *Lakes &*

*Parks All. of Minneapolis v. Metro. Council*, 120 F. Supp. 3d 959, 963 n.4 (D. Minn. 2015)

---

[3] Notably, MAP-21 eliminated preservation of the environment as a stated policy of Chapter 53, *see* MAP-21 § 20003, Policies and Purposes (striking former § 5301(e) in its entirety). The original purpose provided that

> it is the policy of the Government that special effort shall be made to preserve the natural beauty of the countryside, public park and recreation lands, wildlife and waterfowl refuges, and important historical and cultural assets when planning, designing, and carrying out an urban mass transportation capital project with assistance from the Government under sections 5309 and 5310 of this title.

*Id.* § 5301(e).

(same); *N. States Power Co. v. Fed. Transit Admin.*, No. 01-295 JRT/FLN, 2001 WL 1618532, at

*2 (D. Minn. May 24, 2001), *aff'd as modified and remanded*, 270 F.3d 586 (8th Cir. 2001)

(same).  An FFGA "shall establish the terms of participation by the Government in a new fixed

guideway capital project or core capacity improvement project."  49 U.S.C. § 5309(k)(2)(i).

Section 5309 requires a completed NEPA process—as evidenced by a ROD—before the

FTA can make that discretionary policy decision to enter into an FFGA.  *Id.* § 5309(d)(2)(A) ("A

new fixed guideway capital project may advance to the engineering phase upon completion of

activities required under [NEPA], *as demonstrated by a record of decision with respect to the*

*project . . . .*") (emphasis added); *id.* § 5309(k)(2)(B).  However, so long as a ROD has been

issued, nothing in the statute mandates that FTA defer entering into or suspend an FFGA pending

completion of an SEIS.  *See id.*

## FACTUAL AND PROCEDURAL BACKGROUND

On March 19, 2014, FTA issued its ROD concluding the NEPA process for the Purple

Line Project, a 16.2-mile light rail transit project in Montgomery and Prince George's Counties,

Maryland.  The Purple Line is a critical component of the region's transportation infrastructure

and will provide a much-needed east-west corridor between the New Carrolton Washington

Metropolitan Area Transit Authority ("WMATA") Metro station in Prince George's County and

the Bethesda Metro station in Montgomery County, Maryland to serve the area's growing

transportation needs.  The existing Metro system primarily serves passengers travelling in a

north-south orientation to and from Washington D.C.  The Purple Line, in contrast, was designed

to provide faster, more direct, and more reliable east-west transit service connecting the major

activity centers.  The Project will benefit the communities it serves by better linking people to

employment and activities in the corridor and beyond.

On August 26, 2014, Plaintiffs to the instant action filed their first challenge to the Purple

Line ROD, raising a myriad of claims under NEPA, the Federal Transit Act, 49 U.S.C. § 5309, Section 4(f) of the Department of Transportation Act ("Section 4(f)"), 23 U.S.C. § 138, the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq*., and the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703.  Complaint for Declaratory and Injunctive Relief, *Friends of the Capital Crescent Trail v. FTA*, No. 14-1471 (D.D.C.), ECF No. 1 ("*FCCT I*").  After lengthy proceedings before this Court, including the filing of two supplemental complaints raising a host of new claims based on allegedly new information, the Court entered its Final Judgment on May 29, 2017, granting summary judgment in favor of FTA as to all of Plaintiffs' claims with a single exception.  *FCCT I*, Final Judgment, ECF No. 147.  The Court vacated the Project's ROD on the basis that FTA "failed to take the requisite 'hard look' at the potential impact that WMATA's ridership and safety issues could have on the Purple Line Project," because FTA failed to articulate its consideration of three litigation declarations filed by Plaintiffs.  Memorandum Opinion, at 3, 9-11*FCCT I*, ECF No. 138 at 3, 9-11.  Both FTA and the State timely filed notices appealing this Court's Final Judgment, *FCCT I*, Notice of Appeal, ECF No. 168, and Plaintiffs noticed their cross-appeal.  *FCCT I*, Notice of Appeal, ECF No. 171.

The State of Maryland sought a stay of this Court's Final Judgment pending appeal first in this Court, and then in the D.C. Circuit.  *FCCT I*, Mot. to Stay J. Pending Appeal and to Reinstate ROD, ECF No. 145.  This Court denied the State's request, but the D.C. Circuit granted "the State of Maryland's motion for a stay pending appeal of the district court's grant of injunctive relief."  July 19, 2017 Order, *Fitzgerald v. FTA*, No. 17-5132 (D.C. Cir.).  The D.C. Circuit stated that "[t]he district court granted [Plaintiffs'] request for injunctive relief by vacating the Record of Decision, which, as the district court noted in this case, had the direct and intended effect of preventing the use of federal funds and halting the project."  *Id*. (citing *FCCT*

*I*, 200 F. Supp. 3d 248, 254 (D.D.C. 2016); Amended Complaint 59-60, *FCCT I*, ECF No. 20).

