## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRIENDS OF THE CAPITAL CRESCENT TRAIL:
*et al.*
                                  :

          Plaintiffs,        :   Civil Case No. 17-cv-1811 RJL

       v.                        :

FEDERAL TRANSIT ADMINISTRATION, *et al.* :

          Defendants.     :

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS'
## RULE 12(b)(1) MOTIONS TO DISMISS

Plaintiffs, Friends of the Capital Crescent Trail, John MacKnight Fitzgerald, Christine Real de Azua and Anna C. Haac, by and through undersigned counsel, submit this memorandum in opposition to the Rule 12(b)(1) Motions to Dismiss this action filed by the Federal Defendants and Maryland. The motions are without merit and should be denied. The motions are directed at Counts One through Four of the Amended Complaint filed on December 26, 2017, setting out claims against the defendants in six counts. There is no dispute that all six counts are claims not previously made in the prior litigation between the parties, *i.e.*, *Friends of Capital Crescent Trail, et al. v. FTA, et al.*, 877 F.3d 1051 (D.C. Cir. 2017) ("Purple Line I"). Plaintiffs are filing a separate Memorandum in opposition to the Defendants' motions to dismiss Counts Five and Six under Rule 12(b)(6).

Counts One through Four of the Amended Complaint allege violations of the Federal Transit Act ("FTA"), as set forth in specific subsections of 49 U.S.C. §5309. Defendants' challenge to those Counts is solely that Plaintiffs have no standing to maintain them, and therefore they should be dismissed under Rule 12(b)(1).

Under the standard of review for a standing motion under Rule 12(b)(1), as will be detailed,

factual matters alleged in the Amended Complaint are assumed to be true, and plaintiffs are to be

afforded the benefit of all inferences that can be derived from the facts alleged. Hence, Plaintiffs

begin by reviewing the facts and inferences supporting Count One through– Four of the Amended

Complaint (here "Complaint"), including the standing allegations.  All four Counts are grounded

in the execution of a Full Funding Grant Agreement ("FFGA") for the Purple Line Project in

August 2017.[1]  These Counts detail various statutory prerequisites to the execution of an FFGA

with which Plaintiffs allege Defendants failed to comply.[2]

**Count One – 49 U.S.C. §5309(f)(1)(C)**

Subparagraph (f)(1)(C) of 49 U.S.C. §5309 focuses on the resources available for the

"overall system," into which the proposed Project would fit. It stipulates that before approving any

FFGA, the Secretary **shall require** that –

> (C) **local resources are available to recapitalize, maintain, and**
> **operate the overall existing, and proposed public transportation**
> **system,** including essential feeder bus and other services necessary
> to achieve the Projected ridership levels without requiring a
> reduction in existing public transportation services or level of
> service to operate the Project.

49 U.S.C. § 5209f)(1)(C) (emphasis added). Complaint ¶32.

On March 2, 2017, Plaintiffs sent to Secretary of Transportation Chao ("the Secretary") an

APA petition with multiple attachments presenting, *inter alia,* recent evidence that the Project fails

to meet the requirements of §5309(f)(1)(C). ("March Petition").  In the March Petition, Plaintiffs

---

[1] The Complaint alleges that the FFGA was publicly signed on August 28, 2017. The Federal
Defendants state that this was a "public signing ceremony" that post-dated actual execution by six
days. Fed. Mem. 7. The difference is immaterial.

[2] Filed near the end of 2017, the Complaint could not address material subsequent events, which
Plaintiffs would included in an amended pleading if the Court deemed it necessary. Consideration
of these matters is included only as footnotes, in the discussion to follow

(except for plaintiff Haac) requested that the Secretary determine that the Project does not qualify for an FFGA given Metro's decline and lack of resources and the requirement of §5309(f)(1)(C) that sufficient resources be available to recapitalize, maintain and operate the overall local system before such a grant may be made. Complaint ¶¶64, 65. Plaintiffs have received no substantive response to the March Petition. *Id.* ¶69.

On September 19, 2017, at an earlier stage in this action, this Court ordered defendants to produce documents demonstrating the reasoned analysis of evidence necessary to make the findings and evaluations that form the basis for the FFGA. On September 22, 2017, following receipt of Defendants' response to the Order, this Court noted that:

> On this point, the Court cannot help but note its disappointment with Maryland's response to the Court's directive to submit the "prerequisite findings" of the Secretary present in the current record. Tr. of 9/19/17 Hr'g 41:5-6. ...[D]efendants are hereby directed to **review their documents and file a separate document within ten days setting forth the "findings" contained therein that the Secretary was supposedly relying upon to prove her point**. (Emphasis added). Complaint ¶54.

Ten days later, on October 2, 2017, Defendants again responded to the Court. Considering these filings cumulatively, Defendants' documents filed in this action include references to purported findings under §5309(f)(1)(A) and (B), but none under §5309(f)(1)(C). The Defendants have effectively admitted that no finding under §5309(f)(1)(C) was made as to the regional transportation network. Complaint ¶¶55, 58, 100.

On the issue of available local resources and financial commitment, the findings Defendants disclosed address the financial commitment and capacity of the Maryland Transit Administration ("MTA") alone, not the "overall public transportation system" in which the Purple Line is to operate. *Id.* ¶101. Count One is grounded in Plaintiffs' claim that subparagraph (f)(1)(C) is effectively ignored in Defendants' narrow interpretation of it, in that MTA's resources and

3

financial capacity are to be addressed pursuant to subparagraphs (f)(1)(A) and (B). Complaint ¶¶101, 102.

Count One is further supported by factual allegations that in their description of the Project purpose and need, Defendants made clear the connection of their Project to Metrorail, Metrobus and MARC as part of this "overall public transportation system." *Id.* ¶103. Plaintiffs further have alleged that the phrase "overall existing and proposed public transportation system" can only refer to that metropolitan area covered by the planning council of which the applicant entity is a part, namely, the Greater Washington regional system that includes the District of Columbia (DC), Maryland's two counties adjacent to DC and the adjacent jurisdictions of Virginia, as included in the map of the National Capital Region Transportation Planning Board listed by the USDOT in an earlier filing with this Court in this case (Document 32,   filed 10/02/17 page 2, para (3)), as reinforced by the map entitled "Purple Line Connections to Metrorail and MARC", Purple Line FEIS and Draft Section 4(f) Evaluation, Chapter 1 on Purpose and Need, page 1-10.  Complaint ¶103.

Plaintiffs have also alleged that the required (f)(1)(C) finding is also **clearly unattainable in this case**. Specifically, Plaintiffs alleged that local resources are not currently available to "recapitalize, maintain and operate the overall existing and proposed public transportation system". Such a finding, had it been made by the Secretary before signing the FFGA, would be inconsistent (a) with the financial and operational status of WMATA and other reliable statements on funding and resource needs Plaintiffs presented to the Secretary in a March 2017 Petition and (b) with all other evidence readily available to her at the time of the signing. It would also be inconsistent with the actions of officials, including the Executive Director and Chairman of WMATA, in cutting bus and rail services and asking for up to $2.5 billion a year more in funding than is currently available

4

for the next ten years in order to restore safe, reliable services to Metrorail, especially since there is no   reasonable expectation -- let alone present availability -- of the other kinds of necessary resources – i.e., technical, governance, skilled labor, management and fully functioning cars and other material equipment at an affordable price.  Complaint ¶104.[3]

In sum, plaintiffs have alleged that failing to make a finding of any kind to fulfill the requirement of (f)(1)(C), or to establish substantial evidence for such a finding, Defendants are in violation of 49 U.S.C. §5309(f)(1)(C) and their actions are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, within the meaning of § 706(2) of the APA. Complaint ¶106.

**Count Two – 49 U.S.C. §5309(f)(1)(B)**

Subparagraph (f)(1)(B) of 49 U.S.C. §5309 requires, as a prerequisite for an FFGA, that "each proposed local source of capital and operating financing is stable, reliable, and available within the proposed Project timetable." Complaint ¶108.

In Count Two, Plaintiffs have alleged that the Purple Line's local sources of capital and operating financing are not stable and reliable, but rather diminished and declining. *Id.* ¶110. In support of this Count Plaintiffs have alleged that on April 6, 2016, Maryland approved a $5.6 billion Public Private Partnership (P3) contract for the Project that commits the State to monthly payments of $150 million for over 30 years from Maryland's Transportation Trust Fund ("TTF"), regardless of the number of Project riders or amount of revenue they generate. *Id.* ¶60.

---

[3] More recently, the three WMATA jurisdictions, the District of Columbia, Maryland and Virginia have moved closer to agreement of $500 Million in dedicated funding (collectively from all three of them), mostly at the expense of other transportation projects (and in Maryland entirely from the TTF). Plaintiffs would revise Count One to allege that this would not meet the statutory criterion of currently having sufficient resources to repair, maintain and operate the overall local existing transportation network.

The TTF is a segregated fund used to finance Maryland's transportation programs. It is also the fund from which Maryland pays its share of contributions to WMATA. TTF proceeds are used to finance the Maryland Department of Transportation's (MDOT) operating expenses as well as MDOT's debt service and six-year capital program. This means that funding for capital transportation projects is subject to variations in TTF revenue as well as changes in MDOT's operating costs and debt service. A recent TTF Fiscal Briefing revealed a substantial deterioration in the TTF over the last year. *Id.* ¶61.

The TTF is the primary and major source of the Purple Line operating financing. The TTF is not at all stable. It has been and continues to be declining in its revenues. Furthermore, the compact requiring Maryland to pay for its share of WMATA funding will be changed and will almost certainly require a greater contribution from Maryland on the order of hundreds of millions of dollars per year. These are funds that Maryland Transportation Secretary Rahn admitted in testimony on December 5, 2017, before the State Legislature's Joint Committee on Federal Relations, that the TTF does not have. *Id.* ¶108.

