# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

FRIENDS OF THE CAPITAL CRESCENT )
TRAIL, *et al.*, )
 )
        Plaintiffs, )
 )
v. )  Civil Case No. 17-1811 (RJL)
 )
FEDERAL TRANSIT ADMINISTRATION, )
*et al.*, )
 )
        Defendants. )

**FILED**

MAR - 5 2019

Clerk, U.S District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION
(March __5__, 2019) [Dkt. ## 49, 50]

Plaintiffs Friends of the Capital Crescent Trail ("FCCT"), John MacKnight Fitzgerald, Christine Real De Azua, and Anna C. Haac (collectively, "plaintiffs") filed this suit against the Federal Transit Administration ("FTA"), the United States Department of Transportation, and the Maryland Department of Transportation (collectively, "defendants") to stop construction of a 16.2-mile light rail transit project in Montgomery and Prince George's Counties, Maryland. The project, known as the Purple Line project, is being funded in part by a grant from the federal government, and plaintiffs allege that the grant was issued in violation of federal law.

This, of course, is not plaintiffs' first foray in their fight against the Purple Line. In August 2014, FCCT and two of the three individual plaintiffs in this case brought a "challenge[] under the National Environmental Policy Act to Maryland's proposed 'Purple

Line' light rail project." *Friends of Capital Crescent Trail v. FTA*, 877 F.3d 1051, 1054 (D.C. Cir. 2017) ("*FCCT I*"). Our Circuit Court ultimately rejected that challenge. *See id.* at 1066. And shortly after the Court permitted FTA to proceed, the agency committed approximately $900 million to Maryland's project. *See* Am. Compl. ¶¶ 46, 69 [Dkt. # 45]. Undaunted, plaintiffs filed this new suit upon learning that FTA had issued its grant, and defendants have now moved to dismiss all pending claims.

Unfortunately for the plaintiffs, this second attempt to stop the Purple Line fares no better than their first. A suit like this one, which raises Administrative Procedure Act ("APA") challenges to determinations made by a federal agency, may proceed only if plaintiffs are timely seeking review of a final agency action and only if plaintiffs' standing to sue arises from an injury that falls arguably within the zone of interests protected by the statute the agency is alleged to have violated. The claims in plaintiffs' amended complaint each fail one of these requirements. Accordingly, defendants' motions to dismiss this suit must be GRANTED.

## BACKGROUND

In 2003, Maryland applied for federal funding to support its Purple Line project through FTA's "New Starts" program. *See FCCT I*, 877 F.3d at 1055. The "New Starts" program, governed by 49 U.S.C. § 5309, supports public transit systems, including rapid rail, light rail, commuter rail, bus rapid transit, and ferry systems, throughout the country.[1]

---

[1] In 49 U.S.C. § 5309, Congress authorizes the Secretary of Transportation to issue grants to support public transit systems. *See* 49 U.S.C. § 5309(b). The Secretary of Transportation has delegated her authority under Section 5309, including her authority to administer the "New Starts" program, to FTA. *See* 49 C.F.R.

2

*See* Major Capital Investment Projects, 78 Fed. Reg. 1992, 1993 (Jan. 9, 2013). State and local governmental authorities are permitted to submit "New Starts" applications, which undergo several phases of FTA review and are evaluated according to statutorily prescribed criteria before federal funds are committed to any project. *See* 49 U.S.C. § 5309. When an application for a "new fixed guideway capital project," like the Purple Line, passes the required evaluations, FTA awards a full funding grant agreement ("FFGA") to the applicant. *Id.* § 5309(k). The FFGA commits federal funds to support the applicant's project. *See id.*

One prerequisite for an FFGA is the applicant's "completion of [the] activities required under the National Environmental Policy Act of 1969" ("NEPA"). 49 U.S.C. § 5309(d)(2)(A) (citing 42 U.S.C. § 4321 *et seq.*). These activities must be completed during the initial "project development" phase of a "New Starts" application, and in the case of the Purple Line, FTA certified Maryland's completion of NEPA's requirements in a March 2014 record of decision ("ROD"). *See FCCT I*, 877 F.3d at 1056-57. The ROD touched off the first round of litigation about the Purple Line's environmental impact but did not ultimately derail Maryland's application. *See id.* In late August 2017, after our Circuit "reinstated [the ROD] pending appeal," Order at 2, *FCCT I*, No. 17-5132 (D.C. Cir. July 19, 2017), FTA issued an FFGA committing about $900 million in grant money to Maryland's Purple Line project, Am. Compl. ¶¶ 46, 69.