The D.C. Circuit dissolved the injunction and reinstated the ROD finding that "[t]he State of

Maryland has satisfied the stringent requirements for a stay pending appeal."  July 19, 2017

Order, *Fitzgerald v. FTA*, No. 17-5132 (D.C. Cir.) (citing *Nken v. Holder*, 556 U.S. 418, 434

(2009)).[4]

On August 22, 2017, FTA and the MTA executed an FFGA for the Purple Line project.

*See* Ex. A (executed FFGA).  And on August 28, 2017, the agencies held a public signing

ceremony at the site of a future Purple Line maintenance facility in Prince George's County.

FTA had previously notified Congress on July 6, 2016, pursuant to 49 U.S.C. § 5309(k)(5), of its

intention to execute an FFGA with MTA.  *See* Ex. B. (letter to Senator Shelby).

## STANDARD OF REVIEW

### III. Standard for Extraordinary Injunctive Relief.

"The court considers the same factors in ruling on a motion for a temporary restraining

order and a motion for a preliminary injunction."  *Morgan Stanley DW, Inc. v. Rothe*, 150 F.

Supp. 2d 67, 72 (D.D.C. 2001).  The "extraordinary and drastic remedy" of a temporary

restraining order must not issue "unless the movant, by a clear showing, carries the burden of

persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).  Plaintiff has the

burden of proving the need for injunctive relief, but Federal Defendants bear no burden to defeat

the motion.  *Granny Goose Foods v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of

Alameda Cty.*, 415 U.S. 423, 442-43 (1974).

---

[4] An applicant seeking a stay pending appeal must demonstrate that he "has made a strong
showing that he is likely to succeed on the merits" and that he "will be irreparably injured absent
a stay."  *Nken*, 556 U.S. at 435.  "Once an applicant satisfies the first two factors, the traditional
stay inquiry calls for assessing the harm to the opposing party and weighing the public interest.
These factors merge when the Government is the opposing party."  *Id.*

To demonstrate entitlement to such relief, a plaintiff "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).   A plaintiff must satisfy all four factors, *City Fed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995), and a failure to show either a likelihood of success on the merits or irreparable harm obviates the need for the Court to address the remaining factors. *Apotex v. FDA*, 449 F.3d 1249, 1253-54 (D.C. Cir. 2006) (per curiam).[5]   A plaintiff must make a clear showing based on substantial proof that it has suffered or will imminently suffer an irreparable injury. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (citation omitted).

## IV. Review of decisions under the APA.

Plaintiffs' claims—if reviewable at all—can only be reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, and are subject to the "highly deferential" standard of review set out in the APA. *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007).   Under this standard, a court may invalidate a final agency decision only where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

---

[5] While in the past this circuit had sometimes used a "sliding scale" approach to balancing these factors, the D.C. Circuit has suggested that this sliding scale approach may no longer be applicable after the Supreme Court's decision in *Winter*, and that a more stringent test applies instead. *See Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (likelihood of success on the merits and irreparable harm may be "independent, free-standing requirement[s] for a preliminary injunction" (internal quotations marks and citation omitted)); *see also Davis v.Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir.2009) ("[U]nder the Supreme Court's precedents, a movant cannot obtain a preliminary injunction without showing both a likelihood of success and a likelihood of irreparable harm, among other things." (Kavanaugh, J., concurring)); *see generally Guttenberg v. Emery*, 26 F. Supp. 3d 88, 100 (D.D.C. 2014) ("Still, at least two D.C. Circuit judges read *Winter* and other Supreme Court precedents to require a plaintiff to 'meet four independent requirements,' including 'both a likelihood of success and a likelihood of irreparable harm'" (citations omitted).

law." 5 U.S.C. § 706(2)(A).  The scope of review under this standard is narrow, and a court may

not substitute its judgment for that of the agency.  *See Motor Vehicle Mfrs. Ass'n v. State Farm*

*Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983); *Citizens to Pres. Overton Park v. Volpe*, 401 U.S.

402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

"A party seeking to have a court declare an agency action to be arbitrary and capricious

carries 'a heavy burden indeed.'"  *Wis. Valley Improvement v. FERC*, 236 F.3d 738, 745 (D.C.

Cir. 2001) (quoting *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 714 (D.C.

Cir. 2000) (per curiam)).  "The arbitrary and capricious standard is '[h]ighly deferential,' and it

'presumes the validity of agency action.'"  *Nat'l Ass'n of Clean Air Agencies*, 489 F.3d at 1228

(quoting *AT&T Corp. v. FCC*, 349 F.3d 692, 698 (D.C. Cir. 2003)).  The district court must

uphold the agency's action where it "has considered the relevant factors and articulated a rational

connection between the facts found and the choice made."  *Allied Local & Reg'l Mfrs. Caucus v.*

*EPA*, 215 F.3d 61, 68 (D.C. Cir. 2000) (internal quotation marks and citation omitted).