The FFGA findings regarding Maryland's sources of capital and finances are incomplete, and therefore, arbitrary and capricious. In attempting to satisfy the terms of (f)(1)(B) regarding local sources of capital and operating finances -- mainly the capacity of the TTF to pay the Project's private contractor contract-fixed installments for over 30 years -- Defendants' submissions focused largely on the health of the MTA's Baltimore bus system and ignored the wealth of available evidence that the resources of the relevant local region, i.e., the Washington metropolitan area, were grossly inadequate to the task of meeting even Maryland's portion of WMATA's needs, declining in general and far below the standard set by (f)(1)(B), given that that source is primarily the TTF. The drain on local resources may prove to be even worse, as fares

6

from the MARC train may be used to pay the fixed installments that Maryland will need to pay for the Purple Line. Such a diversion would directly undercut a key part of the very same local transportation network serving these very Maryland Counties and DC.  Complaint ¶109.

In the March Petition, Plaintiffs demonstrated in detail facts critical to the (f)(1)(B) issue: Twenty-Five Billion dollars ($25,000,000,000.00) are needed by WMATA to repair, operate and maintain the Metrorail system alone, and there have been intentional reductions in bus and Metrorail service. The Maryland Office of Legislative Services has found that MDOT failed to comply with the directions of the Joint Chairs of its Committees of Jurisdiction in calculating the assets of the TTF and thus is expected to have $1.7 billion less than previously projected. WMATA is diverting federal capital grants to pay for day-to-day operations instead of the repairs and replacements that they are intended to cover.[4]  The north-south roadways of Maryland are continuing to decline in the transportation service they provide due to increased congestion and delays.  These facts and the evidence on declining receipts show that resources subject to (f)(1)(B) in this case are not stable as required. Rather, they are in fact diminished and declining. Complaint ¶110.

The rating for Local Financial Commitment has a different set of criteria, and is derived from ratings assigned to three sub-categories.  Two of these component ratings (Current Financial Condition and Reasonableness of the Financial Plan) focus on the ability of the agency sponsoring the Project (MDOT and MTA) to meet its financial commitments, current and forecast, not only to the Project but also to its other local transit responsibilities.  *Id.*¶¶116-127.  Yet the FFGA

---

[4] Recent legislation has been advancing in the local jurisdictions promising $500 Million per year for 10 years, or only one fifth of the necessary $25 Billion. Aside from this 80% shortfall, Maryland's share is to be paid largely from the TTF, which Transportation Secretary Rahn has made clear is already overcommitted.

assessment that was done for the Secretary by Porter and Associates (May 26, 2016) never took into account TTF's obligation to fund Maryland's share of WMATA funding. This was a significant oversight, as it ignores the financial, management and personal crisis at WMATA. A program of emergency repairs requiring Metrorail track shutdowns for weeks at a time was launched in 2016, and a consensus has now developed among all local jurisdictions that significantly increased funding will be required just to maintain the system, and there is as yet no consensus as to how those funds will be obtained on an ongoing basis. *Id.* ¶¶79, 80.

The ratings for Current Financial Condition and for Reasonableness of the Financial Plan underlying the FFGA concluded that the TTF funds available are sufficient to handle both current needs and significant Purple Line cost overruns. These ratings fail to account for the fact that more cost-effective projects are being postponed, and do not address the now widely recognized need for increased WMATA funding. The financial plan used as the basis for the Reasonableness of the Financial Plan rating erroneously assumed the historical WMATA funding trends would continue. On Wednesday, January 14th, 2017 the Washington Metropolitan Council of Governments failed to agree on a way to provide WMATA's more recent estimate of $500 million more per year, the minimum increase WMATA claimed it needed from Maryland, which itself is only a fraction of the estimated increase of $25 Billion required to achieve safe reliable service over the next ten years that WMATA and the Council of Government said earlier in 2017 was needed.  Complaint ¶¶81-82.

Hence, Count Two has alleged that the Secretary's findings and conclusions under § 5309 (f)(1)(B) on sources of capital and financing for the Project are in violation of that provision of the FTA, rendering her FFGA award for the Project arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, within the meaning of § 706(2) of the APA.

8

**Count Three – 49 U.S.C. §5309(d)(2)(A)**

The Secretary assigns ratings for each transit project considered for a grant through the Capital Investment Grant program. The overall project rating is determined as a combination (with 50/50 weights) of the ratings assigned for "Local Financial Commitment" (subparagraph (iv)) and for what is termed Project Justification (subparagraph (iii)). The Local Financial Commitment rating is in turn a combination of ratings for three sub-categories: Current Financial Condition (25% weight), Commitment of Funds (25% weight), and Reasonableness of the Financial Plan (50% weight). The Project Justification rating is a combination of ratings for six sub-categories (all equally weighted): Mobility Improvements, Congestion Relief, Cost Effectiveness, Environmental Benefits, Economic Development, and Land Use. Complaint ¶¶30, 31, 75.

The Project Justification rating assigned to the Purple Line at the most recent review (in May 2016) was Medium-High. The ratings on four of the six sub-categories are scaled in some way to the ridership forecasts. Specifically, the rating for Mobility Improvements is a direct function of the number of forecast annual trips on the line; the rating for Congestion Relief is based on the number of new weekday transit trips forecast for the Project; Cost Effectiveness is rated based on the annualized cost of the Project per forecast number of riders; and Environmental Benefits is calculated based on the forecast reduction in miles traveled by car as a result of riders shifting to the new rail line. *Id.* ¶76.

New, expert testimony submitted to Defendants by Plaintiffs in the March Petition shows quite dramatically how the Purple Line ridership projections, as approved in the ROD for the Project and detailed in the FEIS, result in projections that far exceed any reasonable expectations. This new information detailed how and why ridership and benefit estimates in the FEIS are implausible and in some instances just impossible. In several reports and analyses that compared

tables published in the Technical Appendix to the FEIS with the publicly posted Project ratings, Dr. Frank Lysy reveals a number of remarkable, impossible conclusions reached by the Defendants in their earlier assessment of these data, and he itemizes a number of obvious and significant errors in the methods used and the reported results for the Defendants' Purple Line ridership forecasts. *Id.* ¶¶71-72.

Dr. Lysy explained that the nature of the errors implies that correcting for them would lead to far lower ridership forecasts. His reports and analyses were furnished to Defendants prior to the Secretary's execution of the Purple Line FFGA, but there is no evidence they were considered in connection with the evaluation of the criteria that must be considered before awarding an FFGA. Defendants were also provided the Declaration of August 30, 2016 by former Long Island Railroad Vice President Martin Saggese. He summarized flaws in the presentation of the ridership projections in the Purple Line NEPA record. As with Dr. Lysy's analysis, there is no evidence it was considered in the making of required FFGA findings. The testimony of these experts, much more timely than projections in the FEIS, make it very likely that the four Project Justification Ratings tied to ridership are unreliably high. *Id.* ¶¶73-74, 77.

The Complaint also alleges that there is no substantial evidence to adequately support at least four of the six of the Project Justification ratings made in support of the FFGA entered into this case, *id.* ¶113, and that properly supported ratings on all six criteria are required to justify on FFGA. *Id.* ¶114. The Complaint sets forth the factual bases for this conclusion as to four of the six criteria, as applied to the Project, in great detail. *Id.* ¶116-127.

Based on these and other factual allegations, Plaintiffs have alleged that Defendants acted in an arbitrary, capricious manner, and not in accordance with law, in the application of their own regulations to the Project under the criteria in 49 U.S.C. §5309(d)(2)(A), and in applying the

requirement that these criteria be rated and ranked with comparable weight in making the §5309 findings supporting the FFGA.  Complaint ¶124.

Plaintiffs have alleged that the Secretary must carefully evaluate the reliability of the methods used for projecting use, i.e., ridership, of the proposed system, before agreeing to an FFGA.  In this instance, that effort has been exposed by a series of expert sworn statements and analyses as based on unfounded numbers from the outset and the adoption of ridership projections without any subsequent reasoned explanation addressing those expert critiques.  Such willful disregard of competent, material evidence is arbitrary and capricious, in violation of 49 U.S.C. §5309(d)(2)(A) and the APA.  Complaint ¶125.

Plaintiffs have further alleged that the Secretary's additional findings that the Project is justified based on the specific costs and benefits required by the FTA to be ranked and rated are not based on an objective and rational "comprehensive review" of any reasonable evidence of record. The rating standards have not been met. Even as to the two of the six subsection (d)(2)(A) required ratings for which evaluations were proffered, the ratings are not supported by substantial evidence. Defendants have failed to provide the findings required by law, and the record does not contain substantial evidence to support proper findings, so as to justify an FFGA.  Defendants findings and conclusions are in violation of 49 U.S.C. §5309(d)(2)(A), and their actions are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, within the meaning of § 706(2) of the APA.  Complaint ¶¶126-27.

**Count Four - 49 U.S.C. §5309(k)(5)**

Subsection (k)(5) of 49 U.S.C. §5309 requires the Secretary, before signing an FFGA, to send the proposed FFGA, and the findings and evaluations required under §5309 to support granting the FFGA, to Congress for a review period of 30 days. Complaint ¶36. Plaintiffs have

alleged that the materials supplied to Congress in this case lacked any supporting evaluation for four of the six performance and cost-benefit ratings required under subparagraph (d)(2)(A)(iii). Nor did the packet include any finding at all, let alone any supporting evaluation, regarding the availability of the local resources required to recapitalize, maintain and operate Metrorail and the overall regional transportation system.  Complaint ¶130.

By the time the FFGA was executed in August 2071, the Defendant's July 2016 notification to Congress was more than a year old and seriously outdated due to continuing and escalating concerns regarding Metrorail funding and safety. At the very least, therefore, even assuming *arguendo* the adequacy of Defendants' July 2016 notification, no FFGA should have been executed prior to Congressional receipt (plus 30 days) of an augmented evaluation of the Project under FFGA criteria and standards. *Id.* ¶133. Plaintiffs have alleged that the Secretary's acts and omissions are in violation of 49 U.S.C. §5309(k)(5), and are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, within the meaning of § 706(2) of the APA.