---

§ 1.91(a) ("The Federal Transit Administrator is delegated authority to carry out . . . Chapter 53 of title 49, United States Code, and notes thereto."); *see also* 49 U.S.C. § 322; 49 C.F.R. § 1.90(a).

Within days, plaintiffs filed this lawsuit and moved for a temporary restraining order, seeking to prevent Maryland from starting construction of the Purple Line. *See* Compl. at 36 [Dkt. # 1]; Mot. for Temp. Restraining Order [Dkt. # 2]. Maryland's Department of Transportation agreed not to begin the challenged construction work until a motion for a preliminary injunction could be briefed and heard. *See* Order at 2-3 (Sept. 8, 2017) [Dkt. # 14]. On September 22, 2017, having held hearings on both the temporary restraining order and the preliminary injunction, I denied plaintiffs' requests for interim relief and allowed construction to begin. *See* Mem. Order at 5 (Sept. 22, 2017) [Dkt. # 28]. In my Order denying plaintiffs' motions, I expressed doubt that plaintiffs could prove the two violations of 49 U.S.C. § 5309 they were asserting at the time, and I noted the substantial "jurisdictional 'impediments to even reaching the merits' of [either] claim." *Id.* at 3-4 (quoting *Munaf v. Geren*, 553 U.S. 674, 690 (2008)).

Defendants then moved to dismiss the complaint. Plaintiffs amended their pleading in response and now raise six claims, each brought pursuant to Section 706 of the APA, 5 U.S.C. § 706. *See* Am. Compl. ¶¶ 106, 111, 127, 134, 139, 151. Plaintiffs allege that, by funding and beginning construction of the Purple Line, defendants have violated "49 U.S.C. § 5309, 49 U.S.C. § 303; . . . 54 U.S.C. §§ 306108, 306113; [and] Sections 101 and 102 of NEPA." *Id.* at 48; *see also id.* ¶¶ 96-151. Defendants filed new motions[2] to dismiss, arguing that the amended complaint still does not state a claim upon which relief can be

---

[2] The federal defendants—FTA and the United States Department of Transportation—jointly filed a motion to dismiss [Dkt. # 49], and the Maryland Department of Transportation filed a separate motion to dismiss [Dkt. # 50]. The motions raise materially identical arguments.

4

granted that falls within this Court's jurisdiction, and their motions are ripe.

## STANDARD OF REVIEW

Defendants' motions to dismiss raise arguments under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

"Under Rule 12(b)(1), 'the plaintiff bears the burden of establishing the factual predicates of jurisdiction by a preponderance of the evidence.'" *Hunter v. FERC*, 569 F. Supp. 2d 12, 15 (D.D.C. 2008) (quoting *Lindsey v. United States*, 448 F.Supp.2d 37, 42 (D.D.C.2006)). "[T]he Court 'must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiffs,'" but because "the inquiry focuses on the Court's power to hear the claim, the Court may give the plaintiff's factual allegations closer scrutiny and may consider materials outside the pleadings." *Logan v. Dep't of Veterans Affairs*, 357 F. Supp. 2d 149, 153 (D.D.C. 2004) (quoting *Fitts v. Federal Nat'l Mortgage Ass'n*, 44 F.Supp.2d 317, 321 (D.D.C.1999)).

"The court will only dismiss a complaint under Rule 12(b)(6) for failure to state a claim if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Logan*, 357 F. Supp. 2d at 153 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Plaintiffs must be "grant[ed] . . . the benefit of all inferences that can be derived from the facts alleged," but "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). "[L]egal conclusions cast in the form of factual allegations" likewise need not be accepted

by a court deciding whether a claim satisfies Rule 12(b)(6). *Id.*

## ANALYSIS

In this second attempt to stop the Purple Line project, plaintiffs' have reframed their claims, added new factual allegations, and alleged additional errors by the agencies overseeing the project. Unsurprisingly, however, they brought their strongest case the first time around. All of plaintiffs' refashioned claims must be dismissed.