## <u>ARGUMENT</u>

### I.      Plaintiffs' NEPA Challenge to the ROD is Barred by the Statute of Limitations and the Doctrines of Claim and Issue Preclusion.

In support of their application for emergency injunctive relief, Plaintiffs raise a single

claim against the March 19, 2014, Purple Line ROD under NEPA.  TRO at 9-10, 13.  Plaintiffs

charge FTA with violating NEPA by failing to implement a mitigation commitment—addressing

the detour and closure of the Capital Crescent Trail—to their satisfaction.  *See* TRO at 9-10

(citing 40 C.F.R. § 1505.2 ("A monitoring and enforcement program shall be adopted and

summarized where applicable for any mitigation.")).[6]

_____

[6]Any claim against the adequacy of the ROD, as raised in this new case, is also plainly barred by
the 150-day statute of limitations set forth in 23 U.S.C. § 139(*l*)(1) ("[A] claim arising under
Federal law seeking judicial review of a permit, license, or approval issued by a Federal agency

Plaintiffs' NEPA argument is barred by the doctrines of claim and issue preclusion to the extent that it was raised (or should have been raised) and dismissed in the prior case.  *See Friends of the Capital Crescent Trail v. FTA*, No. 1:14-cv-01471-RJL (D.D.C.).  Under the doctrine of claim preclusion, "a subsequent lawsuit will be barred if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction."  *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006).  The doctrine "precludes the parties or their privies from re-litigating issues that were or *could have been raised in*" the first action.  *Drake v. FAA*, 291 F.3d 59, 66 (D.C. Cir. 2002) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).  Because the parties to the instant case were parties to the prior case, which resulted in a final judgment by this Court, the second, third, and fourth prongs of this test are unambiguously met.  And to the extent the judgment is not considered final because it has been appealed, the appeal divests this Court of jurisdiction to entertain all claims falling under the scope of the judgment.  *See* Order Denying Motion to Enforce, ECF No. 167, Case No. 14-1471; *Nixon v. Richey*, 513 F.2d 430, 438 n.75 (D.C.Cir.1975) ("The federal rule is that pendency of an appeal does not suspend the operation of a final judgment for purposes of collateral estoppel . . . .").

As to whether there has been a previous lawsuit involving the same claim or cause of action—Plaintiffs concede that their newly filed case "grows out of the same event or transaction" as their previous lawsuit.  This lawsuit is effectively the same as Plaintiffs' prior litigation.  It is likewise clear that, to the extent Plaintiffs' new mitigation claim is reviewable at

---

for a highway or public transportation capital project shall be barred unless it is filed within 150 days after publication of a notice in the Federal Register . . . ."), which ran in late 2014.

all under the APA, they could and should have raised their current challenge to the ROD's

mitigation measures in the prior case.  There, for instance, Plaintiffs argued that the mitigation

measures in the ROD were insufficient as to the "cumulative noise impacts" and the Court

summarily rejected that argument.  *See FCCT I*, ECF No. 47-1 at 39; ECF No. 55 at 39-40.

Plaintiffs now challenge the sufficiency of the ROD's commitment to trail closures.  TRO at 9-

10.  Clearly, any claim based on the regulation Plaintiffs cite—which addresses only whether

mitigation measures are "adopted and summarized," not how they are implemented—could have

been brought at the time of Plaintiffs' earlier challenge.  40 C.F.R. § 1505.2.  Plaintiffs argument

that it could not be foreseen "MTA's recent announcement that it intends to close the [Trail]—

for four to five years—a departure from the ROD," *id*. at 10, is belied by the Final

Environmental Impact Statement, which states that "MTA will continue to coordinate with the

public and agencies to develop appropriate minimization strategies during construction. . . . Trail

detours needed during construction will be coordinated with the agency having jurisdiction over

the trail to identify and develop a plan for a temporary detour route, and the trail routes would be

restored at the end of construction."  FEIS 4-7, 4-170 (Attached as Ex. C).  The FEIS and ROD

make clear that the Trail would be detoured during construction and Plaintiffs point to no

authority supporting their assertion that the current notice is inconsistent with the details

provided in the NEPA analysis.

   To the extent Plaintiffs seek to challenge post-ROD implementation of the mitigation

measures, their claim is also unreviewable because "[t]he actions that an agency takes to

implement a decision are not, themselves, agency actions within the meaning of § 706(1) of the

APA."  *Eason Land Co., LLC v. U.S. Dep't of the Interior*, 2017 WL 2889177, at *1 (9th Cir.

July 7, 2017); *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193-94 (4th

Cir. 2013) (alleged failure of agency to perform beach protection work described in earlier agency decision "was not a determination" akin to an order, rule, license, or sanction, and was not the sort of "circumscribed [and] discrete" action that could be compelled pursuant to Section 706(1)); *Wild Fish Conservancy v. Jewell*, 730 F.3d 791 (9th Cir. 2013) (similar holding).