## ARGUMENT

### I.  PLAINTIFFS HAVE STANDING TO MAINTAIN THIS ACTION AS TO COUNTS ONE THROUGH FOUR

Both Defendants challenge Plaintiffs' standing to maintain this action as to Counts One – Four--Plaintiffs' claims arising under 49 U.S.C. §5309 seeking invalidation of the FFGA executed for the Project.  Both Defendants claim Plaintiffs lack both constitutional (case or controversy) standing under Article III, as well as prudential standing under the "zone of interests" test. Fed. Mem. 10, 15; Md. Mem. 11, 18. These challenges are to be evaluated under the standards for dismissal under Rule 12(b)(1), wherein the Court "must assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting a plaintiff the benefit of

all inferences that can be derived from the facts alleged." Fed. Mem. 8 (*quoting Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)). Defendants' challenges to Plaintiffs' standing have no merit, given the material factual allegations on standing in the Complaint, liberally construed in light of inferences that can be derived from these facts.

## A.   FACTS RELATED TO STANDING IN OR INFERRED FROM THE COMPLAINT

Anticipating the standing challenge made by Defendant's Plaintiffs included facts relating to the standing of each Plaintiff as summarized below, with respect to Counts One – Four.

### 1.   <u>Friends of the Capital Crescent Trail ("FCCT")</u>

Plaintiff, FFCT, is a 501(c)(3) non-profit organization dedicated to preserving parkland, open space, and quality of life in Montgomery County.  FCCT is an environmentally conscious group that strives to protect and establish parkland and green space.   FCCT advocates transportation solutions that (a) preserve invaluable regional resources such as the Capital Crescent Trail and its Georgetown Branch ("Trail"); and (b) protect the public's enjoyment of the natural areas and green spaces of Montgomery County, including, but not limited to, the Trail.  FCCT members use the Trail on a regular basis. Its members enjoy walking, running, biking, and observing wildlife in this unique setting – a serene, natural refuge inside the Beltway. Before the Trail's abrupt closure on the first day of school this past fall, children of FCCT members and supporters used or crossed the Trail to get to school by foot or by bike in a safe, healthy, and direct manner. Complaint ¶3.

As proposed, the Project is feasible only with the FFGA award. If the FFGA is not invalidated, it means the Project will harm the interests of FCCT and its members and supporters and their children and grandchildren in preserving the ecological integrity and tranquil, natural and safe character of the Trail and of nearby areas and buildings that would be affected by the Project.

In its operation and construction, the Project will entirely change the nature of the Trail and the areas through which it passes and to which it leads, adversely impacting the FCCT members' experience on and near it and causing FCCT and its members aesthetic injury as well as health and safety concerns, risks and direct injuries daily due to high levels of peak intermittent noise nearly round the clock, increased air pollution from fugitive dust resulting from the burning of coal and natural gas for most of the electric power to drive the Project's outmoded trains, and loss of property values and the literal quiet enjoyment of their parks, neighborhoods, properties and homes. Defendants have now closed the Trail for as many as five years and will eventually replace it with an impervious concrete surface, walled in and inaccessible except at distant intervals, leaving bicycle and pedestrian users trapped against noise every few minutes and trapped within a distance that is much closer to the trains and tracks than is normally recommended or allowed due to safety concerns arising from potential collisions from derailing and to noise exposure. In conjunction with high-rise commercial development projected to occur as a result of the Purple Line's construction, this will strip the scenery along and surrounding the Trail of its pre-construction natural beauty. The clamor of the Project's construction and the frequently running trains post-construction will shatter the tranquility the FCCT and its members enjoy in this natural haven. In addition, the destruction of the tree canopy along the Trail thus far has harmed and will continue to harm FCCT's interest and that of its members and the public it serves in observing its diverse wildlife, and enjoying health benefits from walking and biking under a fully canopied quiet trail. Complaint ¶4.

Plaintiff, Christine Real de Azua has since 1991 lived in Chevy Chase, Maryland, with just one row of houses between her home and the Trail, during which time she has been a regular user of the CCT and its Georgetown Branch -- until it was closed in September 2017. She is the

Treasurer of FCCT.  Until the abrupt and premature closing of the Trail, she used the Trail several times a week in order to maintain her health and has a recreational, aesthetic, and professional interest in the Trail as a whole and its unimpeded connection to areas east and west of it. Complaint ¶7.

In its proposed construction and operation, the Project will adversely affect Ms. Real de Azua's enjoyment and value of her home and her work and recreation.  It will substantially impair her aesthetic, recreational, and personal health interests; the value of her home; her quiet enjoyment with friends and family; and her occupational interests in the urban and suburban forests along the Trail, including her interest in various species that inhabit the Trails, her interest in biodiversity, her interest in maintaining a healthy mature tree canopy and her interest in biological connectivity. She will experience the adverse effects of the Project along with other FCCT members as stated above, but do so in a more particularized way due to her residing so close to the Trail and being a frequent user of it. Complaint ¶8.

Plaintiff John Fitzgerald has lived in Chevy Chase Maryland near the Trail since 1999, during which time he has been a frequent user of the Capital Crescent Trail and its Georgetown Branch. Until the Trail was abruptly closed in September 2017, he used the Trail once or twice a week and has a practical transportation and recreation and aesthetic interest in both parts of the Trail. Mr. Fitzgerald enjoys biking and strolling on the Trails, looking for and viewing birds and other wildlife species in the mature tree canopy and elsewhere along the Trail. Complaint ¶12.

The Project will permanently impair Mr. Fitzgerald's practical, professional, aesthetic and recreational link to the forests along the Trail.  Its construction and operation will deny Mr. Fitzgerald the quiet enjoyment of his home. Mr. Fitzgerald will experience the adverse effects of

the Project in a more particularized way than those who either do not live so close to the Trail or have not been frequent users of it. Complaint ¶14.

Mr. Fitzgerald and Ms. Real de Azua are also residents of the Town of Chevy Chase ("Town"), which filed extensive comments on the Project's Draft and Final EIS's for the benefit of all residents of the Town, comments, which complemented those filed by the FCCT. They are both members of the Town of Chevy Chase Special Committee on Purple Line Mitigation, which seeks information regarding the adverse impacts of the Purple Line and ways of minimizing and mitigating these impacts to the extent that the Project goes forward. Complaint ¶15.

Plaintiff Anna C. Haac has lived in Bethesda, Maryland since 2007, during which time she has been a regular user of the CCT and its Georgetown Branch until the latter was closed in September 2017. Before then, Ms. Haac used it on a regular basis to commute to work, to get to daycare and medical appointments, and for recreational activities, such as biking and walking. Complaint ¶17. More specifically, in 2012, Ms. Haac purchased a home in a neighborhood in East Bethesda, which abuts a now-closed entrance to the Capital Crescent Trail. Since 2012 and up until the Trail's closing, Ms. Haac used the Trail every day to walk with her dog and child, to commute to her son's daycare or pediatrician, or to commute to work either via the Bethesda Metro or bicycle. Complaint ¶18.

In 2017, Ms. Haac enrolled her son in a daycare center, at a location that abuts the CCT. Until the closing of the Trail, her son's daycare used and crossed the Trail to take the children to a park on the other side. The CCT was the children's only safe access to greenspace and is accessible via a short two-minute walk along and across the Trail from the daycare site to the park. However, because that entire portion – the Georgetown Branch -- is now closed, there is no safe and reasonable way for the daycare facility to take the children to that park. Complaint ¶19.

As proposed, the Project will seriously impair Ms. Haac's aesthetic, recreational, community, and occupational interests in the urban and suburban forests along the Trail, including her interest in various species that inhabit the Trails, her interest in biodiversity, and her interest in maintaining a healthy mature tree canopy. As with the other two individual plaintiffs, Ms. Haac will experience the adverse of the effects of the Project in a more particularized way than Bethesda residents who either do not live so close to the Trail or have not been frequent users of it. Complaint ¶22.

As to all Plaintiffs, a favorable judgment in this action invalidating the FFGA will redress the stated injuries. Complaint ¶¶4, 9, 16 and 23.

## C.   PLAINTIFFS' FACTUAL ALLEGATIONS SATISFY THE TEST FOR CONSTITUTIONAL STANDING

To warrant the invocation of this Court's jurisdiction, Plaintiffs must satisfy the Article III standard for standing, which has three elements:

> The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that it is likely to be redressed by a favorable judicial decision.

*Spokeo, Inc. v. Robins*, ____ U.S. ____, 136 S. Ct. 1540, 1547 (2017). As detailed below, Plaintiffs have satisfied each of these elements.