### I. Plaintiffs' Alleged Injuries Do Not Fall Within the Zone of Interests Protected or Regulated by the Asserted Provisions of the Federal Transit Act

In Counts One through Four of their amended complaint, plaintiffs allege that, by granting funds to support the Purple Line project, FTA violated four provisions of the Federal Transit Act: 49 U.S.C. § 5309(f)(1)(C), (f)(1)(B), (d)(2)(A), and (k)(5). To state these claims—APA claims alleging that a federal agency violated a controlling statutory directive—plaintiffs must allege facts establishing that they have standing to bring their claims and that the injury giving rise to their standing falls "arguably within the zone of interests to be protected or regulated by the [allegedly violated] statute."[3] *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970). Defendants argue that plaintiffs' Section 5309 claims fail both of these requirements. They

---

[3] The zone of interests inquiry has, in past cases, been referred to as a question of prudential standing. But since the Supreme Court clarified that "prudential standing is a misnomer as applied to the zone-of-interests analysis," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (quotation marked omitted), motions to dismiss claims for failing the zone of interests test have been evaluated under Federal Rule of Civil Procedure 12(b)(6), rather than Rule 12(b)(1), *see Maiden Creek Assocs. v. U.S. Dep't of Transp.*, 823 F.3d 184, 189 n.1 (3d Cir. 2016) ("[W]e must analyze . . . dismissal under Rule 12(b)(6) because the issue is whether appellants alleged harm that falls within NEPA's zone of interests, a question of statutory standing.").

6

are certainly correct about the second one: The interests underlying plaintiffs' standing are not protected by the asserted provisions of the Federal Transit Act.

## A. Article III Standing

All parties invoking the jurisdiction of a federal court must satisfy "the irreducible constitutional minimum of standing" to bring their suit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Doing so requires pleading three elements. *See id.* Putative plaintiffs "must have suffered an injury in fact," must allege "a causal connection between the injury and the conduct complained of," and must seek relief rendering it "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561-62 (quotation marks omitted). "[T]here is no justiciable case or controversy" under Article III of the Constitution unless plaintiffs sufficiently allege all three elements. *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017).

Here, plaintiffs try to meet this burden in two ways. First, the individual plaintiffs allege that they use WMATA's Metrorail system and that the Purple Line Project will harm Metrorail by competing for funds, resources, and personnel. *See, e.g.*, Am. Compl. ¶¶ 7, 13. Second, all plaintiffs allege that Purple Line construction has caused the closure of the Georgetown Branch of the Capital Crescent trail and claim they are harmed because the trail, which prior to construction served as "a serene, natural refuge inside the Beltway," can no longer be used for walks, bike rides, and other enjoyment. *Id.* ¶¶ 3, 7, 17.

The first set of allegations, those about Metrorail, are largely abandoned in plaintiffs' opposition to the motions to dismiss their amended complaint. But regardless

of whether the argument is preserved, use of Metrorail does not give plaintiffs standing to bring the claims alleged in this suit. First, plaintiffs do not adequately plead causation. Plaintiffs do not and cannot allege that issuance of the Purple Line FFGA caused the "electrical fires and other failures hampering timely and safe," Am. Compl. ¶ 7, use of the independently funded Metrorail system. They have already taken the position that those alleged harms to Metrorail users long predate the funding and construction of the Purple Line. *See FCCT I*, 877 F.3d at 1057. And plaintiffs' claim that the Purple Line will cause a "scarcity of the personnel, management, and material needed to repair, operate and maintain" Metrorail, *id.* ¶ 13, is wholly conclusory, lacking any factual allegations to lend plausibility to the prediction. Second, it is unclear how plaintiffs obtaining the relief they seek in this suit—an order setting aside the FFGA, enjoining construction of the Purple Line, requiring Maryland to restore the Capital Crescent Trail, and awarding attorneys' fees to plaintiffs—could improve Metrorail. Rescinding the FFGA will not divert any funds to Metrorail, and again, plaintiffs plead no facts plausibly connecting Maryland's Purple Line construction to maintenance or improvement of WMATA's system. Even if plaintiffs were to obtain all the relief they seek in this case, no defendant would be obligated to pay additional money to WMATA. So the allegations in plaintiffs' amended complaint do not establish that any Metrorail-based injury is caused by FTA's alleged statutory violations or would likely be cured by plaintiffs' requested relief. Two of the three elements needed to demonstrate Article III standing are missing.