Regardless of whether the claim is precluded, the doctrine of issue preclusion bars Plaintiffs from asserting their NEPA claim.  Issue preclusion bars successive litigation of an issue of fact or law where: (1) the same issue now being raised was contested by the parties and submitted for judicial determination in the prior case; (2) the issue was actually and necessarily determined by a court of competent jurisdiction in the prior case; and (3) preclusion in the second case does not work a basic unfairness to the party bound by the first determination. *Martin v. Dep't of Justice,* 488 F. 3d 446, 454 (D.C. Cir. 2007).  If the Court does not find that the NEPA claim is precluded in its entirety by res judicata, the Court should find that the three factors demonstrating issue preclusion are satisfied here.  In the prior case, Plaintiffs challenged the sufficiency of the ROD's mitigation commitments (although only as to noise), which this Court rejected despite not explicitly addressing the argument in its Memorandum Opinion, *see Smith v. District of Columbia*, 629 F. Supp. 2d 53, 58–59 (D.D.C. 2009) (explaining that an issue can be actually and necessarily determined even if the court did not explicitly mention it because "courts' opinions typically address explicitly only those contentions they believe are substantial enough to warrant such treatment" (quoting *Clark v. Clark*, 984 F.2d 272, 273 (8th Cir. 1993)). In addition, preclusion would not work basic unfairness because any challenge to the ROD's mitigation could have been included among the dozens of claims Plaintiffs brought in that earlier litigation.

Plaintiffs' attempt to repackage and re-assert their prior NEPA claim in this case fails on

multiple grounds and must be rejected.  To the extent the Court finds that issue preclusion or claim preclusion does not apply because not all of the elements are satisfied, their policy of preventing vexatious litigation counsels against injunctive relief.

## II.    This Court Lacks Jurisdiction Over Plaintiffs' Section 5309 Claims.

### A.    Plaintiffs' Section 5309 Claims Lie Outside the Federal Transit Act's Zone of Interests, and Therefore Must be Dismissed.

Because Plaintiffs raise their Section 5309 claims under the APA, they "must satisfy not only Article III's standing requirements, but an additional test:  The interest [they assert] must be arguably within the zone of interests to be protected or regulated by the statute that [they say] was violated."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970)); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) ("The plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint."). Under the zone-of-interests test, courts ask "whether this particular class of persons has a right to sue under this substantive statute."  *Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014) (quotations and alterations omitted); *c.f. Sierra Club v. EPA*, 755 F.3d 968, 976 (D.C. Cir. 2014) ("The Supreme Court has recently clarified that "'prudential standing' is a misnomer," and that the 'zone of interests' inquiry is in fact a question of whether a plaintiff 'falls within the class of plaintiffs whom Congress has authorized to sue,' not a question of standing." (quoting *Lexmark*, 134 S. Ct. at 1386-88)).

This requirement derives from Section 702 of the APA, which requires that a complainant be "adversely affected or aggrieved . . . *within the meaning of a relevant statute*."  5 U.S.C. § 702 (emphasis added).  In the D.C. Circuit, to meet the zone-of-interests requirement a

plaintiff must demonstrate either (1) that it is an intended beneficiary of the statute that forms the basis of its claim, or (2) that there is some other indication that it is a "peculiarly suitable challenger" to the administrative action at issue. *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277, 283 (D.C. Cir. 1988) (per curiam).  Indeed, Plaintiffs have no "right of review" if their "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Secs. Industry Ass'n*, 479 U.S. 388, 399-400 (1987).

The Court's decision in *Indian River County v. Rogoff*, 201 F. Supp. 3d 1 (D.D.C. 2016) is instructive here.  In *Indian River County*, plaintiffs claimed an alleged injury resulting from construction of a passenger rail project and filed suit to challenge the Secretary's allocation of bond authority for the project.  Among other things, the plaintiffs alleged that project was ineligible under the criteria contained in the statute allowing the award, 26 U.S.C. § 142(m).  The Court dismissed this claim, holding that the plaintiffs' "stake in the project does not arguably fall within the zone of interests protected or regulated by 26 U.S.C. § 142." *Id.* at 20.  The Court noted that Congress enacted the statute "to create a tax benefit to support the development and construction of certain kinds of projects with significant public benefits and a demonstrated need for financial assistance," and that the statute "has nothing to do with [plaintiffs'] asserted interests, nor does it protect (or regulate) those who would claim that public safety or other related interests would be impaired by a bond allocation to an ineligible project." *Id.* at 21.  The Court further explained that "Congress did not intend for plaintiffs asserting public-safety, environmental-protection, or historic-preservation interests to sue for a violation of 26 U.S.C. § 142." *Id.*

Plaintiffs in this case claim that FTA violated Section 5309 by (1) approving the FFGA