### 1.   Plaintiffs Have Suffered an Injury in Fact

*Spokeo* provides that to establish injury in fact, Plaintiffs must show that they have "suffered an invasion of a legally protected interest that is not conjectural or hypothetical." *Id*. at 1548 (*quoting from Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). An injury is particularized when it affects a "plaintiff in a personal an individual way." *Id*. An injury is concrete when it is "real and not abstract." *Id*. On this and the other elements of standing, it is sufficient at the Rule 12(b)(1) stage for Plaintiffs to state a "plausible claim that the requirements of standing

17

are met." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). In addition, the Court is to accept well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences from those allegations in the plaintiffs' favor. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

Applying these standards to the Complaint, it is abundantly clear Plaintiffs have suffered an injury in fact. Plaintiffs have set forth in detail how, in a variety of ways, the Trail has been an important component of their lives at all times before the start of Project construction, and how the high value they placed on use and enjoyment of the Trail is being degraded by the Project in numerous ways. If the Project moves forward to completion, Plaintiffs will experience a substantially altered environment. A quiet, sylvan foot and bicycle path is to be replaced, in Plaintiffs' immediate neighborhood, with an impervious concrete right-of-way, continuously shared with trains rumbling close by at frequent intervals.[5]

Defendants' motions make no serious attempt to dispute Plaintiffs' injury-in-fact showing, and they ignore *Sierra Club v. FERC*, 827 F.3d 36, 44 (D.C. Cir. 2016), which should be regarded as controlling authority on whether Plaintiffs have suffered injury in fact. In that case, the Court held that "credible claims of exposure to increased noise and its disruption of daily activities" would satisfy the injury-in-fact requirement. *Id.* at 44. Similar claims of concrete injury were deemed sufficient in *Sierra Club v. FERC*, 867 F.3d 1357, 1365-66 (D.C. Cir. 2017). In this second, different *Sierra Club* case, the plaintiffs explained how the pipeline project being contested

---

[5] Indeed, apart from the allegations in the Complaint, it must be all but completely self-evident to the Court, which adjudicated Purple Line I with substantially the same parties, that Plaintiffs did not undertake the expense and time of that years long litigation out of some vague, generalized concern about ensuring good government decisionmaking. Plaintiffs actions have always been grounded in averting the very real, particularized harms now being visited upon them due to Project approval pursuant to the FFGA.

18

"would harm their concrete aesthetic and recreational interests." One of the plaintiffs was a proximate property owner who averred that "construction noise would impair the enjoyment of his daily activities, and that trees shading his house will be permanently removed." *Id.* Plaintiffs' claims of injury here are more than "plausible;" they are at least the equal of those found sufficient in these recent precedents from the D.C. Circuit Court of Appeals.

### 2.   Plaintiffs' Injuries are Fairly Traceable to the Execution of the FFGA by Defendants

The second Article III standing element Plaintiffs must satisfy is a showing of a "causal connection between the injury and the conduct complaint of – the injury has to be fairly traceable to the challenged action of the [Defendants] and not the result of the independent actions of some third party not before the Court." *Lujan*, 504 U.S. at 560.

In this case, there is no attenuation of causation due to actions of some third party not before the Court. Plaintiffs are challenging the validity of an agreement entered into between the two defendants in this case – the Purple Line FFGA. In addition, the causal connection between the injuries complained of, all associated with Project construction (now) and Project operations (upon completion of Project construction), and the conduct complained of – FFGA execution – is manifest and direct, more than "fairly traceable."

As plaintiffs have alleged, Complaint ¶¶66-67, a year ago, during the time this Court had vacated the ROD, Defendants repeatedly asserted in the *Purple Line I* litigation that the vacatur put the fundamental viability of the Project at risk and could kill the Project. This concern was escalated further in a mandamus petition filed by Maryland in the Court of Appeals on May 12, 2017 for an order requiring this Court to decide pending motions in that case forthwith. The petition included the declaration of Maryland Transportation Secretary Rahn who stated that execution of the FFGA upon which Maryland was substantially dependent for Purple Line funding

had been held up due to the ROD vacatur. Indeed, he characterized those federal funds as "critical

to the project." Rahn Decl. ¶57.[6] Secretary Rahn predicted a suspension of a Project activities by

June 1, 2017, *id.* ¶62, i.e., less than three weeks later, and a decision to cancel the Project within

60 days thereafter, if the ROD were not promptly reinstated and the FFGA executed as anticipated.

*Id.* ¶65. Of course, as this Court is well aware, the ROD was reinstated by the Court of Appeals.

This occurred on July 19, 2017. The FFGA was executed by the defendants about a month later in

August 2017, and construction of the Project began shortly thereafter.

Based on these facts, there is a clear and compelling causal link between the injury

complained of and the execution of the FFGA. Plaintiffs submit that the "fairly traceable" element

does not require them to demonstrate with certainty that, but for execution of the FFGA, the Project

would grind to a halt. It is sufficient to show that loss of the federal funding in the FFGA would

significantly increase the likelihood that the Project would not go forward. See *Indian River

County v. Rogoff*, 201 F.Supp. 3d 1, 14 (D.C.C. 2016). On the spectrum between "significantly

increased likelihood" and "certainty," Defendants' own claims about this very issue demonstrate

Plaintiffs' satisfaction of this element well beyond fair traceability.

### 3. Plaintiffs' Injuries are Redressable by a Favorable Judicial Decision

The third Article III standing element Plaintiffs must satisfy is a showing that "it must be

likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Lujan*, 504 U.S. at 561. Plaintiffs have shown that it is far from "speculative" to conclude that

invalidation of the FFGA on the grounds set forth in Counts One – Four will redress the injuries

being suffered by Plaintiffs. If the FFGA is not later resuscitated, Maryland's own prior statements

---

[6] A copy of the Rahn Declaration is attached. The Court may take judicial notice of this filed
Declaration, the decisions of the Court of Appeals, and earlier pleadings filed in this case.

concerning the criticality of federal funding, detailed above, belie the Federal Defendants' response: "The State of Maryland is free to proceed with the project using other funding sources." Fed. Mem. 14.

Maryland argues lack-of-redressability premised on the notion that if the Court were to invalidate the FFGA, it would be a momentary harm while Defendants engaged in a paperwork exercise to validate the FFGA with the missing findings: "the remedy would be for FTA to prepare more thorough documentation supporting those findings." Not only is this absurd questions-begging, Plaintiffs did not bring Counts One – Four against Defendants to improve their paperwork. They have alleged that in some instances, the findings necessary to justify an FFGA simply cannot properly be made under the circumstances of this case. Complaint ¶¶104, 116-19, 122. Indeed, if, as Plaintiffs claim, a principal rationale for the required FFGA findings is to make sure that the Secretary is expending federal funds only on the most meritorious light rail projects, and if, as Plaintiffs claim, no serious effort at making proper findings has been undertaken here, then it is far from obvious that if Plaintiffs prevail, the proper final outcome will be a reinstated FFGA. And if the FFA is not reinstated, it is quite likely, based on Maryland's own recent representations in this Court and above, that the Project will not go forward.

What then will happen to the Trail? Maryland's answer is that the demise of the Project "will not redress the principal environmental harms asserted by Plaintiffs, namely impacts to the Georgetown Branch right-of-way," Md. Mem. 16. But this backward-looking view of only the injury already experienced by Plaintiffs is mistaken. Plaintiffs injuries are tethered to the entire period of Project construction and the entire period of Project operation thereafter. If the Project dies for lack of federal funding all further harm is ameliorated and, quite predictably, Montgomery County can be expected to take reasonable steps to restore the Trail to once again serve the

exceeding valuable and valued functions it has served in the community for decades prior to Trail closure last September.

Maryland nonetheless stubbornly argues that Plaintiffs' redressability showing fails because a favorable judgment "will not result in a restoration of the environmental conditions in the [Trail]." Md. Mem. 18. While the demise of the Project will not restore the many mature trees that once graced the Trail that have now been removed, it will restore peace, quiet and Trail utility as new trees grow in coming years to take their place. The redressability element does not obligate Plaintiffs to prove that a favorable judgment will result in a perfect restoration of the *status quo ante*. The standard of "likely redressability" includes a less-than-perfect cure of all pre-judgment injury. See *Orangeburg S.C. v. FERC*, 862 F.3d 1071, 1083-84 (D.C. Cir. 2017); *Douglas Timber Operators v. Salazar*, 774 F.Supp.2d 245, 251-52 (D.D.C. 2011), holding that what is required is a showing that a favorable decision will "likely ameliorate" the harm alleged.

Indeed, if standing based in significant part on degradation of one's immediate environment could be defeated by a claim that the pre-judgment environmental harm was so severe as to be incurable, the standing doctrine would be ample incentive to a defendant in a case such as this to lay waste to what is valued as thoroughly and as quickly as possible. In Plaintiffs' calculus of events, if not Defendants, it is no mere happenstance that the opening target of the 16.2 mile Project last September was the mature trees along the last mile or two of the Project, where Plaintiffs Fitzgerald, Real de Azua and other FCCT members reside. In fact, that choice by Defendant Maryland reveals more profoundly than Plaintiffs could themselves that they are "peculiarly suitable challengers" to the administrative actions at issue. *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277, 283 (D.C. Cir. 1988).

### D.   PLAINTIFFS' FACTUAL ALLEGATIONS SUFFICE TO MEET THE ZONE-OF-INTEREST TEST FOR PRUDENTIAL STANDING

Defendants' standing challenge extends further to claim that Plaintiffs fail to meet the zone-of-interests requirement in the prudential test for standing. The zone-of-interests test "is not meant to be especially demanding," *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987), and simply asks "whether the interest sought to be protected by the complainant is *arguably* within the zone of interests to be protected or regulated by the statute" in question. *Bennett v. Spear*, 520 U.S. 154, 164 (1997). In assessing a zone-of-interests claim, the determination is made not by reference to the overall purpose of the act in question, but by reference to the particular provisions in the act on which the plaintiff relies. *Grand Council of the Crees v.* FERC, 198 F.3d 950, 956 (D.C. Cir. 2000) ("Congress's purposes in enacting the overall statutory scheme are relevant only insofar as they may help reveal its purpose in enacting the particular provision."). Thus, the relevant inquiry is not whether, in the overall act, Congress specifically intended to benefit the Plaintiffs personally by enactment of § 5309. *National Credit Union Admin. v. First National Bank & Trust Co.*, 522 U.S. 479, 488-89 (1998).

As detailed below, Plaintiffs are, at the very least, "arguably" within the zone of interests of the statutory provisions on which Counts One – Four are grounded. In those Counts, Plaintiffs allege serious deficiencies in the  findings made mandatory under § 5309 confirming the financial soundness of the existing public transportation network (whether viewed narrowly as limited to Maryland, as Defendants claim, or more broadly to the entire Washington metropolitan area, as Plaintiffs claim).