Plaintiffs' use of the Georgetown Branch of the Capital Crescent trail fares better in

the constitutional standing analysis. Impairments to a person's enjoyment of nature do indeed constitute an injury in fact. *See Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 n.4 (1986); *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996). And for this injury, plaintiffs plausibly allege both causation and redressability. According to the amended complaint, the Georgetown Branch was closed to allow Purple Line construction to commence, and that construction, which is being funded through the FFGA, will materially alter the trail. *See* Am. Compl. ¶¶ 85, 117. Plaintiffs' allegations thus draw a direct causal line from FTA's allegedly unlawful funding of the Purple Line to plaintiffs' inability to use and enjoy the Georgetown Branch. That inability to use the trail can be redressed, moreover, by an order vacating the project's funding or enjoining construction. *See* Am. Compl. at 48-50. If Maryland loses $900 million in Purple Line funding, construction will likely stop, and the impairments to plaintiffs' use of the trail, which are an alleged result of the ongoing construction, will be removed. In their allegations about the Georgetown Branch, plaintiffs assert an injury that is caused by defendants' unlawful conduct and that can be cured through the relief requested in this suit. That injury thus gives plaintiffs Article III standing.

B.     **The Zone of Interests Protected or Regulated by Section 5309**

A plaintiff "suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224

9

(2012) (quoting *Data Processing*, 397 U.S. at 153). While this additional test "is not meant to be especially demanding," it does "den[y] a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399 (1987). This is where plaintiffs' first four claims run into trouble.

The zone of interests inquiry "requires [courts] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). Congress eliminates much of the "guesswork" from this determination when it codifies a "detailed statement of the statute's purposes." *Id.* at 131. And Congress did so here, enumerating eight specific purposes for the relevant provisions of the Federal Transit Act, all of which relate to developing, improving, and maintaining public transportation systems.[4] *See* 49 U.S.C. § 5301(b). The environment is not

---

[4] The statute identifies the following purposes:

> (1) provide funding to support public transportation; (2) improve the development and delivery of capital projects; (3) establish standards for the state of good repair of public transportation infrastructure and vehicles; (4) promote continuing, cooperative, and comprehensive planning that improves the performance of the transportation network; (5) establish a technical assistance program to assist recipients under this chapter to more effectively and efficiently provide public transportation service; (6) continue Federal support for public transportation providers to deliver high quality service to all users, including individuals with disabilities, seniors, and individuals who depend on public transportation; (7) support research, development, demonstration, and deployment projects dedicated to assisting in the delivery of efficient and effective public transportation service; and (8) promote the development of the public transportation workforce.

49 U.S.C. § 5301(b).

mentioned. *See id.* Congress also enacted a declaration of policy, which again makes clear that Congress intended the statute to promote the development and revitalization of public transportation systems. *See id.* § 5301(a) ("It is in the interest of the United States, including the economic interest of the United States, to foster the development and revitalization of public transportation systems with the cooperation of both public transportation companies and private companies engaged in public transportation."). Like the list of purposes, Congress's declaration of policy omits any reference to environmental interests.

To be sure, in APA cases, the zone of interests inquiry turns on "the particular provision of law upon which the plaintiff relies," rather than the "the overall purpose of the Act in question." *Bennett v. Spear*, 520 U.S. 154, 175-76 (1997). But the purposes listed in 49 U.S.C. § 5301 do not apply broadly to the whole Federal Transit Act. The list is specific to one chapter of the statute—the chapter in which Congress authorized the fixed guideway capital investments grants disbursed through FTA's "New Starts" program. *See* 49 U.S.C. § 5301. And the omission of any reference to the environment in the purposes applicable to that chapter is all the more striking in light of the several other chapters of the Federal Transit Act for which Congress did identify a purpose or underlying policy related to the environment. *See* 49 U.S.C. § 5101 ("The purpose of this chapter is to protect against the risks to life, property, and the environment that are inherent in the transportation of hazardous material in intrastate, interstate, and foreign commerce."); 49 U.S.C. § 5501(a) ("It is the policy of the United States Government to develop a National

Intermodal Transportation System that is economically efficient and environmentally sound . . . ."); 49 U.S.C. § 6101 ("The purposes of this chapter are[] (1) to enhance public safety; (2) to protect the environment . . . .").