"despite [the Secretary's] obligation to make predicate findings on the viability of the existing

public transportation system," and (2) executing the FFGA prior to completion of the SEIS

process.  TRO at 12.  As discussed above, Chapter 53 provides guidance to FTA on

implementation of its grant programs for the benefit of state and local transit agencies.  But there

is no evidence that Congress intended environmental groups and individuals such as Plaintiffs as

the "beneficiaries" of the Federal Transit Act.[7]  *See* 49 U.S.C. 5301; *see also Razorback Cab of

Ft. Smith v.* Flowers. 122 F.3d 657, 659 (8th Cir. 1997) (collecting cases regarding standing to

challenge the Urban Mass Transportation Act); *Pullman Inc. v. Volpe*, 337 F.Supp. 432, 440

(E.D. Pa. 1971) (finding disappointed bidder lacked standing to challenge a grant for

construction of rail cars under the Urban Mass Transportation Act, explaining that "[i]t does not

matter if [plaintiff] would be a reliable private attorney general, because it was financially

injured," and concluding that "plaintiff does not have standing to sue the Secretary under 5

U.S.C. § 702"); *Town of Secaucus v. U.S. Dep't of Transp.*, 889 F. Supp. 779, 787 (D.N.J. 1995)

(rejecting plaintiffs' claim that 49 U.S.C. § 5301(e), "was specifically . . . designed to benefit the

communities and residents thereof who will experience the environmental effects of"

transportation projects), *aff'd*, 79 F.3d 1139 (3d Cir. 1996).

Indeed, Section 5301 makes plain that the intended beneficiaries of the Act are the

prospective project proponents and applicants for federal funds.  49 U.S.C. § 5301.  To the extent

the Act contemplates any more specific group than the general public, its language focuses "not

on the substantive rights of local residents but rather on the obligations of the [grant] applicants

---

[7] Plaintiffs do not contend that they are somehow particularly suited to challenge FTA's discretionary grant of funds for the Purple Line under Section 5309.  Nor could they based solely on their "use and enjoyment of the [Capital Crescent Trail]."  TRO at 13; *see Hazardous Waste Treatment Council*, 861 F.2d at 283.

and the Secretary.  They are primarily spending directives to the Secretary of Transportation, specifying conditions under which grants may be made."  *Rapid Transit Advocates*, 752 F.2d at 377.  The purpose of a statute imposing eligibility requirements for government benefits is to make the benefits available, while limiting the benefits—and the cost to the federal treasury—to those state and local transit agencies most in need of the benefit and best equipped to utilize the funds.  Such a statute is not intended to protect the general public against the environmental and other effects of proposed projects.

Plaintiffs cannot satisfy the APA's requirement that they have been adversely affected within the meaning of the Federal Transit Act.  Their claims fall outside the zone of interests and, therefore, are not reviewable by this Court.

B.      Plaintiffs' Status as Taxpayers Does not Confer Article III Standing to Challenge the FFGA Under Section 5309.

To the extent Plaintiffs are attempting to predicate Article III standing on concerns about FTA's expenditure of funds on a project that the Plaintiffs feel is ill-conceived, the attempt fails. Plaintiffs assert only a generalized grievance shared equally by all taxpayers and thus, this Court lacks jurisdiction over those claims.  *See Parkridge 6, LLC v. U.S. Dep't of Transp.*, 420 F. App'x 265, 268 (4th Cir. 2011) ("Whether or not the taxes and tolls associated with the Project are unnecessary, as the Appellants maintain, is not a particularized legal injury but a policy question of broad applicability.  We therefore find that these claims are 'more appropriately addressed in the representative branches.'" (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004), *abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014)); *Parkridge 6, LLC*, 420 F. App'x at 267-68 (finding that appellants' alleged injuries from funding concerns "fall squarely within the prudential limitation on standing that courts refrain from exercising jurisdiction over a 'generalized grievance' shared in substantially

equal measure by all or a large class of citizens.'" (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975))).

With narrow exceptions not relevant here, a person's status as a federal taxpayer does not provide Article III standing to challenge an allegedly unlawful expenditure of federal funds.  *See, e.g.*, *Hein v. Freedom From Religion Found., Inc*., 551 U.S. 587, 593 (2007) (discussing "the general rule against federal taxpayer standing"); *Arizona Christian School Tuition Org. v. Winn*, 563 U.S. 125, 134-38 (2011); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342-46 (2005). "[T]he 'case or controversy' aspect of standing is unsatisfied 'where a taxpayer seeks to employ a federal court as a forum in which to air his generalized grievances about the conduct of government . . . .'" *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc*., 454 U.S. 464, 479 (1982) (quoting *Flast v. Cohen*, 392 U.S. 83, 106 (1968)); *see also Rapid Transit Advocates*, 752 F.2d at 379 (rejecting challenge to the government's grant for a Los Angeles subway project under the Urban Mass Transportation Act, explaining that "Appellants [] fail to satisfy the requirements for taxpayer standing established in *Flast v. Cohen* . . . since they do not challenge the exercise of congressional power, but rather a decision by the executive branch." (citations omitted)).