Hence, it matters not whether Defendants are correct in claiming that Plaintiffs were not the intended beneficiaries of § 5309 generally, Fed. Mem. 16, or that the "substantive rights of local residents" are not listed among the eight general purposes of the New Starts program,

enumerated elsewhere, i.e., in 49 U.S.C. 5301. Md. Mem. 19-20. Defendants ignore the fact that under §5309, NEPA compliance is an express prerequisite for consideration of an FFGA, and that under §5309 Congress established *criteria* for when grant funds should be distributed, and that those criteria, if applied according to their plain terms, also protect members of the public who are harmed from grants not adequately vetted according to those criteria. Indeed, Congress' intention that compliance with § 5309 benefit more than just the project applicant and proponents is readily apparent in subsection (d)(2)(A)(iii), which requires the Project to undergo a six-factor "comprehensive review," where each factor is directly assessed and "justified" by how the project will benefit the public: mobility improvements, environmental benefits, congestion relief, economic development effects, land development supporting public transportation, and cost-effectiveness at the user level. *Id.*

Defendants ignore these finding requirements and instead rely on a 30-year old case that does not, as Defendants imply, decide a zone-of-interests issue under the APA. Rather, it adjudicated the question of whether there was an implied private right of action under different, predecessor provisions of the Urban Mass Transportation Act, *i.e., Rapid Transit Advocates, Inc. v. S. Ca. Rapid Transit Dist.,* 752 F.2d 373, 377 (9th Cir. 1985). That case therefore does not advance Defendants' argument. Further, nothing like the findings now required of the Secretary by Congress were required at that time. As the court there noted, the statutory obligation was that "each grant application certify that the applicant has considered the economic and social effects of the project and its impact on the environment, and has found the project to be consistent with official plans for the comprehensive development of the urban area." *Id.* A self-serving "certification" made to the Secretary is a far cry from a Congressional mandate that the Secretary himself or herself make a series of detailed findings. In this case, Defendants have thus far been

unable to produce the evaluations necessary to support the FFGA findings required by 49 U.S.C. §5309 to the Court upon two requests for them.  Complaint ¶¶116-27[7]

Far more pertinent than *Rapid Transit,* yet ignored by Defendants, is *Township of Belleville v. FTA*, 30 F. Supp. 2d 782 (D.N.J. 1998).  In that case, the Township of Belleville, New Jersey was found to have standing based on a zone-of-interests analysis under an earlier version of the Secretary's finding requirements, which are now found in § 5309 (f)(1)(C) and § 5309 (d)(2)(A). The court reasoned that adherence to the requirements in what was then § 5309(e)(2) "protect both local and state interests by insuring local and state officials the ability to participate in a meaningful way in the planning process leading up to projects that will directly affect their interests." 30 F.Supp.2d at 795. Those interests, the court noted, "include the social, economic, safety and environmental interests of those impacted by major metropolitan transportation investments receiving federal funds." *Id.*

The court recognized that the Town's interest "in insuring that reasonable alternatives be considered and that potential significant impacts of the project be scrutinized...arguably, fall within the zone of interests sought to be protected by "the statute". *Id.* The same conclusion is warranted here. It is immaterial that the plaintiffs here are a non-profit conservation organization and three individuals rather than a municipality, in that that the Township's municipality status played no role in the court's reasoning.[8] In addition, a zone-of-interest analysis under former §

---

[7] Defendants' responses to the Court reveal that only two of the six performance ratings had any supporting evaluations, that only two of the three required financial findings had been made, and that Defendants were still looking for more. Complaint ¶54.
[8] Should the Court consider the municipal involvement in that case an important factor, we note that Plaintiffs Fitzgerald and Real de Azua have been heavily involved with the Town of Chevy Chase in relation to fulfilling the very functions noted by the Court in *Belleville.*

5309(e)(2) should be deemed equally applicable to a zone-of-interest analysis under the successor provisions in § 5309.

*Belleville* predates, but is in harmony with *Match-e-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012), where the Court found prudential standing for the plaintiff. His claim to live free from the harm to be visited upon him by the threat of being in the vicinity of a casino was within the "zone of interests" intended to be covered by the Indian Reorganization Act. Plaintiff had no claim to the proposed casino property at issue, and was not a Native American of that or any competing tribe. He nonetheless prevailed because the relief he sought was to set aside a purchase of land by the Department of the Interior in trust for the Indian tribe that, as alleged by plaintiff, had been consummated without clearly satisfying the required procedures, and a victory could provide him the relief sought. 567 U.S. at 224-28.

The foregoing amply demonstrates that Plaintiffs' zone-of-interest standing is justified for all the challenged Counts, i.e., One – Four.  Plaintiffs wish to note in addition, however, that under Count Four, while Congress is the clearly intended beneficiary of the 30-day notice requirement in  § 5309 (k)(5),  and while this provision is surely a statutory safeguard for federal funds, it is also a safeguard to all those who can rightfully claim an interest in separation-of-powers style oversight on federal largesse by their elected officials, especially when, as here, those Legislative Branch voters feel strongly victimized and harmed by what they regard as the indiscriminate expenditure of federal funds that, at best, give lip service to Congressionally mandated findings. As the *Belleville* court concluded, "environmental interests of those impacted by major metropolitan transportation investments receiving federal funds" are interests that "arguably fall within the zone of interests sought to be protected" by the statute. 30 F.Supp.2d at 795. That conclusion is just as correct for Count Four as it is for Counts One-Three.

## CONCLUSION

For the foregoing reasons, the motions of the Federal Defendants and Maryland to dismiss Counts One-Four pursuant to Rule 12(b)(1) should be denied.

Respectfully submitted,

**KNOPF & BROWN**

March 29, 2018

David W. Brown, D.C. Bar No. 415429
401 E. Jefferson Street, Ste. 206
Rockville, MD  20850
brown@knopf-brown.com
(301) 545-6100

John M. Fitzgerald, D.C. Bar No. 32209
Attorney and Advocate
4502 Elm Street
Chevy Chase, MD 20815
greenknights.law@gmail.com
(301) 913-5409

**Attorneys for Plaintiffs**

Case 1:17-cv-01811-RJL   Document 52   Filed 03/29/18   Page 28 of 53

Case 1:14-cv-01471-RJL   Document 145-2   Filed 06/02/17   Page 2 of 26
USCA Case #17-5132      Document #1689450        Filed: 08/18/2017    Page 301 of 535

## DECLARATION OF PETE K. RAHN

My name is Pete K. Rahn, and I have first-hand experience with, and personal knowledge of, the facts and matters discussed in this declaration.

### STATEMENT

1.      I am currently the Secretary of Transportation for the State of Maryland, a cabinet position appointed by the Governor and confirmed by the State Senate.  As Secretary of Transportation, I lead the Maryland Department of Transportation ("MDOT").

2.      Before becoming Maryland's Secretary of Transportation, I served as the Secretary of Transportation for the New Mexico State Highway and Transportation Department (1995-2002), as the Director of the Missouri Department of Transportation (2004-2010), and as a Senior Vice President of HNTB Corporation (2010-2015).

3.      In addition, I served in a variety of leadership positions in the transportation industry, including president of the American Association of State Highway and Transportation Officials (2007-08),  membership on the Executive Committee of the Transportation Research Board of the National Academies of Sciences (2006-2009), and Chair of the State Transportation Commission of New Mexico (2011- 2015).

Case 1:17-cv-01811-RJL    Document 52    Filed 03/29/18    Page 29 of 53

Case 1:14-cv-01471-RJL    Document 145-2    Filed 06/02/17    Page 3 of 26
USCA Case #17-5132        Document #1689450        Filed: 08/18/2017    Page 302 of 535

4.      I also received the Vision Award from the National Council on Public

Private Partnerships in 2008; the Environmental Achievement Award for

Environmental Stewardship from the Federal Highway Administration in 2002;

and the Transportation Leadership Award from the Design-Build Institute of

America in 2010.

## The Maryland Department of Transportation

5.      MDOT is a state agency comprised of five modal administrations:  the

State Highway Administration, Maryland Transit Administration ("MTA"), Motor

Vehicle Administration, Maryland Port Administration, and the Maryland Aviation

Administration.  As Secretary, I chair the board of the Maryland Transportation

Authority.

6.      Also as Secretary, I am responsible for overseeing the business units

of MDOT and ensuring that their planning and capital project initiatives are

complementary to each other and that they help realize the Governor's

transportation goals for the State.  I am also responsible for managing MDOT's

financial resources, which are comprised of tax and fee revenues, operating

revenues, bond proceeds, and federal funds.

7.      The State's investment in its transportation system is a key component

to ensuring for its citizens that the State advances its goals for economic success

and sustainment, mobility, quality of life, safety, greater access to employment,

Case 1:17-cv-01811-RJL   Document 52   Filed 03/29/18   Page 30 of 53

Case 1:14-cv-01471-RJL   Document 145-2   Filed 06/02/17   Page 4 of 26
USCA Case #17-5132      Document #1689450      Filed: 08/18/2017   Page 303 of 535

education and health care, and reducing congestion and air pollution in federally designated air quality non-attainment areas.

### The Maryland Transit Administration

8.      MTA, a unit within MDOT, is responsible for the development, administration, and operation of transit services throughout the State. In all, MTA provides more than 112 million trips per year. Services operated by MTA include the Maryland Area Regional Commuter ("MARC") train, as well as the light rail transit system, subway system, and local bus systems in the Baltimore area. It also financially supports locally operated transit systems throughout the State.

9.      The Washington Metropolitan Area Transportation Authority ("WMATA") is a Compact entity that is an instrumentality and agency of Maryland, Virginia and the District of Columbia, wholly separate from MTA. WMATA operates the Metrorail subway system in the Washington, D.C. metropolitan area, as well as a regional bus system, known as Metrobus. All three local jurisdictions – Maryland, Virginia, and Washington, D.C. – make significant financial contributions to WMATA, in addition to funding their own respective transportation systems.