Moreover, even a statute's general purposes are relevant "insofar as they . . . help reveal [Congress's] purpose in enacting the particular provision" at issue in a case. *Grand Council of Crees (of Quebec) v. FERC*, 198 F.3d 950, 956 (D.C. Cir. 2000). Given that the unambiguous and overriding point of the Federal Transit Act chapter at issue here is funding and improving public transportation systems, the specific provisions underlying plaintiffs' first four claims cannot be read to suggest that plaintiffs' environmental injuries fall within the zone of interests the provisions protect.

The provisions underlying Counts One, Two, and Four of the amended complaint have nothing to do with the environment at all. They direct FTA to ensure (i) that "local resources are available to recapitalize, maintain, and operate" a "proposed public transportation system," 49 U.S.C. § 5309(f)(1)(C); (ii) that "each proposed local source of capital and operating financing is stable, reliable, and available," *id.* § 5309(f)(1)(B); and (iii) that "[n]otification [is sent] to Congress" at least thirty days before the Secretary of Transportation issues an FFGA, *id.* § 5309(k)(5). The first two provisions funnel federal funds toward those projects that have the local support needed to keep a transit system maintained and running over time. The third provision simply requires that Congress be notified before FTA commits federal funds to a project through an FFGA. Consistent with Section 5309's purposes, these three provisions regulate the funding of public

transportation systems and help direct funds to the projects most likely to thrive. None of the three implicate, protect, or regulate environmental interests.

In Count Three, plaintiffs allege that FTA violated 49 U.S.C. § 5309(d)(2)(A), a provision that *does* mention the environment. But the references to the environment in Subparagraph 5309(d)(2)(A) "must be read in context," *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (quoting *General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581, 596 (2004)), and must not be interpreted to "thwart the congressional goal" expressed in the statute, *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277, 284 (D.C. Cir. 1988). When so read and interpreted, the statutory language indicates that Congress intended for plaintiffs' alleged environmental injuries to fall within the zone of interests protected by NEPA, not the zone protected by Subparagraph 5309(d)(2)(A).

Subparagraph 5309(d)(2)(A) prescribes certain requirements that must be met before "[a] new fixed guideway capital project may advance to the engineering phase" of FTA's "New Starts" program. 49 U.S.C. § 5309(d)(2)(A). As relevant here, the applicant must have "complet[ed] [the] activities required under [NEPA]," and the Secretary of Transportation must determine that the proposed project is "justified based on a comprehensive review" of certain criteria, including "the project's environmental benefits." *Id.* The provision ensures that all environmental information needed to comply with NEPA and to determine that a proposed project is justified and feasible is developed "[c]oncurrent[ly]," during FTA's initial review phase. *Id.* § 5309(d)(1)(B). Indeed, every environmental determination mandated by Subparagraph 5309(d)(2)(A) relies on

information developed through the incorporated NEPA process. *See id.* § 5309(d); 49 C.F.R. § 611.203. That process "culminates in a [ROD]," which is a final agency action that can be—and in the case of the Purple Line project was—challenged in court. *FCCT I*, 877 F.3d at 1055. Subparagraph 5309(d)(2)(A) does, therefore, reflect Congress's intent to permit parties who suffer environmental harms caused by "New Starts" projects to challenge those projects in court—*under NEPA*.

But for plaintiffs' Subparagraph 5309(d)(2)(A) claim to proceed, Congress must have gone further. Congress must have granted parties asserting environmental injuries the right to bring an APA challenge under Subparagraph 5309(d)(2)(A) *separate and apart from* plaintiffs' recognized, but already exhausted, right to challenge FTA's approval under NEPA. The statute does not bear this reading.

For one thing, plaintiffs' reading of Subparagraph 5309(d)(2)(A) is contrary to Section 5309's purposes. It gives plaintiffs two chances to litigate objections that are based on the sort of environmental interests Congress conspicuously omitted from the Section's enumerated purposes. And it does so unnecessarily. Plaintiffs' reading of Subparagraph 5309(d)(2)(A) does not expand the class of "suitable advocates of the environmental interests," *Hazardous Waste Treatment Council*, 861 F.2d at 285, potentially affected by a "New Starts" project because those advocates may already challenge the project under NEPA. It instead permits redundant attempts to block Section 5309 grants, thereby "distort[ing] [a] regulatory process," *id.*, enacted to promote public transit funding, and "thwart[ing] th[at] congressional goal," *id.* at 284.