Here, Plaintiffs' standing allegations are nearly identical to those asserted in their earlier challenge to the ROD under a myriad of environmental statutes.  *See FCCT I*, 1st Am. Compl. ¶ 3; ECF No. 20; *Id.*, Suppl. Compl. ¶ 3, ECF No. 33.  Friends of the Capital Crescent Trail is an "environmentally conscious" non-profit organization interested in "preserving parkland, open space, and quality of life in Montgomery County."  Compl. ¶ 3.  Its members enjoy walking, biking, running, and observing wildlife on the Trail.  *Id*. ¶¶ 3, 7, 12.  Plaintiffs also claim to be "public transit user[s]" whose "aesthetic, recreational, and occupational interests in the urban and

suburban forests along the [Trail]" will be impacted.  *Id.* ¶¶ 7-8, 13.  While those environmental interests may confer Article III standing to challenge the project under NEPA, they do not suffice to demonstrate standing to bring claims under Section 5309.  At most, Plaintiffs contend that they will be unable to "use and rely on the WMATA" Metrorail system—a different legal entity than MTA, which is will be responsible for operation of the Purple Line—"by competing for and by definition reducing funds and/or raising the price and scarcity of the region's transportation network as a whole."  *Id.* ¶ 13.  Those allegations are certainly speculative, but even if true, they suggest only that Plaintiffs will suffer no injury apart from all taxpayers in the region.

Because Plaintiffs lack any injury—much less the requisite imminent injury required to obtain extraordinary relief—resulting from the agencies execution of the FFGA separate from grievance potentially shared by all taxpayers, this Court lacks jurisdiction over their Section 5309 claims, which should be dismissed.  Accordingly, the Court should deny Plaintiffs' request for injunctive relief.  *See Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("A difficult question as to jurisdiction . . . mak[es] success on the merits] more unlikely due to potential impediments to even reaching the merits.").

**III.  Even if the Court Reaches the Merits of Plaintiffs Section 5309 Claims, Plaintiffs are Not Likely to Succeed.**

    A.    <u>FTA was Permitted to Execute the FFGA Before Completing the Remand SEIS Process.</u>

Plaintiffs contend that FTA violated Section 5309 by executing the FFGA prior to completion of the SEIS process.  TRO at 6-9 (citing 49 U.S.C. § 5309(k)(2)(B)[8]).  As discussed below, this narrow interpretation lacks merit.

---

[8] "The Secretary shall enter into a full funding grant agreement, based on the evaluations and ratings required under subsection (d), (e), or (i), as applicable, with each grantee receiving assistance for a new fixed guideway capital project . . . that has been rated as high, medium-high, or medium . . . ."  49 U.S.C. § 5309(k)(2)(B).

### 1.     Neither Section 5309 nor NEPA Barred FTA from Executing an FFGA Before Completing an SEIS.

After the D.C. Circuit reinstated the ROD, neither Section 5309 nor NEPA barred the agencies from executing the FFGA during the pending SEIS process.  Plaintiffs read FTA's argument in the prior lawsuit that FTA did not violate NEPA by not including its Section 5309 findings in the ROD, and the Court's agreement with FTA's argument, as requiring the ordered SEIS to be completed before FTA can make the Section 5309 findings.  TRO at 6-9, 12.  Not so. Under 49 U.S.C. § 5309(d)(2)(A), the findings required for execution of an FFGA may be made "upon completion of activities requires under [NEPA], as demonstrated by a [ROD] . . . ." Because the original ROD for the Project remains in full force and effect under the D.C. Circuit's order, FTA was permitted to make its Section 5309 findings.  Nothing in Section 5309 requires the completion of an SEIS prior to executing an FFGA.

Moreover, statutory provisions governing judicial review on transportation projects make it clear that Congress intended to authorize FTA to move forward with projects, even where new information might ultimately trigger a duty to prepare a supplemental EIS.  *See* 23 U.S.C. § 139(*l*).  Section 139 expressly states that the SEIS decision is a separate agency action, in 23 U.S.C. §139 ("Efficient Environmental reviews for project decisionmaking"), a statute that contains multiple provisions attempting to streamline the environmental review (both administrative and judicial) for mass transit projects).  *Id*. §139(l)(2) (if FTA prepares an SEIS and a new ROD, the agency's decision "shall be considered a separate final agency action" for purposes of judicial review).  Because in such a situation the earlier ROD remains operative pending completion of the SEIS decision, the predicate for signing an FFGA is satisfied even though a challenge based on the SEIS decision remains potentially viable.