10.     MTA's transit services, by design, intersect with each other as well as with WMATA's Metrorail and Metrobus systems and with other transportation

Case 1:17-cv-01811-RJL   Document 52   Filed 03/29/18   Page 31 of 53

Case 1:14-cv-01471-RJL   Document 145-2   Filed 06/02/17   Page 5 of 26
USCA Case #17-5132        Document #1689450        Filed: 08/18/2017      Page 304 of 535

systems, including county-operated bus services and intercity passenger rail

service operated by Amtrak.

    11.    MTA is responsible for the planning and development of the Purple

Line light rail project.

### The Purple Line: Needed to Connect Maryland Communities

    12.    The Purple Line is a light rail transit ("LRT") project that connects

several major activity centers in Maryland, including Bethesda, Silver Spring,

Takoma/Langley Park, College Park (and the University of Maryland), and New

Carrollton.

    13.    The Purple Line is located in the State's two most populous counties,

Montgomery County and Prince George's County ("the Counties").  Together, the

Counties have a population of more than 1.9 million residents, almost one third of

the entire State's population.

    14.    Both Counties have emerged as significant employment centers in

their own right. Between 2010 and 2040, employment is projected to grow by 43

percent in Montgomery County and 32 percent in Prince George's County, while

population is projected to increase in these Counties by 22 percent and 12 percent,

respectively, over the same period.

    15.    The Purple Line is an important element of the economic development

and land use plans of both Montgomery County and Prince George's County.  In

Case 1:17-cv-01811-RJL   Document 52   Filed 03/29/18   Page 32 of 53

Case 1:14-cv-01471-RJL   Document 145-2   Filed 06/02/17   Page 6 of 26
USCA Case #17-5132      Document #1689450        Filed: 08/18/2017    Page 305 of 535

the case of Montgomery County, the Purple Line has been included in some form in the County's land use plans for more than 30 years. These land use plans represent the visions adopted by the Counties, through a public process, for accommodating future growth in population and attracting economic development and jobs to the Counties.

16.    There is strong demand for public transit service in the Purple Line corridor, which contains a large number of residents who do not own a vehicle, particularly in the eastern end of the corridor. But there is no existing east-west Metrorail service in the Purple Line corridor, and east-west bus transit service is often slow and unreliable because it operates on an increasingly congested roadway network.

17.    The Purple Line would greatly improve east-west transit service in the corridor by providing faster, more frequent, and more reliable transit service connecting 21 stations along the 16-mile route. Some of the project's benefits include:

    a) The Purple Line will connect downtown Bethesda and downtown Silver Spring – Montgomery County's largest employment centers – with a 9-minute train ride, far faster than bus service on the region's increasingly congested roads.

Case 1:17-cv-01811-RJL   Document 52   Filed 03/29/18   Page 33 of 53

Case 1:14-cv-01471-RJL   Document 145-2   Filed 06/02/17   Page 7 of 26
USCA Case #17-5132      Document #1689450      Filed: 08/18/2017      Page 306 of 535

b) The Purple Line LRT is projected to serve approximately 60,000 daily riders when it opens in 2022 and that number will grow to more than 74,000 by 2040.

c) More than one billion dollars of new adjacent development has been advanced in New Carrollton, College Park, Silver Spring and Bethesda in anticipation of the Purple Line's completion. These developments will create thousands of additional new construction, retail, and professional jobs.

d) The Purple Line will run through the center of the campus of the University of Maryland at College Park with three on-campus stops and will be accessible to more than 46,000 students, faculty and staff.

e) The Purple Line leverages existing public transportation services by improving the connections among them. In addition to its four connections to the Metrorail system, the Purple Line connects to dozens of local and regional bus routes, two MARC commuter rail stations, and an Amtrak intercity rail station.

f) The design and construction phase of the Purple Line project will create more than 6,300 direct and indirect jobs.

Case 1:17-cv-01811-RJL    Document 52    Filed 03/29/18    Page 34 of 53

Case 1:14-cv-01471-RJL    Document 145-2    Filed 06/02/17    Page 8 of 26
USCA Case #17-5132      Document #1689450      Filed: 08/18/2017    Page 307 of 535

## The Purple Line:  A Key Part of State and Regional Transportation Plans

18.    The Purple Line is also an important part of State and regional

transportation plans for maintaining and expanding all transportation modes.

These plans are required by federal law and adopted through a public process in

accordance with federal requirements.

19.    Maryland's statewide long-range transportation plan, the 2035

Maryland Transportation Plan ("MTP"), addresses all transportation modes and

defines the State's long-term transportation priorities.  One of the plan's goals is to

"Systematically improve transit service connectivity, frequency, extent, quality and

speed to make transit a more attractive modal option," and, specifically, to "Link

the region's inner Beltway employment and housing across its urban centers with

the construction of the Purple Line LRT and interconnect it with WMATA and

local transit services."  2035 Maryland Transportation Plan at 37.

20.    The Metropolitan Washington Council of Governments ("MWCOG"),

which is governed by representatives from Maryland, Virginia, and the District of

Columbia, is responsible for adopting the National Capital Region's metropolitan

long-range transportation plan, known as the Financially Constrained Long-Range

Plan ("CLRP").  The current CLRP dedicates substantial funds for maintaining

existing infrastructure:  $79 billion for major rehabilitation or replacement projects

by 2040, plus another $123 billion for operating and maintaining the system during

Case 1:17-cv-01811-RJL    Document 52    Filed 03/29/18    Page 35 of 53

Case 1:14-cv-01471-RJL    Document 145-2    Filed 06/02/17    Page 9 of 26
USCA Case #17-5132        Document #1689450        Filed: 08/18/2017    Page 308 of 535

the same period. CLRP at 46. But the CLRP also recognizes the importance of

expanding public transit service throughout the region, and includes funding for 76

additional miles of high-capacity public transit, including the 16-mile-long Purple

Line. CLRP at 47. Collectively, the CLRP reflects a regional consensus on the

need to both maintain the existing transportation and invest in expanding capacity

to meet growing demand.

### Federal Review and Approval of the Purple Line

21.    The Purple Line is expected to be funded, in part, with federal funds

administered by the Federal Transit Administration ("FTA") under its Capital

Investment Grants program, commonly known as the New Starts program. As

such, the project required an environmental review under the National

Environmental Policy Act ("NEPA") and other laws and was subject to a

comprehensive financial analysis as required by the New Starts program.

22.    FTA and MTA initiated the preparation of an environmental impact

statement ("EIS") for the Purple Line in 2003, pursuant to NEPA and other federal

and State laws. FTA and MTA issued the Draft EIS for the Purple Line in October

2008 and issued the Final EIS for the Purple Line in August 2013. FTA issued a

Record of Decision ("ROD") approving the project on March 19, 2014.

23.    In 2011, MTA submitted an application to FTA for a $900 million

grant under the New Starts program.

Case 1:17-cv-01811-RJL   Document 52   Filed 03/29/18   Page 36 of 53

Case 1:14-cv-01471-RJL   Document 145-2   Filed 06/02/17   Page 10 of 26
USCA Case #17-5132      Document #1689450      Filed: 08/18/2017   Page 309 of 535

24.    The FTA grant application process included multiple rounds of review by FTA, including a comprehensive assessment of project justification and local financial commitment.  Following this review, the FTA formally recommended approval of the $900 million grant for the Purple Line in June 2016.  In recommending approval, FTA assigned the Purple Line a rating of "Medium-High" for project justification and "High" for local financial commitment, and assigned the project an overall rating of "High."

25.    The final step in the New Starts application process is the execution of the Full Funding Grant Agreement ("FFGA"), which can be signed only after a 30-day review period by Congress.  FTA submitted the FFGA for the Purple Line to Congress for review on July 6, 2016 for the required 30-day review.  The Congressional review was completed without objection.  The execution of the FFGA was scheduled for August 8, 2016, but was postponed after the District Court's order of August 3, 2016.  To date, the FFGA for the Purple Line has not been signed.

**A Federal, State and Local Partnership to Develop the Purple Line**

26.    With a cost of more than $2.447 billion to develop and construct, the Purple Line is the largest transportation construction project ever undertaken by MDOT.

Case 1:17-cv-01811-RJL   Document 52   Filed 03/29/18   Page 37 of 53

Case 1:14-cv-01471-RJL   Document 145-2   Filed 06/02/17   Page 11 of 26
USCA Case #17-5132      Document #1689450      Filed: 08/18/2017   Page 310 of 535

27.    The development of this complex project has involved close collaboration among the federal government, the State, the Counties, and the private sector – with multiple agreements between and among these entities. Circumstances that affect one party's obligations under one agreement can have a ripple effect across multiple other agreements.

28.    The funding for construction of the Purple Line involves substantial financial contributions from federal, State, and County governments, as well as private financing. The requested federal grant of $900 million represents 37% of the estimated $2.447 billion construction cost of the project.

29.    To implement a project of this magnitude, the State has entered into a public-private partnership ("P3") agreement ("P3 Agreement") as well as numerous agreements and memoranda of understanding with the Counties and other parties. The P3 Agreement is described further below.

**Federal Appropriations for the Purple Line**

30.    To date, Congress has appropriated a total $325 million of the $900 million anticipated federal grant for the Purple Line but none has been distributed to the State. The $325 million has been appropriated in three consecutive years as follows:

a)    $100 million was appropriated for the Purple Line in Fiscal Year 2015;

Case 1:17-cv-01811-RJL   Document 52   Filed 03/29/18   Page 38 of 53

Case 1:14-cv-01471-RJL   Document 145-2   Filed 06/02/17   Page 12 of 26
USCA Case #17-5132      Document #1689450      Filed: 08/18/2017   Page 311 of 535

b) an additional $100 million was appropriated for the Purple Line in Fiscal Year 2016; and

c) an additional $125 million was appropriated for the Purple Line in Fiscal Year 2017 through legislation enacted by Congress on May 4, 2017.