More importantly, plaintiffs' reading cannot be squared with the text of the statute. Subparagraph 5309(d)(2)(A) contains only one reference to the environment that is not simply an incorporation of NEPA obligations: FTA must perform a "comprehensive review of" a proposed "project's environmental *benefits*," among other factors, to determine that the project is "justified." 49 U.S.C. § 5309(d)(2)(A)(iii) (emphasis added). Congress's decision to limit this extra-NEPA environmental review to a project's "benefits" is telling, as other factors FTA must consider in the same "comprehensive review" are not so limited. *See id.* (requiring that the "comprehensive review" take into account the "economic development *effects* associated with the project" (emphasis added)). The "benefits" limitation makes clear that Congress intended for this environmental review to be narrower than the "'hard look' at the [project's] environmental *effects*" required by NEPA. *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 75 (D.C. Cir. 2011) (emphasis added). And it makes clear that FTA's determination of whether a project is justified should not take into account any environmental *injuries* potentially caused by a project— meaning the alleged harms that give plaintiffs Article III standing in this case are relevant only to compliance with NEPA. The review of environmental "benefits" required by Subparagraph 5309(d)(2)(A) cannot therefore be understood to implicate environmental interests beyond those imported by Congress's incorporation of NEPA into the same subparagraph. The statutory language establishes that Congress intended for plaintiffs alleging environmental harms from "New Starts" projects to sue FTA for violations of NEPA, but not for violations of Subparagraph 5309(d)(2)(A) itself.

15

So plaintiffs' first four claims must all be dismissed. Congress enumerated specific purposes for the Federal Transit Act provisions underlying those four claims, and none of them relate to preserving the environment. The text of three of the provisions do not address the environment in any way, and the fourth does not implicate environmental interests beyond those protected by NEPA. Accordingly, plaintiffs' alleged environmental injuries are not within the zone of interests protected by the statutory provisions they allege FTA to have violated in their first four claims.

## II. Count Five Is Time-Barred

In Count Five, plaintiffs allege that FTA failed to account for the Purple Line project's adverse effects on certain historic sites, in violation of the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 306108, 306113, and Section 4(f) of the Department of Transportation Act of 1966 ("DTA"), 49 U.S.C. § 303. This claim cannot proceed because the time to raise it expired well before plaintiffs filed this lawsuit.

FTA made its determinations about the Purple Line project's potential adverse effects on historic sites in 2014. That year, it issued a "Section 4(f) *de minimis* impact determination," certifying Purple Line's compliance with Section 4(f) of the DTA, and entered into a "Section 106 Programmatic Agreement," in compliance with Section 106 of the NHPA. Limitation on Claims Against a Proposed Public Transportation Project, 79 Fed. Reg. 18,113, 18,113-14 (Mar. 31, 2014). After finalizing these determinations, FTA published notice of them in the Federal Register on March 31, 2014. *See id.*

The Federal Register notice is clear about its scope and its consequences. In the

notice, FTA expressly identified the "Section 4(f) *de minimis* impact determination" and the "Section 106 Programmatic Agreement" as approvals subject to the notice and explained that the legal bases for its approvals included "Section 4(f) of the Department of Transportation Act of 1966 [49 U.S.C. 303]" and "Section 106 of the National Historic Preservation Act [16 U.S.C. 470f]."[5] 79 Fed. Reg. at 18,114. Upon publication of the notice, the statute of limitations began to run on any legal claim challenging the identified determinations, *see* 23 U.S.C. § 139(l)(1), and FTA made this clear as well, explaining, "The purpose of this notice is to . . . activate the limitation on any claims that may challenge these final environmental actions," 79 Fed. Reg. at 18,114.