FTA's regulations also contemplate that project approvals may go forward while the

preparation of an SEIS is underway.  *See* 23 C.F.R. § 771.130(f)(1).  That regulation provides

that when an SEIS is "required to address issues of limited scope," the preparation of an SEIS

"shall not necessarily . . . [p]revent the granting of new approvals."  While the Court faulted FTA

for failing to articulate its consideration of three litigation declarations submitted in response to

FTA's request for reconsideration of the Court's August 3, 2016 Order, that flaw (which

Defendants challenge on appeal) is limited in scope.  In its December 13, 2016 decision not to

prepare an SEIS on the WMATA Metrorail safety and ridership issues, FTA concluded that—

even in the unlikely scenario that eliminated all transfers between Metrorail and the Purple

Line—the environmental impacts remained unchanged and any declines in ridership would not

undermine the project justification.  The Court did not call this conclusion into question.  Instead,

the Court simply found that it was arbitrary and capricious for FTA not to provide a more

expansive discussion of the litigation declarations and ordered FTA to prepare an SEIS limited to

addressing that issue.  Courts have recognized that an ongoing SEIS process does not prohibit

FTA from executing an FFGA, *see, e.g., Honolulutraffic.com v. FTA*, 11-cv-307 (D. Hawaii);

*Beverly Hills Unified School District v. FTA*, 12-cv-9861 (C.D. Cal.); *515/555 Flower Associates*

*v. FTA*, 2:13-cv-453 (C.D. Cal.); *NAACP v. DOT*, 10-cv-147 (D. Minn.), and there is no basis for

the Court to reach a different result.

 To the extent the Court even reaches Plaintiffs' Section 5309 claims, their assertion that

FTA violated the Federal Transit Act by making its findings and executing the FFGA prior to

completing the SEIS ordered by this Court lacks merit and cannot support their request for

injunctive relief.

  **2.**  **To the extent the District Court's Order Prohibited FTA from executing an FFGA Even with a Valid ROD, the D.C. Circuit Stayed that Prohibition.**

 This interpretation is also the only one that can be reconciled with the Court of Appeals'

order reinstating the ROD.  The D.C. Circuit's July 19, 2017 Order can only reasonably be

interpreted as permitting the agencies to execute the FFGA after reinstating the ROD.  The D.C.

Circuit interpreted this Court's August 2016 Order as "granting appellees' request for injunctive

relief by vacating the Record of Decision, which . . . had the direct and intended effect of

preventing the use of federal funds and halting the project," and held that the May 22, 2017

Order "continued" that injunction.  July 19, 2017 Order, *Fitzgerald v. FTA*, No. 17-5132 (D.C.

Cir.).  In its request to stay this Court's judgment pending appeal, MTA argued that it would be

irreparably injured by its inability to obtain an FFGA while the ROD remained vacated.  *See,*

*e.g.*, Stay Mot. at 15 ("In the absence of the ROD, $325 million in already appropriated Federal

funds for this Project have been delayed more than nine months, causing significant financial

harm to the State."); *id.* at 17 ("[A] failure to reinstate the ROD, thus preventing the State from

obtaining the Federal grant needed to implement the Project, would likely lead to cancellation of

the Project without a chance for this Court to review the merits of this dispute."); *id.* at 18 ("The

continued delay in receiving Federal funds for the Project threaten its viability and the resulting

financial losses to the State are not recoverable.").

     Thus, the D.C. Circuit clearly intended to stay the injunction that had prohibited the use

of federal funds and halted the project.  It runs counter to the D.C. Circuit's expressed intent to

argue, as Plaintiffs do now, that the very same district court orders continue to prohibit the use of

federal funds, and continue to halt the project.  *See* TRO at 9.  Plaintiffs' interpretation that FTA

was not permitted to execute the FFGA renders the stay meaningless and ineffectual and such a

reading is unsupported.

     B.     FTA's Determination that MTA's Finances are Adequate is Sound.

     Plaintiffs' next Section 5309 claim fares no better.  Plaintiffs make the bald assertion that

WMATA's economic woes prevent FTA from finding that "local resources are available to

recapitalize, maintain, and operate the overall existing and proposed public transportation system, including essential feeder bus and other services necessary to achieve the projected ridership levels without requiring a reduction in existing public transportation services or level of service to operate the project." 49 U.S.C. § 5309(f)(1)(C). Plaintiffs make this sweeping claim solely on the basis of news reporting regarding WMATA's current funding concerns. But Plaintiffs fail to acknowledge that MTA—not WMATA—is the Purple Line project sponsor. MTA was the Section 5309 applicant, FTA's FFGA is with MTA, and MTA will own and operate the project. Moreover, MTA does not control WMATA. WMATA and MTA are separate entities and while Maryland is one of three funding partners for WMATA, it is not solely responsible for management of the WMATA system or its difficulties. Plaintiffs' assumption that Section 5309 required MTA to demonstrate the long-term solvency of a separate transportation system managed by a different entity is simply wrong.

In accordance with Section 5309 and agency guidance, FTA thoroughly vetted MTA's financial plans as they relate to the Purple Line and assessed the ability of the State to continue to fund and operate its existing transit services while implementing the Purple Line project. *See* Financial Capacity Assessment of the Maryland Transit Administration for the Maryland National Capital Purple Line (Attached as Ex. D). The financial capacity assessment prepared for the Purple Line project explains that FTA "analyze[d] the reasonableness of the Project financial plan," and concluded that "[t]he current financial condition is sound for both MTA and MDOT. In the past five years, transit service was expanded, transit capital assets were replaced or improved at a reasonable pace, and the cost of new and existing services, including capital replacement, was funded from current revenues." *Id*. at 6.

The Court should not consider Plaintiffs' Section 5309 claim, but even so, Plaintiffs'

contention that MTA's financial capacity is so dire that FTA is prevented from executing the FFGA is meritless.

## IV.     The Equities Counsel Against the Injunctive Relief Plaintiffs Seek.

Where, as here, Plaintiffs fail to show that they are likely to succeed on the merits of their claims, the Court need not address the remaining *Winter* factors.  *Apotex*, 449 F.3d at 1253-54. In any event, even if Plaintiffs' allegations suffice to establish standing as to their NEPA claim, that is not enough to meet the more stringent standard for irreparable harm in the context of seeking injunctive relief.  *See Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011) ("Of course, . . . a plaintiff may establish standing to seek injunctive relief yet fail to show the likelihood of irreparable harm necessary to obtain it.").  The injury Plaintiffs allege here is nearly identical to their claimed injury in the prior case, which the D.C. Circuit found wanting in balancing the equities.  *See* July 19, 2017 Order, *Fitzgerald v. FTA*, No. 17-5132 (D.C. Cir.) ("The State of Maryland has satisfied the stringent requirements for a stay pending appeal." (citing *Nken*, 556 U.S. at 434; *D.C. Circuit Handbook of Practice and Internal Procedures* 33 (2017)).

A temporary restraining order is contrary to the public interest served by the mandate rule, because the D.C. Circuit now has jurisdiction over the earlier-filed case, which Plaintiffs concede is "related."  When a case is on appeal, the district court is normally divested of jurisdiction in order to prevent that 'broad class of situations . . . in which district courts and courts of appeals would both have had the power to modify the same judgment."  *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58, 103 (1982) (per curiam).  As Judge Posner has explained, the rule is intended "to keep the district court and the court of appeals out of each other's hair."  *In re Jones*, 768 F.2d 923, 931 (7th Cir.1985) (Posner, J., concurring) (cited in *Amarin Pharmaceuticals Ireland Limited v. Food and Drug Administration*, 139 F.Supp.3d 437,

440 (D.D.C. 2015).  After the D.C. Circuit granted Maryland's request that FTA's ROD be reinstated pending appeal, FTA proceeded to execute the FFGA with MTA for the sum of $900 million, demonstrating the federal agency's considered judgment that the project is worthy of such a substantial investment and should proceed.  Granting injunctive relief would create another unnecessary impediment to the execution of the Purple Line project and would undermine the D.C. Circuit's current exercise of its jurisdiction over Plaintiffs' claims, a result that court could not have intended.  Indeed, Plaintiffs' attempt to obtain extraordinary relief here would appear to be an attempt to circumvent the D.C. Circuit's decision to reinstate the ROD and permit the project to go forward.

Congress has deemed it "in the interest of the United States . . . to foster the development and revitalization of public transportation systems" run by state and local entities.  49 U.S.C. 5301(a).  And even if the Court finds that Plaintiffs' claims are not barred by the statute of limitations or doctrines of claim preclusion and issue preclusion, the policies of repose embodied in those doctrines, and Congress's direction requiring the prompt resolution of challenges to public infrastructure projects such as this, *see* 23 U.S.C. § 139(*l*), argue against allowing Plaintiffs to file a fifth complaint challenging the same decision and project they first challenged in 2014.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' request for a temporary restraining order should be denied.

Respectfully submitted this 6th day of September, 2017.

JEFFREY H. WOOD
Acting Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

 /s/  *Tyler L. Burgess*
TYLER L. BURGESS (DC 1025617)
Trial Attorney
Natural Resources Section
PO Box 7611
Washington, DC  20044-7611
(202) 616-4119
tyler.burgess@usdoj.gov

*Attorneys for Federal Defendants*

OF COUNSEL
NANCY-ELLEN ZUSMAN, Assistant Chief Counsel for Litigation and Regional Operations
Federal Transit Administration

CHARLES E. ENLOE, Trial Attorney
U.S. Department of Transportation
Office of General Counsel

JOY K. PARK, Senior Trial Attorney
U.S. Department of Transportation
Office of General Counsel

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 6th day of September, 2017, I filed the foregoing

document electronically through the CM/ECF system, which caused all parties or counsel of

record to be served by electronic means, as more fully reflected on the Notice of Electronic

Filing.

/s/  *Tyler L. Burgess*
TYLER L. BURGESS
U.S. Department of Justice