31.    The State intends to continue seeking annual appropriations for the remaining amounts of the anticipated $900 million federal grant in the Fiscal Year 2018 appropriations process and in future years until the full amount is appropriated.

32.    The $325 million in appropriated federal funds, including the $125 million in Fiscal Year 2017, cannot be distributed to the State until FTA enters into an FFGA with MTA, and the FTA cannot execute the FFGA until the ROD is reinstated.

33.    In anticipation of being reimbursed the $325 million in funds appropriated over the last three fiscal years, the State has expended that amount in State taxpayer dollars to carryout on-going and long lead-time pre-construction activities, such as real property acquisitions, engineering and design, soil and geotechnical analysis, utility relocations, and community and small business outreach and involvement.

Case 1:17-cv-01811-RJL   Document 52   Filed 03/29/18   Page 39 of 53
Case 1:14-cv-01471-RJL   Document 145-2   Filed 06/02/17   Page 13 of 26
USCA Case #17-5132      Document #1689450      Filed: 08/18/2017      Page 312 of 535

## The Public-Private Partnership Agreement

34.    The use of a P3 agreement to implement a transportation project is authorized under Title 10A of the State Finance and Procurement Article of the Annotated Code of Maryland ("Title 10A"), as a way to finance and operate costly and critical transportation projects.

35.    A P3 agreement is a performance-based contract that places primary design, construction, implementation, and maintenance risk on the private entity, with the aim of achieving the most efficient expenditure of costs and allocation of risk and reward between the State and the concessionaire.  With a P3 agreement, the State remains the owner of, and ultimately accountable for, the public infrastructure asset and its public function.

36.    On November 8, 2013, the State initiated a competitive bid process to select a private partner to finance, develop, design, construct, and supply light rail vehicles for the Purple Line and to operate and maintain the Purple Line for a period of 30 years after operations begin.

37.    Through the three-year bid process, MTA selected Purple Line Transit Partners LLC ("PLTP") as the concessionaire for the Purple Line project and negotiated a P3 agreement with PLTP ("P3 Agreement").  The term of the P3 Agreement is approximately 36 years, consisting of a design-build period of approximately six years followed by an operations and maintenance period of 30

Case 1:17-cv-01811-RJL   Document 52   Filed 03/29/18   Page 40 of 53

Case 1:14-cv-01471-RJL   Document 145-2   Filed 06/02/17   Page 14 of 26
USCA Case #17-5132      Document #1689450      Filed: 08/18/2017   Page 313 of 535

years (through 2052).  At the end of the term of the P3 Agreement, PLTP is required to return the Purple Line to the State in a state of good repair.

38.    The P3 Agreement was presented to the State's Board of Public Works ("BPW"), which consists of three statewide elected officials: the Governor, Treasurer, and Comptroller.  On April 6, 2016, the BPW unanimously approved the P3 Agreement.  The State and PLTP executed the P3 Agreement on April 7, 2016.

39.    Following execution of the P3 Agreement, PLTP took several major steps to begin implementing its obligations under the agreement:

   a)  PLTP first entered into debt and related financing arrangements to perform its financing obligation under the P3 Agreement, discussed in greater detail below;

   b)  PLTP entered into separate design-build contracts and operations-and-maintenance contracts with contractors; and

   c)  PLTP entered into a contract with a rail car manufacturer for the supply of light-rail vehicles for the Purple Line.

40.    On June 17, 2016, the State and PLTP completed the financing of the Purple Line, with PLTP entering into the various debt and financing-related agreements with bond-holders and lenders, including an $875 million loan to PLTP

Case 1:17-cv-01811-RJL   Document 52   Filed 03/29/18   Page 41 of 53

Case 1:14-cv-01471-RJL   Document 145-2   Filed 06/02/17   Page 15 of 26
USCA Case #17-5132       Document #1689450       Filed: 08/18/2017   Page 314 of 535

by the U.S. Department of Transportation under the Transportation Infrastructure Finance and Innovation Act ("TIFIA") program.

41.    The P3 Agreement provides considerable certainty for the State in terms of performance, financial payments and risk.  Following completion of construction, the State pays PLTP a specified amount per year for the next 30 years.  The State maintains oversight of the project throughout the life of the P3 Agreement and may deduct amounts from its payments to PLTP if PLTP does not meet performance standards for operating and maintaining the Purple Line as defined in the P3 Agreement.  This defined payment schedule greatly helps the State with budgeting and planning for other capital projects.

42.    In addition to the Purple Line transitway, PLTP's responsibilities under the P3 Agreement include construction of certain projects funded by the Counties, including the construction of a new Bethesda Station South Entrance to the existing underground Metrorail system, the construction of two jogging/walking/biking trails: (1) a permanent Capital Crescent Trail from Bethesda to Silver Spring, and (2) the Silver Spring Green Trail.  The Bethesda Station South Entrance and Silver Spring Green Trail are independent of the Purple Line but are being built under the same contract for reasons of efficiency and cost savings.

## Initiation of Preconstruction Activities under the P3 Agreement

43.    On April 7, 2016, with FTA's approval, the State authorized PLTP to perform certain "early work" consisting of preliminary design and geotechnical activities and preparation of certain contractual submittals and permit applications. PLTP issued a corresponding limited notice to proceed to its design-build contractor.  The design-build contractor performed this specified early work through June 17, 2016.

44.    On June 17, 2016, MTA gave PLTP full notice to proceed with pre-construction work under the P3 Agreement.

45.    On June 18, 2016, after submitting the required certification that all necessary preconditions had been met, PLTP commenced non-construction activities on the Purple Line.  PLTP then authorized its design-build contractor to commence its non-construction activities.

46.    Since June 18, 2016, PLTP's design-build contractor has been engaged in performing non-construction activities, including engineering work, geotechnical borings, permitting and marking the location of utilities in the Purple Line right-of-way.  In addition, certain other non-construction long lead-time activities also are being carried out by the State, including right-of-way acquisition and relocation activities, which have been under way since approximately May 2014.

Case 1:17-cv-01811-RJL   Document 52   Filed 03/29/18   Page 43 of 53

Case 1:14-cv-01471-RJL   Document 145-2   Filed 06/02/17   Page 17 of 26
USCA Case #17-5132      Document #1689450      Filed: 08/18/2017      Page 316 of 535

47.    Pursuant to the P3 Agreement, PLTP has developed a project schedule that takes into account thousands of factors to develop an efficient and cost-effective plan and critical path to timely complete the Purple Line and the County-Funded Projects. The project schedule has been carefully crafted to satisfy all applicable constraints and interdependencies (including financing requirements) to maximize efficiency and minimize construction costs. The schedule is extremely complex, with almost 6,000 discrete activities that must be coordinated and sequenced over the approximately six-year design and construction period.

### Vacation of FTA's Record of Decision (ROD)

48.    On August 3, 2016, the U.S. District Court for the District of Columbia issued an order ("August 3 Order") finding that FTA was required to prepare a Supplemental EIS under NEPA on a limited issue: to assess the effects of WMATA Metrorail safety and ridership issues on Purple Line ridership. Based on that decision, the District Court vacated FTA's March 2014 ROD for the Purple Line as part of the August 3 Order.

49.    The execution of the FFGA by FTA and MTA for the Purple Line was scheduled for August 8, 2016, but was postponed after the District Court issued the August 3 Order vacating the ROD.

50.    Following the August 3 Order, MTA began performing additional analysis as directed by the District Court to assess the potential effects of Metrorail

Case 1:17-cv-01811-RJL   Document 52   Filed 03/29/18   Page 44 of 53
Case 1:14-cv-01471-RJL   Document 145-2   Filed 06/02/17   Page 18 of 26
USCA Case #17-5132      Document #1689450      Filed: 08/18/2017    Page 317 of 535

safety and ridership issues on Purple Line ridership.  This analysis culminated in a report that MTA submitted to FTA on November 3, 2016.

51.    On August 23, 2016, FTA and MTA filed motions with the District Court asking the court to modify its August 3 Order to allow FTA and MTA the opportunity to conduct a new analysis of Metrorail safety and ridership issues and make a determination as to whether new information requires a Supplemental EIS to be prepared.  FTA and MTA also asked the court to reinstate the ROD while this additional analysis was conducted.

52.    In a November 22, 2016 decision, at the request of FTA and MTA, the District Court modified its August 3, 2016 order to allow FTA and MTA the opportunity to conduct a new analysis of Metrorail safety and ridership issues and make a determination as to whether new information requires a Supplemental EIS to be prepared ("November 22 Order").  The court declined to reinstate the ROD while this analysis was prepared.

53.    In accordance with the District Court's November 22 Order, FTA and MTA prepared an analysis of the effects of Metrorail safety and ridership issues on Purple Line ridership, and concluded that even under extreme and unrealistic assumptions about declining Metrorail ridership, the Purple Line still would have sufficient ridership to qualify for FTA funding and to meet the project's purpose

Case 1:17-cv-01811-RJL   Document 52   Filed 03/29/18   Page 45 of 53

Case 1:14-cv-01471-RJL   Document 145-2   Filed 06/02/17   Page 19 of 26
USCA Case #17-5132      Document #1689450      Filed: 08/18/2017   Page 318 of 535

and need. Based on that analysis, FTA determined that a Supplemental EIS was
not required.

54.     On December 16, 2016, FTA filed its analysis and determination with
the court as required by the November 22 Order. On the same date, FTA and
MTA filed motions asking the court to find that the new analysis was sufficient
and to reinstate the ROD.

55.     As of this date, the FTA's and MTA's motions for summary judgment
remain pending and the ROD remains vacated.

## Harm from Delay in Reinstating the ROD

56.     The continued absence of a ROD has significant, immediate, and
potentially devastating consequences for the Purple Line project and for other State
of Maryland transportation capital and maintenance projects.

57.     In the absence of a ROD, FTA is unable to execute the FFGA, the
vehicle through which FTA can provide the federal funds critical to the project.
Because the ROD remains vacated, the federal funds anticipated for this project
have been delayed now for nine months. MDOT has been advancing State dollars
in lieu of federal funding while anticipating the timely resolution of the litigation
and reinstatement of the ROD and the reimbursement of those advances. MDOT is
rapidly approaching the point at which it cannot continue to advance these funds.

58.     Further, in order to maintain eligibility for FTA funds, MTA is restricted to carrying out only pre-construction activities and is prohibited from proceeding with project construction even with State funds.  Therefore, the ROD remaining vacated is effectively prohibiting the State from moving forward with construction of the project, even with State funds.

59.     As further described below, a delay in construction – if attributed to the District Court decision – would likely give rise to substantial delay claims by PLTP under the terms of the P3 Agreement.

60.     The absence of a ROD also jeopardizes the State's ability to secure federal funding through the annual appropriations process.  As noted above, the FY2017 appropriations bill includes $125 million in funding for the Purple Line, which the State cannot access without reinstatement of the ROD.  With the completion of the FY2017 bill, negotiations in Congress for FY2018 appropriations are beginning and will continue through the summer.  During this time, the absence of a ROD for the Purple Line will jeopardize the State's ability to secure additional federal funding needed and anticipated for the project in FY2018, as well as future years.

### Potential Suspension of Ongoing Activities after June 1, 2017

61.     The State remains firmly committed to the Purple Line, and completion of the Purple Line is one of the State's highest infrastructure priorities.

Case 1:17-cv-01811-RJL   Document 52   Filed 03/29/18   Page 47 of 53

Case 1:14-cv-01471-RJL   Document 145-2   Filed 06/02/17   Page 21 of 26
USCA Case #17-5132      Document #1689450      Filed: 08/18/2017   Page 320 of 535

Nonetheless, without access to the anticipated federal funding for the project, and without any clear indication of when an FFGA may be executed, the State will be compelled to reduce project expenditures by suspending many, if not all, ongoing project activities in the near future, as further described below.

62.    I anticipate that as of June 1, 2017, the State will no longer have sufficient cash flow to continue funding ongoing pre-construction activities. Therefore, if there is no foreseeable path to resolving the litigation, and no reasonable expectation that the ROD will be reinstated, I anticipate that the State will direct PLTP shortly after June 1, 2017 to begin an orderly process of suspending Project activities. In addition, the State will initiate suspension of activities being carried out by the State.

63.    A suspension of ongoing project activities would have severe consequences for the Project. Following a suspension, steps consistent with demobilization would occur. Re-starting project activities in the future – if and when federal funding is obtained – would involve substantial additional delays and increased project costs.

64.    I expect that the suspension of ongoing project activities also would impair the State's ability to obtain additional federal appropriations for the 2018 Fiscal Year, which begins on October 1, 2017. If such appropriations are not

Case 1:17-cv-01811-RJL  Document 52  Filed 03/29/18  Page 48 of 53
Case 1:14-cv-01471-RJL  Document 145-2  Filed 06/02/17  Page 22 of 26
USCA Case #17-5132    Document #1689450    Filed: 08/18/2017   Page 321 of 535

obtained, the delay in obtaining the remaining portions of the federal funding could cause additional delays, increased costs, and possible cancellation of the project.

65.    Following a suspension of ongoing project activities, the State would face the ultimate decision of whether to cancel the project altogether.  While the State has taken and will continue to take all reasonable steps to avoid that outcome, I expect that a decision to cancel the project could occur unless the ROD is reinstated within approximately 60 days following the suspension of ongoing project activities.

### Potential Delay Claims to the State

66.    To date, MTA and PLTP have taken steps to minimize the cost of delay through the re-sequencing of project activities.  However, with the passage of time, opportunities to avoid incurring delay costs have greatly diminished and are nearly exhausted.  MTA anticipates that delay costs will escalate rapidly in the coming months if the ROD is not reinstated.  As described below, those delay costs will likely average $13 million a month.

67.    Under the terms of the P3 Agreement, PLTP has the right to additional compensation if a "Relief Event," as defined in the P3 Agreement, occurs.

68.    On November 14, 2016, pursuant to the P3 Agreement, PLTP provided notice to MTA asserting that the August 3, 2016 District Court order

Case 1:17-cv-01811-RJL   Document 52   Filed 03/29/18   Page 49 of 53

Case 1:14-cv-01471-RJL   Document 145-2   Filed 06/02/17   Page 23 of 26
USCA Case #17-5132      Document #1689450      Filed: 08/18/2017   Page 322 of 535

vacating the ROD for the Purple Line constitutes a Relief Event under the P3

Agreement.

69.   If the State is required to compensate PLTP under the terms of the P3

Agreement, the State (and consequently, its taxpayers) would incur substantial

costs from factors such as:

> a)  additional costs of financing and interest on bonds that have already
>
> been issued for the project (including extension costs on associated
>
> letters of credit);
>
> b)  additional cost escalation and inflation resulting from delaying the
>
> purchasing of materials, additional equipment, and performing work
>
> later;
>
> c)  additional labor costs for State employees and MTA's consultants
>
> (that serve as an extension of MTA staff) who are assisting MTA with
>
> its functions and also performing oversight of PLTP; and
>
> d)  extended overhead for PLTP relating to construction activities.

70.   MTA has not yet made a determination regarding PLTP's claim of a

Relief Event under the P3 Agreement.

71.   MTA has been advised by its project management consultant that the

delay costs to be borne by the State if construction is delayed would be

approximately $13 million per month.  This estimate includes but is not limited to

Case 1:17-cv-01811-RJL   Document 52   Filed 03/29/18   Page 50 of 53

Case 1:14-cv-01471-RJL   Document 145-2   Filed 06/02/17   Page 24 of 26
USCA Case #17-5132      Document #1689450      Filed: 08/18/2017   Page 323 of 535

delay costs that may be owed to PLTP under the P3 Agreement. Based on this monthly estimate, a 12-month delay would result in delay costs in excess of $150 million.

## Potential for Termination of the P3 Agreement

72.     The P3 Agreement gives PLTP certain rights to terminate the P3 Agreement if an "Extended Delay" related to a Relief Event occurs. An Extended Delay is defined to include a delay resulting from a Relief Event that lasts 180 days or more within a 365-day period.

73.     If termination occurs due to an Extended Delay from a Relief Event, in accordance with the P3 Agreement, the State would also have the obligation to make a significant termination payment to PLTP, reimbursing PLTP for costs incurred in performance of the P3 Agreement, including costs relating to the project's financing obtained by PLTP that would otherwise have been spread over the 30-year operating term. If applicable, the termination payments to PLTP plus other termination costs could be in excess of $200 million.

## Total Cost of Delay Resulting in Termination

74.     The potential costs to Maryland taxpayers if the project were delayed for an extended period and then shut down could exceed $800 million. This estimate includes:

Case 1:17-cv-01811-RJL   Document 52   Filed 03/29/18   Page 51 of 53

Case 1:14-cv-01471-RJL   Document 145-2   Filed 06/02/17   Page 25 of 26
USCA Case #17-5132     Document #1689450     Filed: 08/18/2017   Page 324 of 535

a)  the State's total investment in the Purple Line project to date, which is

approximately $545 million, consisting of approximately $325 million

in FY2016 and $220 million in prior fiscal years;

b)  the potential delay costs, which are an estimated $13 million per

month, and therefore would be in the range of $150 million over a 12-

month period; and

c)  the potential termination costs under the P3 Agreement and other

agreements could be in excess of $200 million.

75.   In addition, any investments made by Prince George's County and

Montgomery County may be lost.

### Additional Injury to Citizens of Maryland

76.   In addition to the potential costs to Maryland taxpayers, a delay in the

start of construction or termination of the project will delay or deprive the many

benefits of the project to the citizens of Maryland as described above.

77.   As one example, the project is causing eight bridges in the Counties to

be replaced.  Several of these bridges are structurally deficient and major

maintenance or replacement was put on hold by the Counties pending the project.

The project delay has recently forced Montgomery County to close Talbot Avenue

to traffic.  This bridge is one of four that provides an important link to Lyttonsville,

Case 1:17-cv-01811-RJL   Document 52   Filed 03/29/18   Page 52 of 53

Case 1:14-cv-01471-RJL   Document 145-2   Filed 06/02/17   Page 26 of 26
USCA Case #17-5132      Document #1689450      Filed: 08/18/2017      Page 325 of 535

Maryland. Emergency vehicles and school buses will now have to take longer routes to reach their destinations.

78.     Termination payments required under the P3 Agreement would need to be paid from taxpayer dollars. Given the potential magnitude of those payments, it would be necessary to cancel or delay a like amount in in transportation projects statewide, which could amount to hundreds of millions of dollars. In effect, the cancellation of the Purple Line would have an immediate and devastating negative effect on transportation funding for projects across the entire State.

I declare under penalty of perjury that the foregoing is true and correct.


Executed in ＭＡＲＹＬＡＮＤ   on May 12, 2017.


Pete K. Rahn

25

JA0817

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that this 29th day of March 2018, a true and correct copy of the foregoing Plaintiffs' Memorandum Of Law In Opposition To Defendants' Rule 12(B)(1) Motions To Dismiss a was served on the defendants by electronically sending a copy to their attorney of record through the CM/ECF filing system in the Court:

Counsel for Department of Justice ("DOJ") and Federal Transit Authority ("FTA"):

Tyler Burgess, Esq.
U.S. Department of Justice
Tyler.burgess@usdoj.gov

Counsel for Maryland Transit Administration (MTA):

Julie Sweeney, Esq.
Assistant Attorney General
jsweeney@sha.state.md.us

Albert M. Ferlo, Esq.
Perkins Coie LLP
aferlo@perkinscoie.com

David W, Brown