The limitations period triggered by FTA's notice expired 150 days after its publication. *See* 23 U.S.C. § 139(l)(1) ("[A] claim arising under Federal law seeking judicial review of a permit, license, or approval issued by a Federal agency for a highway or public transportation capital project shall be barred unless it is filed within 150 days after publication of a notice in the Federal Register announcing that the permit, license, or

---

[5] Plaintiffs' amended complaint alleges violations of 54 U.S.C. §§ 306108 and 306113, rather than 16 U.S.C. § 470f. *See* Am. Compl. ¶¶ 136-38. The distinction in the United States Code citations in FTA's notice and plaintiffs' amended complaint is primarily due to a nonsubstantive recodification of the relevant provision of the NHPA: As of December 19, 2014, "Section 106 of the NHPA," which was "[f]ormerly cited as 16 U.S.C. § 470f," is "now cited as 54 U.S.C. § 306108." *WildEarth Guardians v. Provencio*, 272 F. Supp. 3d 1136, 1165 & nn.5-6 (D. Ariz. 2017); *see also* Act of Dec. 19, 2014, Pub. L. 113-287, 128 Stat. 3094, 3227. While plaintiffs also cite 54 U.S.C. § 306113, Section 110 of the NHPA, in their amended complaint, that provision "'does not affirmatively mandate the preservation of historic buildings or other resources' and only requires an agency 'to comply to the fullest extent possible with, and in the spirit of, the Section 106 consultation process.'" *National Parks Conservation Ass'n v. Semonite*, 311 F. Supp. 3d 350, 380 (D.D.C. 2018) (quoting *Oglala Sioux Tribe v. United States Army Corps of Engineers*, 537 F.Supp.2d 161, 173 (D.D.C. 2008)). The citation to 54 U.S.C. § 306113 does not, therefore, raise an allegation that FTA violated any independent statutory duty, beyond those imposed by Section 106 of the NHPA.

approval is final pursuant to the law under which the agency action is taken . . . ."). This means that legal challenges to the approvals identified in the notice had to be raised by August 28, 2014, more than three years *before* plaintiffs filed this suit on September 5, 2017. And because plaintiffs point to no final agency action taken under Section 4(f) of the DTA or any provision of the NHPA that postdates the determinations identified in the March 31, 2014 notice, plaintiffs' APA claim alleging violations of those statutes is subject to that long-expired statute of limitations.

As such, Count Five of the amended complaint is time-barred, and must be dismissed. *See Jones v. Bock*, 549 U.S. 199, 215 (2007) ("If the allegations . . . show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim . . . .").

### III. Count Six Does Not Challenge a Final Agency Action

Finally, in Count Six of the amended complaint, plaintiffs allege that defendants "have breached binding mitigation commitments contained in the Record of Decision" by, for example, "failing to have copies of, let alone enforce, the Transportation and Environmental Compliance Plans" referred to in the ROD's table of commitments. Am. Compl. ¶¶ 141-42. Like plaintiffs' other claims, Count Six was brought pursuant to the APA. *See id.* ¶ 151. And as with any APA claim, "for a court to have jurisdiction" to decide it, the claim "must challenge a final action of an agency." *Independent Petroleum Ass'n of America v. Babbitt*, 235 F.3d 588, 594 (D.C. Cir. 2001). Count Six does not do this.

"[G]eneral deficiencies in compliance" with an agency's obligations "lack the specificity requisite for agency action" and do not therefore give rise to APA claims. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 66 (2004); *see also Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) ("Because an on-going program or policy is not, in itself, a final agency action under the APA, our jurisdiction does not extend to reviewing generalized complaints about agency behavior." (quotation marks omitted)). This is true when the agency's obligations flow from a statute, *see Norton*, 542 U.S. at 65-67, and it is just as true when the obligations stem from commitments made in a prior agency action, *see Village of Bald Head Island v. United States Army Corps of Engineers*, 714 F.3d 186, 195 (4th Cir. 2013). As the Fourth Circuit has explained, an agency's "approval, not [its] subsequent activities in carrying it out, [i]s the final agency action." *Id.* "'[P]roject implementation' is neither 'agency action' nor 'final' agency action subject to judicial review under the APA." *Id.*

This limit on judicial review applies squarely to plaintiffs' Count Six. Plaintiffs allege that defendants are breaching obligations imposed by FTA's ROD "as they proceed with construction activities." Am. Compl. ¶ 141. While the ROD is a final agency action subject to judicial review, implementing or carrying out—or, as plaintiffs put it, "follow[ing] through on," Pls.' Mem. in Opp. to Defs.' Rule 12(b)(6) Mot. to Dismiss at 15 [Dkt. 51]—commitments contained in the ROD during ongoing construction is not. *See Bald Head Island*, 714 F.3d at 195. Because Count Six is not a challenge to a final agency action, it too must be dismissed.

## CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motions to dismiss plaintiffs' amended complaint with prejudice. An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge